In re WRT ENERGY CORPORATION, Debtor.

WRT Creditors Liquidation Trust, Plaintiff,

v.

WRT Bankruptcy Litigation Master File Defendants, Defendants.

Bankruptcy No. 96–50212. Adversary No. 98–5445.

United States Bankruptcy Court, W.D. Louisiana, Lafayette–Opelousas Division.

Aug. 24, 2001.

**350**

Paul N. Debaillon, Lafayette, LA, Gerald F. Slattery, Jr., New Orleans, LA, Mitchell A. Seider, Houston, TX, Jeffrey S. Sabin, New York City, Paul J. Goodwine, New Orleans, LA, Milling, Benson, Woodward, Lafayette, LA, David R. Dyer, New Orleans, LA, Michael L. Schein, Schulte, Roth & Zabel, LLP, New York City, Mark S. Farha, Dallas, TX, Lisa Dianne Hollbrook, Oklahoma City, OK, for WRT Energy Corp.

Charles H. Robertson, Dallas, TX, Douglas S. Draper, New Orleans, LA, Robein Ronquillo De Leo, Mandeville, LA, Daniel H. Golden, New York City, for DIP.

### REASONS FOR DECISION

GERALD H. SCHIFF, Chief Judge.

### I. INTRODUCTION

WRT Energy Corporation, Inc. ("WRT" or "Debtor"), filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code [1] on February 14, 1996 ("Petition Date"), and on that day an order for relief was duly entered. On May 5, 1997, an order was entered confirming the Modified Second Amended Joint Plan of Reorganization Under Chapter 11 of the United States Bankruptcy Code ("Plan"). The Plan has now become effective.

#### A. *Litigation*

Pursuant to the Plan, the WRT Creditors Liquidation Trust ("Trust") was created to litigate and liquidate certain claims held by the Debtor. The Trust filed hundreds of complaints, which, for the purposes of this proceeding, generally fell into two categories—

● The Fraud Actions. The Trust filed some 17 complaints against over 90 parties alleging the Trust's right of recovery pursuant to various theories, including the avoidance of fraudulent conveyances under § 548, and miscellaneous state law remedies pursuant to § 544(a).

● The Preference Actions. Asserting rights to avoid pre-petition transfers under § 547(b), the Trust filed over 400 complaints seeking to recover what is referred to as "voidable preferences."

Although § 548 and the various state law causes of action contain several varied theories under which the Trust might recover, the insolvency of the Debtor at the time various transfers occurred was a common thread which linked all of the Fraud Actions. Accordingly, the court decided to consolidate the Fraud Actions for the purpose of determining the issue of the Debtor's insolvency at various points in time.

The common thread of the Debtor's insolvency, however, was also weaved into the Preference Actions as the point in time of the Debtor's insolvency was a necessary

1. Title 11, United States Code. References herein to the Bankruptcy Code appear as " § ____" or "section ____."

element of proof under § 547. Not wishing to try this issue piecemeal, the court entered an order in the Preference Actions requiring that each preference defendant desiring to rebut the presumption of insolvency under § 547(f) "opt in" to the consolidated case for the purpose of determining if and when the Debtor was or became insolvent. Several of the preference defendants chose to opt in and became part of the consolidated trial. Any preference defendant who did not opt in to the consolidated proceeding was precluded from raising the issue of the Debtor's insolvency upon the resumption of the individual preference trials on the remaining issues.

Although counsel for one or more of the preference defendants may have been present in the courtroom at limited times during the consolidated trial, none formally participated. During the lengthy trial, during which many witnesses testified either live or by deposition, not one word of evidence was presented to suggest the Debtor was solvent during the preference period, i.e., 90 days prior to the Petition Date. Accordingly, the court concluded that the Trust was entitled to a finding of fact (as to the preference defendants only) that WRT was insolvent during the 90 days preceding the Petition Date. This, of course, merely recognized that the presumption of insolvency which arises under § 547(f) was not rebutted by any of the preference defendants.

### B. Insolvency Trial

For some 33 days during the period May 1 through August 18, 2000, the court conducted the insolvency phase ("Insolvency Trial") of the consolidated proceedings. The Insolvency Trial was the crown jewel of the Trust's efforts to recover funds for the benefit of creditors of the Debtor and others[2]. The trial, which involved issues dealing with principles of general and forensic accounting as well as petroleum and reservoir engineering, often became contentious. Over 30 witnesses were heard and more than 4,000 exhibits were admitted into evidence. Although numerous defendants remain in these actions, the defense to the Trust's claims during the Insolvency Trial was presented by counsel for LLOG Exploration Company ("LLOG"), Benton Oil & Gas Company of Louisiana ("Benton"), Stephen Edwards, Great Southern Oil Company ("Great Southern"), and BSFI Western E & P, Inc. ("BSFI"), (collectively the "Defendants").

While several accounting principles were at issue, the court believes the main focus was the valuation of several oil and gas properties acquired by WRT from certain of the Defendants. Valuation of oil and gas properties is a two-step process. First, the amount of oil and gas in place must be determined. Then, a price must be ascertained. Applying one factor (quantity) to the other (price) should result in the value of the property. Oh, if it were only so easy.

## II. FACTUAL BACKGROUND

### A. History of WRT

2. The Plan also provided for the distribution of certificates of beneficial interest ("CBIs") to various entities ("CBI Holders"), including pre-petition creditors, the reorganized debtor (on the effective date the Debtor's name was changed to "Gulfport Energy Corporation"), and the two entities (Wexford Management, LLC, and DLB Oil & Gas, Inc.), which invested substantial sums in order to fund the reorganization. Among other things, CBI Holders are to receive certain distributions from recovery made by the Trust through the litigation and liquidation process. Further, as they are transferrable, CBI Holders now include persons who have acquired CBIs by purchase from the original holders.

WRT was founded by Steve McGuire.[3] Around 1987 or early 1988, Mr. McGuire became CEO and Chairman of Tesla Resources, Inc. ("Tesla"), and Western Resource Technology, which later became WRT.[4] WRT owned 100% of the stock of Tesla and Southern Petroleum, Inc. ("SPI"). Through August 1993, WRT also owned a 20% investment in TesTech, Inc. ("TesTech"), for which it had funded 100% of the operations and had management control. In September 1993, WRT acquired the remaining 80% interest in Tes-Tech and dissolved that entity. In 1992, both Tesla and SPI were merged into WRT, which became the sole surviving corporation.[5] Following that consolidation, WRT "went public," with its stock being traded on the NASDAQ.[6] WRT remained continuously listed on NASDAQ from 1992 until at least Mr. McGuire's resignation in late 1995.[7]

As a publicly traded company, WRT was required by regulations of the Securities and Exchange Commission ("SEC") to file audited financial statements, both quarterly and annually. Those statements, of necessity, included valuations of WRT's oil and gas reserves.[8] Shortly after going public, KPMG Peat Marwick ("KPMG") was retained to audit WRT's financial statements[9] and the Scotia Group ("Scotia"), an engineering consulting firm located in Dallas, Texas, was retained to prepare WRT's reserve reports.[10]

## B. WRT's Proprietary Technology

Beginning with its predecessor companies, TesTech and Tesla, WRT developed certain proprietary tools and technologies for use in connection with the logging of wells to locate overlooked and by-passed oil and gas reserves. Specifically, WRT used specialized radioactive spectral logging tools and a hydrocyclone water treatment system.[11] The radioactive spectral logging tools were a series of tools which emitted radiation through the tubing and casing of old wells and then read the signals to develop a log showing whether oil and/or gas was present.[12] These tools were unique in that their miniaturized size allowed them to be run in older wells without the necessity of spending hundreds of thousands of dollars to pull out the tubing in place.[13]

The hydrocyclone water treatment system was a series of devices that spun fluids fast enough to separate produced water from the lighter density oil and gas hydrocarbons.[14] The hydrocyclone replaced much larger separator systems and processed fluid much quicker than a conventional system, thus increasing production.[15] WRT believed that the use of the hydrocyclone would allow it to obtain an

---

3. Tr. 5/23/00, p. 297–298, ln. 2–14.

4. Tr. 5/24/00, p. 7, ln. 19–22.

5. First Amended Disclosure Statement Under 11 U.S.C. § 1125 in Support of Debtor's and DLBW's First Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code, p. 18.

6. Tr. 5/24/00, p. 18,ln. 22—p. 19, ln. 9.

7. Tr. 5/24/00, p. 19, ln. 10–17.

8. Tr. 5/24/00, p. 19, ln. 19—p. 20, ln. 15.

9. Tr. 5/24/00, p. 19, ln. 24—p. 20, ln. 5.

10. Tr. 5/3/00, p. 44, ln. 13—p. 46, ln. 11; Tr. 5/24/00, p. 20, ln. 11–18.

11. Tr. 5/24/00, p. 25, ln. 1–4.

12. Tr. 5/24/00, p. 25, ln. 5–15.

13. Tr. 5/24/00, p. 25, ln. 16—p. 27, ln. 3.

14. Tr. 5/24/00, p. 29, ln. 2–7.

15. Tr. 5/24/00, p. 29, ln. 7–11.

exemption from the Louisiana Department of Environmental Quality permitting it to discharge produced water overboard rather than having to reinject the water into the ground, thus saving additional expense.[16] While the hydrocyclone was not new technology, that type of equipment was not at that time being used in South Louisiana oil and gas fields.[17]

## C. *WRT's Business Strategy*

WRT thus developed into an independent oil and gas producer specializing in the acquisition, revitalization and production of mature oil and gas fields located in South Louisiana.[18] WRT focused on South Louisiana because the geology in that area—numerous productive zones or sands—provided significant opportunities for overlooked and by-passed oil and gas.[19]

The company's strategy was to use property acquisitions to reach a critical mass as an integrated oil and gas company.[20] Wayne Beninger, who formerly consulted with WRT as a Scotia manager and joined WRT as a member of senior management in July, 1995, testified that WRT's strategy has been successfully employed by other companies in South Louisiana, citing Flores and Rucks as a specific example.[21] Mr. McGuire, WRT's president, testified that WRT's vision was to become "an operator and possibly a second-tier independent that could collect large properties from the majors when they were done or had exploited most of the initial reserves."[22]

According to Mr. Beninger, in the 1994 time period, WRT was looking to get to "a particular size, 100–million–plus, and to do that within a couple of years."[23] Mr. McGuire testified that WRT's target was to acquire $75,000,000 of additional oil and gas properties by the end of 1994.[24] Both Messrs. McGuire and Beninger agreed that the closing of a "next tier" acquisition in the $50,000,000 plus or minus range was a major goal for WRT.[25]

The long term goal of the company was to grow to $1 billion in assets.[26] Mr. Beninger testified that he believed that WRT's long term vision to become a $1 billion company was possible.[27]

## D. *WRT's Acquisition Efforts*

To accomplish its corporate mission of rapid acquisition of increasingly significant oil and gas properties, WRT, in early 1994, hired Scotia to create, in electronic form, a ranking of South Louisiana oil and gas properties for potential acquisition.[28] Scotia reviewed "every field south of I–10,

16. Tr. 6/27/00, p. 13, ln. 5–19.

17. Tr. 5/2/00, p. 80, ln. 9–24.

18. Tr. 5/23/00, p. 215, ln. 12–23; *See* Exhibit L–947 (June 1994 WRT Business Plan) at p. 1; Exhibit L–1 (12/31/94 WRT 10–KSB) at 3–4; Exhibit L–407 (2/28/95 Prospectus for WRT's $100 million Note Offering) at 3–4.

19. Tr. 6/26/00, p. 30, ln. 17 to p. 31, ln. 14; *See* Exhibit L–1 (12/31/94 WRT 10–KSB) at 3.

20. Tr. 5/3/00, p. 73, ln. 25 to p. 74, ln. 22.

21. Tr. 5/4/00, p. 160, ln. 5–8.

22. Tr. 5/23/00, p. 209, ln. 21 to p. 210, ln. 5.

23. Tr. 5/3/00, p. 74, ln. 1–16.

24. Tr. 5/24/00, p. 75, ln. 23 to p. 76, ln. 1.

25. Tr. 5/24/00, p. 136, ln. 15–23; Tr. 5/3/00, p. 15, ln. 16 to p. 16, ln. 8; Tr. 5/4/00, p. 253, ln. 16 to p. 254, ln. 5; *See* Exhibit L–521 (9/22/94 Letter from Scotia to Steve McGuire).

26. *See* Exhibit L–947 (June 1994 WRT Business Plan); Tr. 6/26/00, pp. 39–40.

27. Tr. 5/4/00, p. 182, ln. 4 to p. 183, ln. 15.

28. Tr. 5/23/00, p. 182, ln. 2–22; Tr. 5/15/00, p. 15, ln. 3–10; Tr. 6/26/00, pp. 29–33; *See also* Exhibit L–16 (11/2/94 WRT Acquisition Ranking, by Parameters).

[and] every field operator combination south of I–10."[29] Scotia ultimately generated some 100 "blue books"—which covered an entire wall of one of the WRT offices—and provided WRT with evaluation parameters on approximately 100 different South Louisiana oil and gas fields, and as many as 100,000 different wells.[30] These acquisition rankings were updated over time and would change as additional information would become available.[31]

In accordance with the WRT business plan and the directive from its board of directors, Paul White—WRT's vice-president of acquisitions—found himself focusing "more and more on acquiring new oil and gas properties" as the company grew.[32] Potential acquisition candidates were discussed by Mr. White at weekly executive staff meetings, which included Mr. McGuire and other officers.[33] Mr. White testified that WRT "constantly evaluated and pursued a number of different properties in order to find one it could actually buy and close on."[34] Mr. McGuire testified that during any given time WRT would be looking at as many as 30 different properties, and have solicitations out on 5.[35] Indeed, Mr. McGuire testi-

fied that, during 1994 alone, WRT evaluated over 150 possible acquisition candidates, and made offers on as many as 30 separate properties.[36]

John Petersen, WRT's in-house legal counsel, confirmed that fully one-third of the staff in the Houston office was dedicated to "looking primarily at acquisition candidates."[37] WRT's acquisition folders are replete with dozens of concrete examples throughout 1994 and 1995 of WRT's efforts to identify and acquire Louisiana oil and gas property interests, including: WRT's offers to purchase different oil and gas interests from Texaco ($22.7 million),[38] Phillips Petroleum ($35.5 million),[39] Chevron ($60 million),[40] and Shell ($35 million).[41] Throughout 1994 and 1995, WRT pursued an aggressive acquisition program as part of its daily operations which resulted in a number of significant purchases. According to Mr. Petersen, these acquisition activities were part of WRT's day-to-day business and were critical to the company's growth.[42]

### E. *WRT's Property Evaluation*

As WRT approached specific property acquisition candidates, management would

**29.** Tr. 5/3/00, p. 60, ln. 9–14; Tr. 5/23/00, p. 182, ln. 23 to p. 183, ln. 2; Tr. 5/3/00, p. 16, ln. 20 to p. 17, ln. 21.

**30.** Tr. 5/4/00, p. 173, ln. 17 to p. 176, ln. 10; Tr. 6/26/00, p. 31, ln. 15 to p. 34, ln. 12.

**31.** Tr. 5/23/00, p. 194, ln. 10–15; Tr. 5/24/00, p. 37, ln. 20 to p. 38, ln. 7.

**32.** Deposition Excerpt, Paul White, 1/13/99, Vol. 1, p. 37, ln. 9–11; *See* Exhibit L–947 (June 1994 WRT Business Plan).

**33.** Deposition Excerpt, Paul White, 1/13/99, Vol. 1, p. 48, ln. 5 to p. 49, ln. 2; Tr. 5/25/00, p. 21, ln. 23 to p. 23, ln. 1.

**34.** Deposition Excerpt, Paul White, 1/13/99, Vol. 1, p. 48, ln. 1–4; *See* Exhibit L–947 (June 1994 WRT Business Plan).

**35.** Tr. 5/24/00, p. 70, ln. 15 to p. 71, ln. 10.

**36.** Tr. 5/24/00, p. 71, ln. 3 to p. 74, ln. 5.

**37.** Tr. 6/26/00, p. 33, ln. 24 to p. 34, ln. 12.

**38.** Tr. 5/25/00, p. 122, ln. 2 to p. 123, ln. 5; *See* Exhibit L–947 (June 1994 WRT Business Plan) at 6; *See* Benton Exhibit # 53.

**39.** Tr. 5/25/00, p. 123, ln. 6–13; *See* Benton Exhibit # 54.

**40.** Tr. 5/25/00, p. 123, ln. 14–20; *See* Benton Exhibit # 58.

**41.** Tr. 5/25/00, p. 122, ln. 2 to p. 123, ln. 5; *See* Exhibit L–497 (June 1994 WRT Business Plan) at 6.

**42.** Tr. 6/26/00, p. 41, ln. 24 to p. 42, ln. 9.

form a team to evaluate the property.[43] The team would include Scotia personnel, landmen, in-house geologists and, in some instances, contract geologists.[44] Scotia would do a preliminary screening to give the company a workable estimate of likely value.[45] In helping WRT formulate acquisition strategies, Scotia would attend any presentations that were made, review all the material provided by the seller, gather whatever information was available in the public domain, do a performance analysis on the producing reserves, do a log analysis, develop their own structural and isopach or isochore maps, review lease operating expense statements and marketing contracts, do a risk analysis and arrive at a range of offering prices for WRT's review.[46] Scotia would also advise WRT as to whether there was potential other than proved reserves.[47]

Internally, WRT would "run cash-flow projections at different oil and gas pricing scenarios and discounting in different categories to arrive at prices that could be paid." [48] WRT's personnel specializing in operations would go into the field to look at the property and equipment.[49] Mr. McGuire identified 14 separate components considered by WRT with each potential property acquisition: number of wells, accumulated production by well and by field, number of productive sands per well, peak production by well and by field, well pressure/water production, aerial extent, well schematics, current production, facilities/surface equipment, probable and possible reserves, gas and oil contracts, geographic location, availability of additional acreage, and whether the field was on land versus water.[50]

WRT would also prepare Tobin maps for the fields that WRT's management viewed as particularly desirable.[51] Raymond Landry, who became WRT's president and chief operating officer in April 1995, testified that, as part of the acquisition program in place from the time he joined the company, WRT was pursuing additional acreage around the properties it had acquired.[52] Mr. McGuire similarly testified that it was WRT's practice to acquire a property and then immediately turn to focusing on how it could acquire additional acreage adjacent to the newly acquired property.[53] WRT used Tobin maps to track the lease ownership of a field it was interested in acquiring so that the company could see which operators they should approach in order to round out an entire field purchase.[54] WRT also used Tobin maps in order to assess what additional acreage it should attempt to acquire if it elected to purchase the property that was on the market.[55] This information was necessary as WRT did not wish to start to

43. Tr. 5/24/00, p. 36, ln. 7–16.

44. Tr. 5/24/00, p. 36, ln. 7–16.

45. Tr. 5/3/00, p. 64, ln. 18 to p. 65, ln. 20.

46. Tr. 5/3/00, p. 65, ln. 21 to p. 66, ln. 17.

47. Tr. 5/3/00, p. 68, ln. 5–12.

48. Tr. 5/23/00, p. 217, ln. 10–18.

49. Tr. 5/4/00, p. 256, ln. 13–19; *See also* Exhibit L–31 and Exhibit L–33 (Memoranda from WRT's Field Evaluation Team).

50. *See* Exhibit L–3062 (WRT Value Components for Acquisitions); Tr. 5/24/00, p. 51, ln. 4 to p. 62, ln. 2.

51. Tr. 5/24/00, p. 41, ln. 25 to p. 42, ln. 3.

52. Tr. 6/2/00, p. 265, ln. 1–10.

53. Tr. 5/24/00, p. 60, ln. 23 to p. 61, ln. 3.

54. Tr. 5/24/00, p. 44, ln. 4–12.

55. Tr. 5/24/00, p. 47, ln. 4–8.

enhance the value of a property if it did not have a controlling block position.[56]

### F. The Bond Offering and Due Diligence of Underwriters

By mid–1994, WRT was exploring the possibility of acquiring oil and gas properties through the issuance of public debt with Wertheim Schroeder ("Wertheim"), an investment banking firm in New York.[57] At that time, Wertheim and CIBC Oppenheimer Corporation ("Oppenheimer"), another investment banking firm, were both pursuing WRT's business.[58] Ultimately, Wertheim and Oppenheimer acted as co-underwriters with regard to the debt offering.[59]

Wertheim, Oppenheimer and WRT evaluated a $100,000,000 debt offering, to be followed by an equity offering in the range of $35–50,000,000.[60] Indeed, the $100,000,000 debt offering was specifically written to incorporate a $35,000,000 "claw-back" provision.[61] The debt offering, however, was not dependent upon a subsequent equity offering.[62]

WRT eventually pursued the equity offering through a third underwriter, Prudential Securities, Inc. ("Prudential").[63] Mr. Landry testified that, based upon his conversations with Prudential during the first quarter of 1995, he was confident that such an equity offering could be made.[64] When Mr. Beninger was making his decision to join WRT in the July/August 1995 time frame, he was told by Mr. Landry that he still expected the equity offering to happen in the fourth quarter.[65] Mr. Beninger prepared his own calculations of WRT's finances and included an assumed offering.[66] Mr. McGuire testified that he was confident the equity offering would occur until late September declines in oil prices, production and the price of WRT stock made the offering impossible.[67]

In underwriting the debt offering, Wertheim spent about six months in the due diligence process.[68] Numerous people from Wertheim were involved,[69] reviewing WRT's financials[70] and properties.[71] Wertheim evaluated presently-owned properties as well as those WRT intended to acquire, including the properties to be acquired from LLOG.[72] Wertheim inter-

---

56. Tr. 5/24/00, p. 46, ln. 3–10.

57. Tr. 5/25/00, p. 27, ln. 22 to p. 28, ln. 4; Tr. 6/26/00, p. 62, ln. 12–24.

58. Tr. 6/26/00, p. 62, ln. 19 to p. 63, ln. 9.

59. See Exhibit L–407 (WRT Prospectus); Tr. 5/25/00, p. 28, ln. 5 to p. 29, ln. 7; Tr. 5/25/00, p. 37, ln. 25 to p. 39, ln. 21; Tr. 6/26/00, p. 66, ln. 23 to p. 67, ln. 17.

60. Tr. 5/25/00, p. 39, ln. 15–21; Tr. 6/2/00, p. 248, ln. 10–23, p. 251, ln. 10–20; p. 258, ln. 9 to p. 259, ln. 12.

61. Tr. 5/25/00, p. 39, ln. 4–8; Tr. 6/2/00, p. 248, ln. 10–23.

62. Tr. 5/23/00, p. 81, ln. 20–23 and p. 106, ln. 11–19.

63. Tr. 5/25/00, p. 38, ln. 8 to p. 39, ln. 8.

64. Tr. 6/2/00, p. 259, ln. 13–18.

65. Tr. 5/4/00, p. 191, ln. 13 to p. 192, ln. 7; Tr. 6/2/00, p. 259, ln. 19 to p. 260, ln. 9; Tr. 5/25/00, p. 68, ln. 16 to p. 70, ln. 20.

66. Tr. 5/04/00, p. 192, ln. 8 to p. 193, ln. 13.

67. Tr. 5/25/00, p. 68, ln. 16 to p. 71, ln. 6.

68. Tr. 5/23/00, p. 284, ln. 22 to p. 285, ln. 1.

69. Tr. 5/23/00, p. 285, ln. 2–5.

70. Tr. 5/23/00, p. 285, ln. 6–8.

71. Tr. 5/23/00, p. 185, ln. 9–11.

72. See Tr. 5/23/00, p. 102, ln. 2 to p. 103, ln. 23; Tr. 5/23/00, p. 109, ln. 16 to p. 110, ln. 5; Tr. 5/23/00, p. 114, ln. 25 to p. 117, ln. 5.

viewed WRT's outside consultants.[73] Wertheim personnel had complete and unfettered access to all WRT documents[74] including all of WRT's financial records.[75] All three of WRT's in-house CPA's, Ronald Hale, Ernie Begnaud and Kathy Stubbs, were assigned to assist Wertheim in this process.[76]

Wertheim generated more than 20 different projections for the company to assess financial performance.[77] WRT reviewed and commented on those projections.[78] Mr. McGuire testified that he was personally involved in at least half a dozen work sessions with Wertheim, and reviewed multiple sets of projections at each session.[79]

Wertheim concluded that WRT could repay the indebtedness.[80] Robert Israel, Wertheim's lead consultant working on the WRT project at the time, testified that, in his professional opinion, it was "absolutely true" based on the due diligence performed by Wertheim, that WRT could repay the $100 million bond offering at 13 ⅞ percent.[81] "We concluded they could service the debt and meet their obligations."[82] Mr. Israel testified that had his firm concluded otherwise, it would not have pro-

ceeded with the bond offering.[83] Mr. Israel further testified that, in his view, the proceeds of the bond offering were sufficient to develop the WRT properties.[84]

Other events were occurring at the same time Wertheim was engaged in its extensive due diligence: (1) Oppenheimer was involved in its own due diligence of WRT.[85] Oppenheimer enjoyed the same unfettered access to WRT—including access to WRT's financial records and reserve reports—as Wertheim.[86] Attorneys for both Wertheim and Oppenheimer were also involved in the due diligence regarding the properties.[87] (2) Internationale Nederlanden Capital Corporation ("INCC") was undertaking due diligence with regard to a $40 million line of credit sought by the company.[88] INCC not only reviewed the books and records of WRT, but also performed an independent reserve evaluation with regard to WRT's properties.[89] (3) KPMG was involved in a full audit of WRT[90] and an audit of expenses relating to the LLOG and Napoleonville properties.[91] This process involved numerous KPMG professionals and was headed up by William Transier, KPMG's senior partner who specialized in oil and gas account-

---

73. Tr. 5/23/00, p. 285, ln. 12–14.

74. Tr. 5/23/00, p. 285, ln. 15–17.

75. Tr. 5/25/00, p. 30, ln. 1–8.

76. Tr. 5/25/00, p. 30, ln. 12 to p. 31, ln. 17.

77. Tr. 5/25/00, p. 31, ln. 18 to p. 33, ln. 19; *See also* Exhibit L–944 (Wertheim Projections).

78. Tr. 5/25/00, p. 31, ln. 18 to p. 32, ln. 1.

79. Tr. 5/25/00, p. 31, ln. 24 to p. 32, ln. 8.

80. Tr. 5/23/00, p. 118, ln. 23 to p. 119, ln. 1.

81. Tr. 5/23/00, p. 119, ln. 6–14.

82. Tr. 5/23/00, p. 119, ln. 6–14.

83. Tr. 5/23/00, p. 119, ln. 2–5.

84. Tr. 5/23/00, p. 124, ln. 13–17.

85. Tr. 5/23/00, p. 287, ln. 8–10.

86. Tr. 5/23/00, p. 287, ln. 14–16; Tr. 5/25/00, p. 39, ln. 22 to p. 40, ln. 9.

87. Tr. 5/23/00, p. 287, ln. 20 to p. 288, ln. 14.

88. Tr. 5/25/00, p. 40, ln. 20 to p. 41, ln. 2.

89. Tr. 5/23/00, p. 292, ln. 9–19.

90. Tr. 5/23/00, p. 285, ln. 25 to p. 286, ln. 5.

91. Tr. 6/26/00, p. 172, ln. 17 to p. 173, ln. 22.

ing.[92] (4) Finally, WRT prepared its own analysis of the bond offering and its ability to support the debt, which included some 15 to 20 separate projections.[93] Each of these independent evaluations concluded WRT was solvent and would be able to pay the bond debt as well as the company's other obligations.[94]

This information was reviewed with WRT's board of directors, including James Rash, an outside director, who agreed that the projections showed that WRT could survive different runs of oil and gas pricing.[95] As stated by Mr. McGuire, "[w]ith all the cash flow projections that we had run, it looked like we could survive even down to what was called a disaster case scenario."[96] Thus, after months of extraordinary due diligence undertaken by WRT, three outside underwriters, their lawyers, their accountants, two separate independent reserve engineers, WRT's in-house staff and a big six accounting firm, WRT made the final decision to go forward with the bond offering.

### G. *Overview of Major Transactions*

### 1. LLOG Properties.

In late spring or early summer of 1994, LLOG decided to actively market proper-ties, some of which were ultimately acquired by WRT.[97] LLOG did not require that any group of properties be purchased as a bundle, but was prepared to accept less, and ultimately did accept less, if properties were sold in a group rather than individually.[98] LLOG utilized this same price determination process in some fifteen separate sales involving more than forty fields and which generated combined proceeds of more than $500,000,000.[99]

Messrs. White and McGuire contacted Donald Burks ("Burks") to obtain data on the LLOG properties in early October, 1994.[100] Mr. Burks is a petroleum engineer who has been active in reservoir engineering and acquisition work since the early 1970's.[101] They were informed that 18 properties were available.[102] WRT then performed its internal analysis on all of the properties and concluded that eight of them fit WRT's acquisition criteria—Bayou Penchant, Bayou Pigeon, Abbeville, Golden Meadow, Deer Island, N.E. Deer Island, Paradis and Lac Blanc.[103] WRT and Scotia initially focused on the properties other than Paradis and Lac Blanc and concluded that those six properties could readily support a $60 million purchase price.[104]

92. Tr. 6/26/00, p. 163, ln. 20 to p. 164, ln. 4; Tr. 5/23/00, p. 286, ln. 6–13.

93. Tr. 5/24/00, p. 99, ln. 3–9.

94. Tr. 5/25/00, p. 42, ln. 22 to p. 44, ln. 16.

95. Tr. 5/23/00, p. 289, ln. 22–24; Tr. 5/25/00, p. 43, ln. 1 to p. 44, ln. 11; Deposition Excerpt, James Rash, 3/26/99, Vol. 3, p. 39, ln. 4–8.

96. Tr. 5/25/00, p. 41, ln. 14–21.

97. Tr. 7/26/00, p. 47, ln. 22 to p. 48, ln. 17.

98. Tr. 5/24/00, p. 116, ln. 4–13; Tr. 7/26/00, p. 75, ln. 15 to p. 76, ln. 1.

99. Tr. 7/26/00, p. 19, ln. 15–25.

100. Tr. 5/23/00, p. 239, ln. 9 to p. 240, ln. 3, Tr. 6/28/00, p. 175, ln. 24 to p. 176, ln. 7.

101. Tr. 6/28/00 p. 123, ln. 3 through p. 135, ln. 12.

102. *See* Exhibit L–26 (10/28/94 Burks Finder Fee/Confidentiality Letter Agreement from Don Burks to Paul White); 5/23/00, p. 240, ln. 4–9.

103. Tr. 5/23/00, p. 303, ln. 23 to p. 306, ln. 3; Tr. 5/24/00, p. 48, ln. 2; Tr. 5/25/00, p. 26, ln. 2–15; Tr. 5/24/00, p. 95, ln. 24 to p. 96, ln. 3.

104. Tr. 5/24/00, p. 102, ln. 22 to p. 104, ln. 2.

While WRT was performing its analysis of the properties, Forest Oil, a large publicly traded oil and gas company, tendered an offer of $15 million for the Deer Island and N.E. Deer Island properties.[105] LLOG rejected that offer because it failed to meet LLOG's minimum acceptable price; [106] LLOG tendered a counteroffer of $18.5 million plus a bonus tied to production.[107]

In mid-November, WRT offered $56 million for Bayou Penchant, Bayou Pigeon, Golden Meadow, Abbeville, Deer Island and N.E. Deer Island.[108] The offer was conveyed to Mr. Burks who in turn relayed it to Gerald Boelte ("Boelte"), LLOG's major shareholder.[109] WRT's offer, however, was less than the minimum acceptable price established by LLOG, and the offer was rejected without counter.[110]

Mr. Burks relayed the rejection to WRT, but noted that if the price were raised into the $60 million range, it might be acceptable.[111] Following that advice, WRT made a $60 million offer for all working interests plus an additional amount—initially estimated at $2,500,000—for overriding royalty interests ("ORR").[112] That offer was acceptable to LLOG and a letter of intent outlining the proposed transaction was executed on November 18, 1994.[113]

The letter of intent contemplated execution of purchase and sale agreements in mid-December, 1994,[114] although it shortly became obvious that this deadline could not be met.[115] LLOG and WRT had no previous relationship, and WRT required time to complete extensive due diligence.[116] WRT not only required reserve evaluations on each of the properties, but also title documentation and other legal due diligence.[117]

One of the delays resulted from the fact that LLOG did not own all working interests in the subject fields. Obviously, WRT would only pay for those percentages of working interests which were actually transferred.[118] At WRT's urging, LLOG did its best to convince the other working interest owners to sell to WRT.[119] Such efforts, however, were not completely successful. Vintage Oil, an independent oil and gas producer, found the purchase price inadequate and refused to sell its interest in the Abbeville Field.[120]

---

105. *See*, Exhibit L–1528 (9/12/94 Forest Oil Offer letter); Tr. 6/28/00, p. 220, ln. 17–22; Tr. 6/28/00, p. 221, ln. 19 to p. 222, ln. 6.

106. Tr. 7/26/00, p. 54, ln. 21 to p. 55, ln. 5.

107. *See* Exhibit L–102 (9/23/94 LLOG Exploration Co. letter from Gerald Boelte to Robert Boswell re: proposed property sale, Deer Island Field); Tr. 6/28/00, p. 251, ln. 5 to p. 252, ln. 6.

108. Tr. 6/28/00, p. 215, ln. 10 to p. 216, ln. 2; Tr. 7/26/00, p. 64, ln. 5–8.

109. Tr. 6/28/00, p. 216, ln. 3–7.

110. Tr. 7/26/00, p. 64, ln. 8–20.

111. Tr. 6/28/00, p. 216, ln. 8–10.

112. Tr. 6/28/00, p. 216, ln. 8 to p. 217, ln. 3.

113. *See* Exhibit L–34 (11/18/94 Letter of Intent).

114. *See* Exhibit L–34 (11/18/94 Letter of Intent).

115. Tr. 5/24/00, p. 116, ln. 14–23.

116. Tr. 5/24/00, p. 104, ln. 18 to p. 105, ln. 25.

117. Tr. 5/24/00, p. 120, ln. 24 to p. 121, ln. 11.

118. Tr. 7/26/00, p. 65, ln 16 to p. 66, ln. 16.

119. Tr. 7/26/00, p. 65, ln. 20 to p. 66, ln. 16.

120. Tr. 7/26/00, p. 66, ln. 19 to p. 67, ln. 7.

On December 21, 1994, LLOG and WRT executed a purchase and sale agreement for Bayou Penchant.[121] Similar agreements were signed on January 10, 1995, for Abbeville,[122] Bayou Pigeon,[123] N.E. Deer Island[124] and Golden Meadow[125]. The Deer Island agreement was signed on January 30, 1995.[126] Each of the purchase and sale agreements bound WRT to buy and LLOG to sell the respective properties.

At the time the letter of intent was executed, WRT anticipated the bond offering—the source of funding for the LLOG transaction—would close by year-end. Delays occasioned by due diligence delayed the bond offering into January, February and finally March.[127] LLOG, however, was not willing to have its properties taken off the market with no assurance of ultimate funding.[128] Accordingly, WRT agreed to close on the Bayou Penchant property using funds drawn from the INCC line of credit.[129] WRT also agreed to tender a $5 million non-refundable deposit which would be credited against the purchase price for the remaining proper-

ties.[130] Consistent with this agreement, WRT wire transferred $15 million to LLOG on January 30, 1995, and delivered a promissory note for $5,570,317.93 as the non-refundable deposit.[131] The note was paid the following week.[132]

While awaiting closing on the remaining LLOG properties, WRT continued with its due diligence on the Lac Blanc and Paradis Fields.[133] Mr. McGuire contacted Mr. Boelte directly to discuss price.[134] Mr. Boelte indicated that he was looking for a price of $12 million for Paradis[135] and in the range of $12 to $14 million for Lac Blanc.[136] Mr. McGuire concluded that both were too "pricey," and dropped the matter as to those properties.[137] LLOG ultimately sold Paradis to Force Energy for $16 million and Lac Blanc to Shell for $44 million.[138]

The bond issue closed on March 6, 1995. On March 8, 1995, WRT wire transferred the balance of the purchase price to LLOG's account, namely, $41,119,867.26. WRT immediately assumed operation of all the acquired properties.

**121.** See Exhibit L117 (12/21/94 Purchase and Sale Agreement, Bayou Penchant Field).

**122.** See Exhibit L–842 (10/10/95 Purchase and Sale Agreement, Abbeville Field).

**123.** See Exhibit L–840 (1/10/95 Purchase and Sale Agreement, Bayou Pigeon Field).

**124.** See Exhibit L–844 (1/10/95 Purchase and Sale Agreement, N.E. Deer Island Field).

**125.** See Exhibit L–843 (1/10/95 Purchase and Sale Agreement, Golden Meadow Field).

**126.** See Exhibit L–846 (1/31/95 Purchase and Sale Agreement, Deer Island Field).

**127.** Tr. 6/28/00, p. 92, ln. 3–22.

**128.** Tr. 5/23/00, p. 252, ln. 10 to p. 253, ln. 10; Tr. 7/26/00, p. 73, ln. 23 to p. 74, ln. 19.

**129.** Tr. 5/25/00, p. 41, ln. 3–9.

**130.** See Tr. 7/26/00, p. 74, ln. 4–8; Tr. 6/28/00, p. 85, ln. 18 to p. 86, ln. 1; Tr. 5/23/00, p. 252, ln. 19 to p. 253, ln. 10.

**131.** See Exhibit L–1538 (Bayou Penchant Field Closing Documents); See Exhibit L–121 (1/30/95 Promissory Note).

**132.** Stipulated Facts of LLOG and Trust, No. 7, Final Pre–Trial Order.

**133.** Tr. 5/24/00, p. 95, ln. 14 to p. 96, ln. 9.

**134.** Tr. 5/25/00, p. 19, ln. 15 to p. 20, ln. 7.

**135.** Tr. 7/26/00, p. 60, ln. 22 to p. 61, ln. 15.

**136.** Tr. 7/26/00, p. 60, ln. 5–12.

**137.** Tr. 7/26/00, p. 60, ln. 5–14.

**138.** Tr. 7/26/00, p. 60, ln. 5 to p. 61, ln. 3.

## 2. East Hackberry.

Between January and September 1994, WRT acquired various oil and gas properties in the East Hackberry area including the Erwin Heirs Lease, State Lease 50, and the Roussel Royalty. WRT acquired these properties directly from Great Southern, or from Great Southern through Texas American Resources, Inc. ("TARI").

On July 8, 1992, Great Southern, through its subsidiary, Southern Petroleum Company, paid Chevron $7.35 million for, *inter alia*, a 100% working interest in the Erwin Heirs Lease and a 1.515% ORR in State Lease 50.[139] Further, and with an effective date of October 14, 1993, Texaco agreed to convey certain interests in State Lease 50 to Great Southern for no consideration.[140]

Shortly after the 1993 preferred stock offering, Mr. McGuire had discussions with TARI, concerning the potential acquisition of oil and gas interests in Louisiana.[141] These negotiations led to the execution of a Master Purchase and Sale Agreement between WRT and Tari, dated February 2, 1994. Pursuant to this agreement, TARI was to convey to WRT certain oil and gas interests in the Erwin Heirs Lease, State Lease 50, West Hackberry and Rankin Fields for $11.5 million in cash, 454,000 shares of WRT common stock, and warrants to purchase 300,000 shares of WRT stock exercisable at $8.50 share.[142]

At the time the negotiations with WRT were underway, on or about December 28, 1993, TARI offered to purchase the Erwin Heirs Lease from Great Southern for $9.7 million. Also, on February 1, 1994, TARI purchased the Erwin Heirs lease from Great Southern for approximately $9.5 million.[143] On the same day TARI purchased the Erwin Heirs Lease, it sold the identical property interest to WRT for $12.622 million.[144]

In connection with the Erwin Heirs Lease closing on February 1, 1994, Great Southern conveyed Rig No. 14 and Rig No. 55 to TARI for a total of $900,000.[145] WRT acquired Rig No. 14 and Rig No. 55 from TARI for $1,200,000 at the same closing.[146]

Further, in a letter of intent dated February 1, 1994, Great Southern agreed to convey State Lease 50 to TARI for $1 million. Thereafter, on April 29, 1994, Great Southern accepted Texaco's offer to convey Texaco's remaining interest in State lease 50 to Great Southern for $50,000. Finally, on May 26, 1994. Great Southern conveyed State Lease 50 directly to WRT for approximately $1,000,000.[147]

## 3. Gulf Coast Joint Venture.

In 1991, WRT, Tricore Energy Venture, L.P. ("Tricore"), and Stag Energy Corporation ("Stag") entered into a joint venture agreement identified as the Gulf Coast Joint Venture ("GCJV"). Pursuant to the GCJV, WRT was to contribute certain oil and gas properties and Stag would raise the necessary capital to develop these

---

**139.** Trust Ex. 1211., Trust Ex. 525.

**140.** Trust Ex. 590.

**141.** Wright Dep. 6/24/99, p. 33, ln. 10—p. 34, ln. 7.

**142.** Trust Ex. 697.

**143.** Trust Ex. 675; Final Pre-trial Order: Stipulated Fact.

**144.** Trust Ex. 695.

**145.** Trust Ex. 688. Final Pre-trial Order: Stipulated Fact.

**146.** Trust Ex. 689.

**147.** Trust Ex. 803.

properties by selling interests in the GCJV to Tricore. The GCJV was based on WRT's belief that certain tax credits would be available and would be offered by WRT to Tricore, the investor, in lieu of or as a supplement to production revenue.

Tricore would contribute capital under the terms of the GCJV, while Stag received a five (5%) percent share of the production revenue from the various wells contributed by WRT.[148] The GCJV required that a minimum percent consideration be paid to Tricore. Section 29 tax credits which WRT claimed it was eligible to receive were assigned to Tricore and applied to the guaranteed considerations under the agreement. The GCJV claimed Section 29 tax credits and allocated them to Tricore, based on production from the Delcambre No. 1 and Lac Blanc.[149]

In October 1993, attempting to claim the Section 29 tax credits, WRT filed its initial state application seeking certification that certain of the wells were producing gas from geopressured brine. WRT supplemented its application in February 1994, and filed for four additional wells at Lac Blanc. The State of Louisiana accepted certification of the wells as geopressured brine wells.

In April and May, WRT applied for FERC approval of the Louisiana agency certification of the wells. In August, however, the FERC issued a preliminary finding that the determination by the state was not supported by substantial evidence. In September, WRT asked FERC to withdraw its application. FERC notified WRT that the withdrawal of the application before it becomes final nullifies the determination and application. At this point, however, WRT asked FERC to reinstate its application. Although the FERC reinstated the proceeding, on December 6, 1994, a preliminary finding consistent with the August preliminary finding was issued.[150] On April 3, 1995, the FERC issued its Final Order Reversing Well Determination, affirming the preliminary finding.

WRT unsuccessfully appealed the FERC ruling.[151] In its ruling, however, the Fifth Circuit stated that the FERC ruling "is not dispositive" and that the IRS is "not bound to follow the FERC's ruling."[152] Both Michael Sterling, Stag's president, and Mr. Petersen testified that the Section 29 tax credits taken by the joint venture partners were never challenged or disallowed by the IRS.[153]

Effective June 30, 1994, WRT, Stag, and Tricore entered into an Amended and Restated Joint Venture Agreement WRT–Gulf Coast JV ("Amended and Restated JVA").[154] Article Seven of the Amended and Restated JVA sets forth the "Production Guarantee" under which WRT guaranteed that Tricore's "interest in this GCJV would produce the minimum quantities of natural gas set forth in Exhibit B ... during the forty eight month period commencing October 1, 1992."[155] Para-

---

**148.** See Exhibit L–2295 (10/18/91 Joint Venture Agreement) at ¶ 1.02.

**149.** Trust Ex. 4213.

**150.** Trust Ex. 4271.

**151.** Tr. 6/2/00, p. 243, ln. 1—17, p. 244, ln. 7—19; Tr. 5/31/00, p. 202, ln. 2—p. 203, ln. 13.

**152.** *WRT Energy Corporation v. Federal Energy Regulatory Commission,* 107 F.3d 314, 318 (5th Cir.1997).

**153.** Tr. 5/26/00, p. 121, ln. 21 to p. 122, ln. 8; Tr. 6/27/00, p. 74, ln. 18 to p. 75, ln. 2.

**154.** Exhibit L–2301 (Amended and Restated Joint Venture Agreement WRT—Gulf Coast JV Effective June 30, 1994).

**155.** Exhibit L–2301 (Amended and Restated Joint Venture Agreement WRT—Gulf Coast JV Effective June 30, 1994) at ¶ 7.01, page 5.

graph 7.11 of the Amended and Restated JVA further provided that "[a]ny payment required by this Article Seven may be satisfied by the issuance to [Tricore] of registered debt or equity securities of WRT or Stag which have a full market value equal to the required payment." [156]

Mr. McGuire testified that WRT specifically negotiated for the option to use stock to satisfy any obligation that may arise under the production guarantee. [157] He further testified that it was a deal breaking point, and that WRT would not have entered into the guarantee without the option. [158] Finally, Mr. McGuire testified that WRT would never have paid with anything other than the stock had there ever been a call on the guarantee. [159]

### 4. Napoleonville Field.

BSFI and other working interest owners acquired an interest in the Napoleonville Field in 1991. [160] BSFI, acting through Joseph P. Brantley, IV, was the operator of the field and acted on behalf of all working interest owners throughout. Their plan was to develop the field and then market it for sale. Brantley sought Mr. Burks' advice regarding decisions to develop or market the Napoleonville Field over several years. [161]

Between 1991 and 1994, BSFI drilled three wells and completed several marginally successful workovers in the Napoleonville Field. [162] By early 1994, after completing two successful wells, BSFI retained Mr. Burks to begin active marketing efforts to sell the Napoleonville Field. [163]

BSFI and WRT engaged in negotiations for the sale of the Napoleonville Field, with BSFI initially seeking some $13 million for the property. WRT initially offered to purchase the Napoleonville Field from BSFI with WRT stock which Brantley valued between $10 and $11 million. [164]

The consideration indicated in the first draft of a letter of intent dated November 4, 1994, was all stock (600,000 shares of common stock and 240,000 shares of preferred stock) with a value of $11,585,000. [165] Mr. Edwards wrote a letter to Brantley dated November 18, 1994, conveying WRT's demand that the price be reduced by $500,000 due to the results of certain due diligence investigation on the Trahan # 1 well. [166] BSFI countered WRT's offer of $11 million; WRT rejected BSFI's counteroffer. [167]

Ultimately, a letter of intent between BSFI and WRT was executed on Novem-

---

**156.** Exhibit L–2301 (Amended and Restated Joint Venture Agreement WRT—Gulf Coast Effective June 30, 1994) at ¶ 7.11, page 7. Although the parties entered into an addendum to the Amended and Restated JV Agreement, ¶ 7.11 was neither altered nor modified. See Exhibit L–2300 (1994 Addendum to the Amended and Restated Joint Venture Agreement WRT–Gulf Coast JV). See also Tr. 5/25/00 p. 86, ln. 8–18.

**157.** Tr. 5/25/00, p. 83, ln. 22 to p. 84, ln. 2.

**158.** Tr. 5/25/00, p. 84, ln. 6–14. See also Tr. 5/25/00, p. 86, ln. 8–18.

**159.** Tr. 5/25/00, p. 87, ln. 14–25.

**160.** Tr. 5/22/00 p. 180, ln. 3–20.

**161.** Tr. 6/29/00 p. 4, ln. 16 through p. 5, ln. 3.

**162.** Tr. 5/22/00 p. 180, ln. 21 through p. 182, ln. 25.

**163.** Tr. 5/22/00 p. 183, ln. 12–15.

**164.** Tr. 5/22/00 p. 201, ln. 6–13; Edwards Ex. 13.

**165.** Tr. 5/22/00 p. 206, ln. 5 through p. 207, ln. 6; Edwards Ex. 16.

**166.** Tr. 5/22/00 p. 214, ln. 8 through p. 215, ln. 17; Trust Ex. 1094.

**167.** Tr. 5/22/00 p. 215, ln. 24 through p. 217, ln. 24; Edwards Ex. 108.

ber 23, 1994, indicating a purchase price of 1.25 million shares of WRT common stock with a value of approximately $10 million.[168] Mr. Brantley, however, did not consider this letter of intent to be a binding deal as BSFI was still entertaining an offer from another entity interested in purchasing the Napoleonville Field.[169] Mr. Brantley understood that whatever terms were finally agreed to would be subject to a purchase and sale agreement and that the letter of intent was not binding.[170]

In addition to negotiating the amount of the consideration to be paid for the Napoleonville Field, BSFI and WRT negotiated the form that the consideration would take. BSFI and WRT discussed various ways to structure the transfer of the Napoleonville Field, including a merger, a combination of preferred stock and common stock, all common stock, and potentially cash.[171] Mr. Brantley was attempting to obtain more cash than stock, and WRT was attempting to purchase the property for more stock than cash.[172] BSFI eventually agreed to accept stock for the Napoleonville Field,[173]as on December 2, 1994, the parties executed a final version of the earlier letter of intent, the new agreement providing that the consideration for WRT's purchase of the Napoleonville Field was to be 1.25 million shares of WRT common stock.[174]

On December 7, 1994, WRT's board of directors approved WRT's purchase of the Napoleonville Field for 1.25 million shares of common stock together with 50,000 shares for two finders.[175] The Purchase and Sale Agreement was executed on December 16, 1994.[176] Paragraph 2 thereof provides that the consideration shall be 1.25 million shares of WRT common stock.[177] WRT committed to issue and BSFI agreed to take 1.25 million shares of WRT common stock as consideration for the Napoleonville Field.[178] WRT actually issued 1.3 million shares of its common stock to BSFI as consideration for the purchase of the Napoleonville Field.[179] The certificates were delivered to Mr. Edwards to hold as the escrow agent.[180]

### 5. West Cote Blanche Bay Field.

Sometimes in the late 1980's, Tesla had acquired a 6.25% working interest in both

168. Tr. 6/26/00 p. 82, ln. 13 through p. 83, ln. 19; LLOG Ex. 138; Trust Ex. 1099.

169. Tr. 5/22/00 p. 218, ln. 10 through p. 219, ln. 21; Edwards Ex. 183.

170. Tr. 5/22/00 p. 215, ln. 11–14.

171. Tr. 5/22/00 p. 17, ln. 23 through p. 18, ln. 8; p. 202, ln. 6–9; Tr. 5/24/00 p. 137, ln. 19 through p. 138, ln. 2.

172. Tr. 6/26/00 p. 78, ln. 9–13.

173. Tr. 5/22/00 p. 223, ln. 5–7; p. 228, ln. 2–16; p. 241, ln. 12 through p. 242, ln. 12; p. 275, ln. 20–22; Tr. 5/24/00 p. 137, ln. 19 through p. 138, ln. 5; p. 140, ln. 6–12; Tr. 6/26/00 p. 78, ln. 9–15; p. 89, ln. 20 through p. 90, ln. 1; p. 91, ln. 17 through p. 92, ln. 2; Trust Ex. 1185; Edwards Ex. 27; Edwards Ex. 301; Edwards Ex. 302; Edwards Ex. 54.

174. Tr. 5/22/00 p. 220, ln. 8–23; Tr. 6/26/00 p. 82, ln. 13 through p. 83, ln. 19.

175. Tr. 6/26/00 p. 89, ln. 2 through p. 90, ln. 1; Tr. 5/24/00 p. 151, ln. 7 through p. 153, ln. 14; Edwards Ex. 27.

176. Trust Ex. 1185.

177. Tr. 5/22/00 p. 227, ln. 7–20; Trust Ex. 1185.

178. Tr. 5/22/00 p. 228, ln. 5–16; Tr. 5/24/00 p. 151, ln. 23–25; Trust Ex. 1185.

179. Tr. 5/22/00 p. 241, ln. 12 through p. 242, ln. 12; Tr. 5/24/00 p. 154, ln. 11–19; Tr. 6/1/00 p. 418, ln. 11–21; Edwards Exs. 301 and 302.

180. Tr. 5/22/00 p. 228, ln. 5–16.

the shallow and deep rights in West Cote Blanche Bay.[181] Although its prior attempts to acquire additional interests in the field had been unsuccessful, WRT's desire to increase its stake in that field continued. WRT resumed those acquisition efforts in the fall of 1994.[182] In particular, WRT commenced negotiations in earnest as of November 29, 1994, with Benton seeking to acquire the 43.75% working interest owned by Tenneco Ventures Corporations and Tenneco Gas Production Corporations (collectively, "Tenneco") and Benton. The specific interest being sought was a portion of West Cote Blanche Bay located above a certain geological marker (the "Shallow Rights").[183]

Benton rejected a series of offers tendered by WRT, which offers included part cash, part stock and other variations.[184] Benton did, however, ultimately accept a $20 million cash offer.[185] On January 31, 1995, Benton, Tenneco and WRT executed a letter of intent calling for the sale of the Shallow Rights.[186] On or about March 31, 1995, Benton entered into a Purchase and Sale Agreement with Tesla to convey its 32.95221% working interest in the Shallow Rights, effective January 1, 1995. WRT paid Benton $14,824,955 in connection with that transaction. On or about April 6, 1995, Tenneco entered into a Purchase and Sale Agreement with Tesla to convey their 10.79779% working interest in the Shallow Rights effective January 1, 1995.

### 6. South Hackberry Field.

WRT was interested in acquiring the properties to "fill in" the area between East and West Hackberry known as South Hackberry. Tico Exploration Company ("Tico") was formed to accomplish that purpose. Tico's mission was to acquire leases covering more than one thousand acres from various property owners and then convey the acquired leases to WRT.

Tico raised money from investors and used those funds not only to buy the properties but also to do certain field work.[187] Tico eventually acquired the South Hackberry properties for the purpose of transferring them to WRT.[188] In connection with the purchase of South Hackberry, Tico obtained valuations from several different reserve engineers.[189] Tico eventually decided to discharge its obligation to perform certain work in the field by wiring $500,000 into Mr. Edwards's escrow account as a payment to WRT for the field work that was to have been performed.[190] Although WRT started to perform the field work, the work was never completed because of a blowout that occurred.[191]

As matters developed, Tico used the proceeds from the sale of South Hackberry to buy 300,000 shares of WRT stock held

181. Tr. 7/27/00, p. 38, ln. 1—p. 28, ln. 7.

182. Tr. 6/27/00, p. 103 l. 16—p. 104, ln. 1.

183. Tr. 7/27/00, p. 62, l. 24–p. 63, ln. 17.

184. Tr. 7/27/00, p. 69, ln. 10—p. 81, ln. 12; Benton Ex. 89.

185. Tr. 7/27/00, p. 82, ln. 15—p. 83, ln. 16.

186. Trust Ex. 1346.

187. Phillips 1/25/99 Dep. p. 107, ln. 19 through p. 108, ln. 3.

188. Phillips 1/25/99 Dep. p. 99, ln. 4–15.

189. Phillips 1/25/99 Dep. p. 99, ln. 16 through p. 100, ln. 22; p. 114, ln. 20 through p. 116, ln. 6.

190. Phillips 1/25/99 Dep. p. 120, ln. 7 through p. 122, ln. 12.

191. Phillips 1/25/99 Dep. p. 121, ln. 22 through p. 122, ln. 12.

by BSFI.[192] WRT thereafter issued checks for $1 million and $170,000 to BSFI in connection with the South Hackberry transaction.

The Trust has asserted that WRT did not receive any leases for its money. Ms. Stubbs, the in-house accountant with responsibility for WRT's SEC reporting, testified that she saw the South Hackberry leases that WRT purchased.[193] Mr. Beninger testified that, subsequent to the Petition Date, WRT caused the public records to be searched and determined that WRT was in fact the record owner of the South Hackberry leases.[194]

### 7. Arnoult Transactions.

In 1993 and 1994, WRT acquired, at a cost of approximately $7.3 million, four workover and drilling rigs (which included Great Southern Rig # 2, Rig # 14, Rig # 15 and one additional workover rig), a jack-up barge/lift boat, the M/V Energy VII and miscellaneous other marine equipment.[195]

Subsequently, WRT arranged to sell the rigs and its marine-based assets to several companies owned and/or controlled by Donald Arnoult, namely, Arnoult Energy & Construction, Inc. ("AEC"), and E.C.

Energy Production, Inc. ("E.C.Energy"), (collectively, "Arnoult Entities"). The Arnoult Entities were WRT's primary oil field service contractors.[196] In 1994, WRT sold the lift boat, the Energy VII, to AEC, and four rigs to E.C. Energy, AEC's wholly owned subsidiary.[197]

These sales were completed in two separate transactions.[198] Pursuant to a credit sale dated November 30, 1994, WRT sold the four rigs to E.C. Energy for a total consideration of $3,900,000, evidenced by a promissory note which was payable in monthly installments.[199] The credit sale agreement expressly confirmed WRT's continuing security interest in the rigs.[200] WRT subsequently sold the Energy VII to AEC for $1,800,000, evidenced by a promissory note, dated December 4, 1994, also payable in monthly installments.[201] AEC executed a preferred ship mortgage on the Energy VII in favor of WRT securing repayment of the note, which mortgage was recorded with the Coast Guard.[202] The $3,900,000 and $1,800,000 notes will be collectively referred to hereinafter as the "Arnoult Notes."

WRT's book value for the four rigs was $2,765,000.[203] The book value for the En-

---

192. Phillips 1/25/99 Dep. p. 118, ln. 7 through p. 119, ln. 6; Edwards Exs. 104 and 121.

193. Stubbs 2/25/99 Dep. p. 87, ln. 2 through p. 92, ln. 3.

194. Beninger Tr. 5/3/00 p. 176, ln. 12–25.

195. See Exhibit L–294 (8/22/95 Hale Memorandum to Accounting File re: Rig and Marine Equipment); Tr. 6/26/00, p. 118 ln. 21 to p. 119 ln. 14.

196. Tr. 6/26/00, p. 118, ln. 24 to p. 120, ln. 5; See Exhibit L–289 (Hale Memorandum re: Rig and Equipment).

197. Tr. 5/2/00, p. 137, ln. 10 to p. 138, ln. 7.

198. See Exhibit L–1 (12/31/94 WRT 10–KSB) at 14.

199. See Exhibit L–263 (11/30/94 Credit Sale Agreement); Exhibit L–285 (11/30/94 $3.9 million promissory note).

200. See Exhibit L–263 (11/30/94 Credit Sale Agreement).

201. See Exhibit L–298 (12/4/94 $1.8 million Promissory Note by E.C. Energy to WRT Energy).

202. See Exhibit L–297 (12/4/94 Preferred Mortgage on M/V Energy VII).

203. See Exhibit L–294 (8/22/95 Hale memo).

ergy VII was $1,173,000.[204] Accordingly, prior to these transactions, WRT's property account reflected a combined value of $3,938,000 for these marine assets.

WRT did not immediately book the $1.8 million dollar gain that it anticipated would be realized over time from the sale of these assets; the gain was *deferred* and therefore recorded as a liability.[205] AEC never made any payments on the $3.9 million rig notes, leading WRT eventually to demand the return of the rigs. The rigs were eventually given back to WRT pursuant to a *dation en paiement.*[206]

In addition to defaulting on the $3.9 million note, AEC did not make a single payment on the $1.8 million note.[207] AEC, however, subsequently mortgaged the vessel to General Electric Capital Corporation ("GECC"). After suffering personal injuries aboard the Energy VII, the vessel's captain made a claim on the vessel. No insurance was in place on the vessel and a lawsuit resulted, wherein the ranking of security interests was disputed. The result was that the vessel was sold pursuant to an agreed compromise of the personal injury action, with the proceeds going to the captain (approximately $400,000), GECC (approximately $200,000) and WRT (approximately $200,000).[208]

### III. APPLICABLE LAW

The Trust now seeks to avoid certain of the foregoing transactions as fraudulent transfers under federal law and/or pursuant to state law by virtue of section 544(b). As state law issues come into play, the court must initially determine which state's law to apply. All parties concede that Louisiana law applies to the LLOG and Benton transactions.

█ The Trust argues, however, that Texas law should apply to the Napoleonville and South Hackberry transactions. This position is based upon the fact that the transactions involved the transfer of WRT stock. The court disagrees with that analysis. The most significant contact regarding those transactions were the properties which were the subject of the transfers involved, all of which properties are located in Louisiana. Accordingly, the court will apply Louisiana law as to each of the transactions involving real property transfers.

The Trust also argues that Texas law should apply to its action seeking to avoid the transfers of preferred stock dividends. The court agrees; there is no question but that Texas law should apply with respect to that issue.

### IV. BURDEN OF PROOF

█ The Trust has the burden of proof on all elements of a fraudulent transfer action under section 548. *Besing v. Hawthorne*, 981 F.2d 1488, 1494 (5th Cir. 1993); *In re McConnell*, 934 F.2d 662, 665 n. 1 (5th Cir.1991). The standard of proof in fraudulent transfer avoidance actions is proof by preponderance of the evidence. *See, e.g., In re Gutierrez*, 160 B.R. 788 (Bankr.W.D.Tex.1993); *In re American Way Serv. Corp.*, 229 B.R. 496 (Bankr. S.D.Fla.1999).

█ The Trust also has the burden of proving each element of each state law claim asserted under section 544(b). *WCC Holding Corp. v. Texas Commerce Bank–*

---

204. See Exhibit L–294 (8/22/95 Hale memo).

205. Tr. 6/29/00, p. 318, ln. 3–18.

206. Tr. 5/2/00, p. 173, ln. 3—p. 174, ln. 5.

207. Tr. 5/2/00, p. 185, ln. 9—p. 194, ln. 9.

208. 1/20/98 Clarification Agreement between WRT Energy Corporation and WRT Creditors Liquidation Trust, p. 6.

*Houston,* 171 B.R. 972, 984 (Bankr. N.D.Tex.1994). The Trust must establish each element of the state law claims by a preponderance of the evidence. *See, e.g., In re Interest of K.R.,* 22 S.W.3d 85 (Tex. App.2000) (the burden of proof in civil cases is preponderance of the evidence unless a heightened burden has been specifically prescribed); *Johnson v. Texas,* 23 S.W.3d 1, 15 n. 14 (Tex.Crim.App.2000) ("[T]he burden of proof on the civil side is preponderance of the evidence."); *Boise Cascade Corp. v. Dean,* 767 So.2d 76, 87 (La.Ct.App.2000) (in a civil matter "a plaintiff must prove each element of his case by a mere preponderance of the evidence").

■ The burden of showing something by a preponderance of the evidence "simply requires the trier of fact to believe that the existence of the fact is more probable than its nonexistence ..." *Concrete Pipe and Prod. of Cal. v. Construction Laborers Pension Trust,* 508 U.S. 602, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); *Sandoval v. Hagan,* 7 F.Supp.2d 1234 (M.D.Ala.1998) (preponderance of the evidence merely means that the evidence must demonstrate that what is sought to be proved is more likely true than not true).

■ The Trust may meet its burden by expert testimony, financial statements, public documents, appraisals, or a combination of these. *See, e.g., Traina v. Blanchard (In re Mayer),* 1999 WL 777758 (E.D.La. Sept.29, 1999).

■ The burden of proof remains on the Trust as to any element to which there is a presumption. However, a presumption requires the party against whom the action is directed "to come 'forward with evidence to rebut or meet the presumption.' " *In re Emerald Oil Co.,* 695 F.2d 833, 838 (5th Cir.1983) (quoting Fed.R.Evid. 301) (holding that creditor did not rebut presumption of insolvency during 90–day period prior to bankruptcy where debtor rested on presumption and creditor presented a C.P.A. who testified that it was possible debtor's assets exceeded its liabilities). Moreover, "mere speculative evidence ... is not enough." *Gasmark Liquidating Trust v. Louis Dreyfus Natural Gas Corp.,* 158 F.3d 312, 315 (5th Cir.1998).

## V. WRT'S ASSETS AND LIABILITIES

### A. *The Law.*

■ To determine if an entity is insolvent for purposes of avoiding a fraudulent conveyance, courts must utilize the balance sheet test under section 101(32), evaluating whether the entity's "financial condition [is] such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation ...," exclusive of property fraudulently transferred. Section 101(32); *see* section 548(a)(1)(B). This test is "the traditional bankruptcy balance sheet test of insolvency." H.R. No. 100–11, 100th Cong.2d Sess. 5–6 (1988).

■ The relevant solvency valuation date for avoidance purposes is the date of the challenged transfer. *See, e.g., Harvey v. Orix Credit Alliance, Inc. (In re Lamar Haddox Contractor, Inc.),* 40 F.3d 118, 121 (5th Cir.1994); *In re Sullivan,* 161 B.R. 776, 783 (Bankr.N.D.Tex.1993) (stating that the "Court may find insolvency if the plaintiff shows the debtor was insolvent 'proximately before or immediately after the transfer' "; insolvency established by showing debtor was insolvent six months before and after transfer).

■ Courts generally conduct a two-step analysis to determine whether a debtor is insolvent under the balance sheet test. *Union Bank of Switzerland v. Deutsche Financial Services Corp.,* 2000 WL 178278, at *9 (S.D.N.Y. February 16,

2000) (citing *In re Taxman Clothing Co.*, 905 F.2d 166, 169–70 (7th Cir.1990)). First, the court determines whether it is proper to value the debtor's assets on a "going concern" basis or a "liquidation" basis. Second, the court conducts a "fair valuation" and assigns a value to all the debtor's assets and liabilities as of the date of the challenged transfer. These assets and liabilities are tallied, and if debts exceed assets at fair valuation as of the date of the challenged transfer, the debtor is "insolvent" within the meaning of the balance sheet test. *See id.;* section 101(32).

■ A liquidation analysis is used to determine "fair valuation" of assets where the debtor is "financially dead or mortally wounded." *E.g., Langham, Langston & Burnett v. Blanchard,* 246 F.2d 529, 532–33 (5th Cir.1957). Liquidation or scrap value of assets must be used because, if the entity is not a going concern at the time of the transfer, "it would not be proper for the assets to be valued at a going concern value." *Id.* (citation omitted); *Mitchell v. Investment Secs. Corp.,* 67 F.2d 669, 671 (5th Cir.1933) (stating that use of scrap or junk values is proper if the debtor, though nominally alive, is really dead on its feet on the date of the transfer).

■ If bankruptcy was not clearly imminent on the date of the challenged transfer, the court must achieve a "fair valuation" of the debtor's assets on a "going concern" basis. *In re Trans World Airlines, Inc.,* 134 F.3d 188 (3d Cir.1998); *see also WCC Holding Corp. v. Texas Commerce Bank–Houston,* 171 B.R. 972, 984 (Bankr.N.D.Tex.1994) (citing *Moody v. Security Pac. Business Credit, Inc.,* 971 F.2d 1056, 1067 (3d Cir.1992)).

■ "Fair value, in the context of a going concern, is determined by the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts." *In re Roblin Indus., Inc.,* 78 F.3d 30, 35 (2d Cir.1996) (citations omitted); *Lamar Haddox,* 40 F.3d at 121 (stating that "fair value of property is ... determined [not by arbitrary book values of assets but rather] by ... 'estimating what the debtor's assets would realize if sold in a prudent manner in current market conditions' "; equating fair value with fair market value at the time of the transfer); *see also Langham, Langston & Burnett,* 246 F.2d at 532 (quoting *Mitchell v. Investment Securities Corp.,* 67 F.2d 669, 671 (5th Cir.1933)): "One is insolvent under the statute when his assets, if converted into cash, at a fair not forced sale will not pay [his debts]." "In determining a debtor's insolvency, a court must examine the actual values of the assets [at the time of the transfer] and not arbitrary values assigned by the debtor." *E.g., Pioneer,* 147 B.R. at 892. "A fair valuation may not be equivalent to the values assigned on a balance sheet. Financial statements reflect the book value of assets." *Lamar Haddox,* 40 F.3d at 121. Book value may not be equivalent to fair market value.

■ "[F]air valuation ... means a fair market price that can be made available for payment of debts within a reasonable period of time, and 'fair market value' implies a willing seller and a willing buyer." *American Nat'l Bank and Trust Co. of Chicago v. Bone,* 333 F.2d 984, 987 (8th Cir.1964). For purposes of a "fair valuation," the fair market value of the property must be measured by what the property would bring if actually sold on the market at the time of the transfer, assuming an informed, hypothetical willing seller and an informed, hypothetical willing buyer not under compulsion to buy or sell, and having a reasonable amount of time to sell the property.

■ Because "[a] fair valuation of assets contemplates a conversion of assets into cash during a reasonable period of time," " '[a]sset valuation ... should be reduced by the value of the assets not readily susceptible to liquidation and the payment of debts.' " *Trans World Airlines, Inc.*, 134 F.3d at 194 (3d Cir.1998)(quoting *Briden v. Foley*, 776 F.2d 379, 382 (1985)); *Constructora Maza, Inc. v. Banco de Ponce*, 616 F.2d 573, 577 (1st Cir.1980) ("Reduction in the fair value of assets may be appropriate if those assets are not susceptible to liquidation, and thus cannot be made available for payment of debts, within a reasonable period of time"; discussing discounting of accounts receivable); *Louisiana Nat. Life Assur. Society v. Segen*, 196 F. 903, 905 (E.D.La. 1912)(same).

■ Additionally, contingent assets or liabilities should be included as part of the balance sheet insolvency test. *E.g., In re Worcester Quality Foods, Inc.*, 152 B.R. 394 (Bankr.D.Mass.1993)(stating that section 101(32) requires the full amount of contingent liabilities to be included in solvency analysis and thus full amount of debtor's contingent lease commitments should be reflected on liability side of balance sheet); *Marine Midland Bank v. Stein*, 105 Misc.2d 768, 433 N.Y.S.2d 325 (N.Y.Sup.Ct.1980)(finding that debtor's guaranty was contingent liability that must be included at face value in determining balance sheet solvency).

Insolvency and "fair valuation" may be established to the court's satisfaction by expert testimony, financial statements, public documents, appraisals, or a combination of these. *See, e.g., Traina v. Blanchard (In re Mayer)*, 1999 WL 777758 (E.D.La. Sept.29, 1999)(proper to establish fair market value of an asset through compilation of expert testimony, balance sheets, financial statements, appraisals, and other affirmative evidence) (citation omitted); *Pembroke Dev. Corp. v. Commonwealth Sav. & Loan Ass'n*, 124 B.R. 398, 402 (Bankr.D.Fla.1991)(holding that evidence such as appraisals or opinion testimony was required to establish actual fair market value versus book value of real properties).

■ In reaching its conclusions on "fair valuation," the court may adopt the asset values of one party or the other, or the court may choose its own fair valuation figure after weighing all the evidence. *See, e.g., Roblin Indus.*, 78 F.3d at 35 (stating that if possible, insolvency determinations should be based on seasonable appraisals or expert testimony, but that "[b]ecause the value of property varies with time and circumstances, the finder of fact must be free to arrive at the 'fair valuation' defined in § 101[ (32) ] by the most appropriate means."); *Syracuse Eng'g Co.*, 110 F.2d at 470 (upholding "middle course" that court took with respect to value of assets and liabilities).

■ After considering the evidence and assigning a final value to the debtor's assets and liabilities, a court should subtract the debtor's liabilities from its assets to determine whether the debtor was insolvent under the balance sheet test. *See, e.g., Associated Painting Servs., Inc.*, 1993 WL 179423 (E.D.La. April 29, 1993)(reviewing trial court's "fair valuation" and insolvency calculations); *see Pioneer*, 147 B.R. at 892 (stating that ultimately, under the balance sheet test, "it is the actual, rather than the theoretical condition of the debtor which determines [insolvency]" at the time of the transfer) (quoting *Mitchell*, 67 F.2d at 671). The essential question to be answered by the court is whether the debtor's liabilities exceeded its assets, valued in accordance with the statute, at the time of the transactions at issue.

## B. *The Experts.*

### 1. The Trust's Expert Witnesses.

(a) *Michael Heinz.* Mr. Heinz, a petroleum engineer, was accepted by the court as an expert in the field of oil and gas reserve engineering. Mr. Heinz holds a Bachelor of Science degree in Petroleum Engineering and is a Vice President and Team Leader with Netherland, Sewell & Associates.

(b) *Jeff Spilker.* Jeff Spilker was accepted as an expert in the fields of forensic and financial accounting, financial fraud investigation, and property business valuation, including projections analysis. Mr. Spilker is a certified public accountant and holds a Bachelor of Architecture, a Masters of Business Administration and a Doctorate of Jurisprudence.

(c) *Sheila Macdonald.* Sheila Macdonald was offered by the Trust as an expert witness in the area of valuation of oil and gas properties. The Defendants strongly challenged Ms. Macdonald's credentials and in fact presented evidence to suggest her resume contained false information and that she had given false testimony. Of particular concern, the Defendants presented evidence to suggest that not only did Ms. Macdonald not hold an Archeology degree from Stanford University, but that she in fact had never attended Stanford.

After Ms. Macdonald provided an elaborate explanation regarding the Defendants' evidence and adamantly insisted that she did hold a degree from Stanford, the court permitted Ms. Macdonald to testify as an expert in the valuation of oil and gas properties. The court noted at that time, however, that the weight to be given her testimony might well be affected by matters such as a lack of strong qualifications, prior inconsistent statements and other facts suggesting impeachment.

Subsequent to Ms. Macdonald's testimony, counsel for the Trust advised the court that their investigation revealed that Ms. Macdonald in fact had not attended Stanford University. At the same time, the court was advised (by letter from her counsel) that Ms. Macdonald refused to return to Louisiana to testify on behalf of the Trust. Through that attorney, Ms. Macdonald attempted to withdraw those portions of her resume and testimony dealing with Stanford University.[209]

In light of what the court now knows about Sheila Macdonald's testimony, the court cannot give any weight to that testimony. At this point, the court is not certain whether Ms. Macdonald holds any degrees whatsoever or whether any testimony she gave was true. It was established that she lied about attending Stanford University; she thereafter created a more elaborate lie when confronted on the witness stand with her first lie. This was compounded when a chambers conference was held with Ms. Macdonald and counsel for the Trust. The fact that Ms. Macdonald was not a fact witness is of no moment. The court cannot trust the word of an expert witness who would brazenly lie about her credentials and then further lie when caught. If she would lie about her academic credentials, there is no reason to believe that she would not provide erroneous and/or misleading valuation testimony if she believed it would benefit her client.

The court, therefore, will not ascribe any weight to the evidence supplied by Ms. Macdonald. As Ms. Macdonald was the sole witness on valuation for the Trust, this decision will create a significant hole

---

209. The court submitted a report and recommendation to the District Court suggesting that Ms. Macdonald be held in criminal contempt. She ultimately entered a plea of guilty to criminal contempt before the Hon. F.A. Little, Jr. Chief United States District Judge.

in the Trust's case with respect to valuation. While this is unfortunate, the Trust chose this witness and apparently was satisfied with this selection as counsel for the Trust vouched for her veracity when she was confronted by counsel for the LLOG defendants [210].

### 2. The Defendants' Expert Witnesses.

(a) *Dr. Stephen A. Holditch.* Dr. Holditch was qualified as an expert in petroleum engineering, including reservoir engineering, and the valuation of oil and gas properties. Dr. Holditch holds Doctor of Philosophy, Master of Science and Bachelor of Science degrees in Petroleum Engineering from Texas A & M University. Dr. Holditch is a registered engineer and has had 32 years of experience in the oil and gas industry, including the estimation of reserves and future reserves and the valuation of oil and gas properties.

(b) *Peter Huddleston.* Mr. Huddleston was allowed to testify as an expert in the area of oil and gas reserve engineering and fair market valuation of oil and gas properties. He is a registered professional petroleum engineer and holds a Bachelor of Science degree in Petroleum Engineering from Texas A & M University.

(c) *William Legier.* Mr. Legier, a certified public accountant, was qualified to testify as an expert in the fields of public and forensic accounting, business valuation, and fraud examination.

### C. *The fair value of WRT's assets as of the dates of the transactions at issue.*

### 1. WRT's oil and gas properties.

Clearly the most significant asset owned by WRT was its oil and gas proper-

ties. As such, the valuation of the oil and gas properties owned by WRT and those purchased by WRT during the relevant time periods was the most contested issue during the Insolvency Trial.

Unfortunately, the valuations provided by the experts for the Trust and those provided by the experts for the Defendants were not even in the same ballpark. The extreme differences are the result of several factors. First and foremost, the art of valuing oil and gas properties, which includes the task of estimating reserves, is not an exact science. Each and every expert witness, as well as the fact witnesses who were experienced in the oil and gas industry, readily conceded that the opinions of professionals in estimating reserves and valuing oil and gas properties can differ greatly. As such, the methodology employed by the experts differed.

The Trust's experts created a mechanical formula of deriving fair market value, examining only proved reserves, calculating likely cash flow through employing assumptions as to expenses and pricing and then reducing that cash flow by various risk factors. The experts for the Defendants, on the other hand, started with the price WRT paid for the properties, and then reevaluated and audited reserve reports and market factors, such as comparable sales, to determine whether the prices paid by WRT (or WRT's book value for properties already owned) were reasonable.

The court initially notes that as a result of the lack of credible testimony from Ms. Macdonald, the Trust has essentially no evidence on the fair market value of the

---

**210.** This is not to suggest that counsel was aware of the misrepresentations made by Ms. Macdonald.

properties. However, even if the court were to consider the testimony of Ms. Macdonald, the court finds that the methodology employed by the Trust's experts in valuing the oil and gas properties is flawed in several critical respects, namely the failure to even consider comparable sales and the failure to give any value whatsoever to "probable" and "possible" reserves. Pursuant to SEC regulations, estimates of oil and gas reserves are limited to "proven" and certain categories of "probable." These limitations are for at least two reasons. First, to protect the public from wild unsubstantiated reserve reports, and second, to provide some standard by which all reserves are reported. This is not to say, however, that there is no value whatsoever to non-reportable "probable" and any "possible" reserves. And while a prospective purchaser of oil and gas reserves may not ascribe much value to these categories when negotiating the purchase of the asset, they no doubt have some indication that these reserves may certainly increase the value of the purchase.

Most importantly, however, the court does not believe that the valuations arrived at by Ms. Macdonald have any connection to real market values. A dramatic example of the fundamental disconnect between Ms. Macdonald's opinion of value and the real world occurred with respect to the East Hackberry property.[211] Ms. Macdonald placed a combined value on WRT's 50% interest in East Hackberry as of December 1, 1994, of approximately $4,500,000. However, only ninety days prior to this date, on September 2, 1994, Milam Royalty Corporation ("Milam") paid WRT $8,605,431 for an undivided 50% ORR in these same properties—plus almost $3 million additional for an interest in well bores existing as of September 2, 1994.[212]

Milam did have the right to elect to participate in wells after May 1, 1994;[213] however, if it made such an election, it had the obligation to share in the costs as a deferred overriding purchase price.[214] Prior to the September 2 closing, Milam made the election to participate in all well activities initiated subsequent to the effective date (May 1, 1994), but prior to the closing date (September 2, 1994).[215] As a result, Milam paid an additional deferred purchase price through September 2, 1994, in the amount of $2,694,617.[216] Accordingly, through an effective date of September 2, 1994, Milam paid WRT $11.3 million for a 50% ORR in the field—almost 2½ times the value ascribed by Ms. Macdonald![217]

Throughout 1995, Milam continued to make payments to WRT under the deferred portion of the purchase price.[218] Mr. William Hurt, Milam's Vice President,

---

211. The East Hackberry properties are the Erwin Heirs lease and State Lease 50.

212. Depo. Tr. 4/5/99, p. 79, ln. 3–12. Depo. Tr. 4/5/99, p. 69, ln. 25 to p. 74, ln. 8; See also Exhibits L–549, L–550, L–551 and L–552 (9/26/94 Conveyances and Ancillary Agreements from WRT/Southern Petroleum Co. to Milam Royalty Corp.).

213. Depo. Tr. 4/5/99, p. 79, ln. 13 to p. 80, ln. 3.

214. Depo. Tr. 4/5/99, p. 80, ln. 4–8.

215. Depo. Tr. 4/5/99, p. 82, ln. 21 to p. 85, ln. 4.

216. Depo. Tr. 4/5/99, p. 82, ln. 21 to p. 87, ln. 17.

217. Depo. Tr. 4/5/99, p. 99, ln. 19–25; See also Exhibit L–1 (WRT's 10–KSB for year ending 12/31/94), at 17; Exhibits L–553 (Preliminary Settlement Statement); Exhibit L–554 (WRT Updated Closing Statement); Exhibit L–1791 (WRT Gain Calculation—9/2/94).

218. Depo. Tr. 4/5/99, p. 100, ln. 1–6.

testified that Milam made the decision to participate "in excess of 20 to 25" new wells and/or recompletions as part of the deferred purchase price.[219] As reflected in an audit undertaken over a year later, Milam paid the original acquisition price of $8,605,431, plus a deferred purchase price of $9,890,948, for a total of $18,496,379— almost 4 times the value ascribed by Ms. Macdonald![220]

Ultimately, the original acquisition price plus the deferred purchase price paid by Milam to WRT exceeded $20,000,000.[221] Mr. Hurt specifically testified that based upon Milam's assessment of the value, Milam considered this price to be a fair price for their ORR in the property.[222]

Milam was a sophisticated purchaser. It was a wholly-owned subsidiary (of JP Morgan and the representatives) of a commingled pension trust—with several hundred millions in assets—which invested solely in ORRs and direct royalties in oil and gas properties located primarily in the oil producing states in the domestic United States, including Louisiana.[223]

The pension trust spent several months in conducting due diligence on WRT's East Hackberry properties.[224] That due diligence was generally similar to what they do with every prospective acquisition.[225]

Mr. Hurt testified that the pension trust independently analyzed the information regarding the properties given to them by WRT.[226] The pension trust's internal reserve engineer independently evaluated the reserves for the properties.[227] The representatives of the pension trust were comfortable with the reserve analysis provided by the internal reserve engineer.[228]

The pension trust also undertook due diligence with regard to WRT, as the potential seller. Mr. Hurt explained that, because the pension trust was an ORR owner, the quality of the seller's ability to operate and manage their finances played a significant role in the outcome in the investment.[229] This evaluation of any seller was a standard part of the pension trust's due diligence.[230]

Finally, Mr. Hurt testified that the pension trust "had a policy of regularly auditing each one of its investments on a periodic basis in order to confirm and verify the performance and accounting of each of our entities that we did business with." [231] The pension trust monitored each one of these projects on a daily basis, getting both daily well reports and monthly production reports, and also undertook periodic re-evaluations of the reserves.[232] For

---

219. Depo. Tr. 4/5/99, p. 105, ln. 4–17 and p. 106, ln. 4–9.

220. Depo. Tr. 4/5/99, p. 100, ln. 25 to p. 101, ln. 7; p. 102, ln. 4–24.

221. Depo. Tr. 4/5/99, p. 219, ln. 8 to 220, ln. 9.

222. Depo. Tr. 4/5/99, p. 102, ln. 25 to p. 103, ln. 7.

223. Depo. Tr. 4/5/99, p. 20, ln. 9 –19, p. 21, ln. 19–25, p. 22, ln. 6–19, p. 23, ln. 2–7 and p. 45, ln. 11 to p. 46, ln. 4.

224. Depo. Tr. 4/5/99, p. 37, ln. 15–19.

225. Depo. Tr. 4/5/99, p. 37, ln. 20 to p. 38, ln. 4.

226. Depo. Tr. 4/5/99, p. 90, ln. 7–17.

227. Depo. Tr. 4/5/99, p. 38, ln. 18–21 and p. 90, ln. 18 to p. 91, ln. 1.

228. Depo. Tr. 4/5/99, p. 39, ln. 4–8.

229. Depo. Tr. 4/5/99, p. 31, ln. 15 to p. 32 ln. 9.

230. Depo. Tr. 4/5/99, p. 32, ln. 10–12.

231. Depo. Tr. 4/5/99, p. 131, ln. 15–20.

232. Depo. Tr. 4/5/99, p. 128, ln. 7–16.

the 1995 audit of the East Hackberry reserves, Milam used Ryder Scott,[233] an engineering consulting firm in Houston agreed by all parties to be one of the leaders in the field.

Again, through May of 1996, the pension trust's investment in the East Hackberry Field totaled in excess of $20,000,000.[234] These real world decisions by fiduciaries of a trust—made without the benefit of hindsight—stand in stark contrast to Ms. Macdonald's opinion that as of December 1, 1994, WRT's remaining 50% interest in these same fields was worth less than one quarter of this amount. Quite clearly, Ms. Macdonald's valuation cannot be reconciled with amounts paid by Milam.

But the Milam situation is hardly unique. Ms. Macdonald's valuations of other properties are at direct odds with other concrete examples of real world market valuation. Ms. Macdonald opined that the Deer Island and N.E. Deer Island Fields had an aggregate value of less than $9,000,000.00. However, in October 1994, LLOG received an offer for those very properties of $15 million from Forest Oil, a substantial independent oil and gas producer.[235] LLOG rejected the offer because it was less than what it perceived to be the minimum acceptable price;[236] LLOG indicated to Forest Oil, however, that it would be willing to accept $18.5 million for the interests plus a bonus tied to production.[237]

Turning to the Abbeville property, Ms. Macdonald opined that this property had a value of $650,000. Of the total purchase price paid for the remaining LLOG properties, WRT allocated more than $3 million to Abbeville, some 500% of the value calculated by Ms. Macdonald. LLOG was not the sole working interest owner in the Abbeville Field. Vintage Petroleum, an independent oil and gas operator, was offered the opportunity to sell its interests to WRT at a price consistent with the amount paid to LLOG. Vintage found the price inadequate, however, and refused to sell its interest in the field.[238]

Ms. Macdonald's values for West Cote Blanche Bay are also in direct conflict with amounts actually paid for other interests in that property. Ms. Macdonald testified that the 6.25% interest owned by WRT had a value as of December 1, 1994, of $530,000. She valued the approximate 33% interest WRT acquired from Benton for $15 million as of April 1, 1995, at only $2,080,000. These figures, however, are in direct conflict with prices of actual sales in the same relative time frame. Several examples are illustrative:

1. WRT rejected an offer of $3 million for its 6.25% interest in 1993 in West Cote Blanche Bay; no counter offer was made. Ms. Macdonald values the same interest at $530,000. Extrapolating Benton's offer to the 33% interest acquired by WRT would establish a value in excess of $16 million.[239]

2. Tenneco acquired an approximate 10.8% interest in West Cote Blanche Bay

233. Depo. Tr. 4/5/99, p. 197, ln. 1–24.

234. Depo. Tr. 4/5/99, p. 100, ln. 25 to 101, ln. 7, p. 102, ln. 4–24, and p. 219, ln. 8 to p. 220, ln. 9.

235. Tr. 7/26/00, p. 1, ln. 5–9.

236. Tr. 7/26/00, p. 55, ln. 1–5; Tr. 7/26/00, p. 54, ln. 21–23.

237. Tr. 7/26/00, p. 55, ln. 1–5.

238. Tr. 7/26/00, p. 60, ln. 8 to p. 67, ln. 7; Tr. 7/28/00, p. 34, ln. 16 to p. 35, ln. 2.

239. Tr. 5/24/00, p. 164, ln. 10–24.

for $13,410,860.00, in 1994. This extrapolates to an approximate $40 million dollar value for a 33% interest.[240]

3. In the summer of 1995, Texaco rejected a $22.2 million offer for a 50% interest. This initial offer, which WRT officers admitted they were prepared to raise, would extrapolate a value of $14,650,000. Ms. Macdonald, however, valued that interest at $2,080,000.00.[241]

4. Benton paid a total of $23,435,058.00 for its 43.75% interest. This extrapolates to a value of approximately $17,576,000.00 for the 33% it sold WRT.

Even if the court were to overlook her total lack of credibility, the values ascribed to these properties by Ms. Macdonald simply do not stand up to the reality of the marketplace.

The court has reviewed the expert reports, testimony and other evidence and finds that the methodology employed by the Defendants' experts provides appropriate valuations for WRT's oil and gas properties. Accordingly, based upon all relevant and credible evidence presented, the court fixes the fair market value of WRT's oil and gas properties at the relevant dates as set forth in the following chart:

| Property | 12/16/94 | 1/30/95 | 3/8/95 | 3/31/95 |
|---|---|---|---|---|
| Tigre Lagoon | $ 840,000 | $ 827,000 | $ 819,000 | $ 811,000 |
| West Hackberry | $10,789,000 | $11,495,000 | $ 11,436,000 | $ 11,410,000 |
| Lac Blanc | $ 9,339,000 | $ 8,783,000 | $ 8,830,000 | $ 8,672,000 |
| East Hackberry | $13,033,000 | $15,870,000 | $ 16,198,000 | $ 17,098,000 |
| West Cote Blanche Bay | | | | |
| (1) 6.25% | $ 3,180,000 | $ 3,195,000 | $ 3,234,000 | $ 3,409,000 |
| (2) 32.95221% | N/A | N/A | N/A | $ 14,824,000 |
| Napoleonville | $ 9,750,000 | $ 9,893,000 | $ 9,893,000 | $ 9,898,000 |
| Bayou Penchant | N/A | $15,000,000 | $ 15,570,000 | $ 23,332,000 |
| Abbeville | N/A | N/A | $ 2,443,000 | $ 2,443,000 |
| Bayou Pigeon | N/A | N/A | $ 14,315,000 | $ 14,135,000 |
| Deer Island | N/A | N/A | $ 16,562,000 | $ 16,562,000 |
| Golden Meadow | N/A | N/A | $ 7,647,000 | $ 7,647,000 |
| Totals | $46,931,000 | $65,063,000 | $106,947,000 | $130,000,000 |

Although these values are either the WRT book values or purchase prices of the properties at issue, the court did not merely adopt those values without further evaluation. The court believes that the evidence supports that these values represent the *minimum* fair market values of these properties. The following observations support this conclusion:

First, the court notes that WRT's books were reviewed by numerous professionals, both inside and outside the corporation. By the middle of 1994, WRT had an internal accounting staff of seven to ten people including three CPAs.[242] In addition, an outside director, Mr. Rash, and a senior corporate officer, Mr. Petersen, were each CPAs. WRT's accounting department con-

240. Tr. 5/25/00, p. 141, ln. 15 to p. 142, ln. 6.

241. Tr. 5/24/00, p. 189, ln. 2 to p. 190, ln. 14; p. 191, ln. 1—3; p. 192, ln. 1–24.

242. Deposition Excerpt, Ronald Hale, 4/22/99, Vol. 1, p. 19, ln. 7–12; Tr. 5/23/00, p. 295, ln. 19 to p. 296, ln. 7.

sisted of three CPAs, Mr. Hale, CFO, Ms. Stubbs, manager of financial accounting, and Mr. Begnaud, manager of corporate accounting; Bill Jenny, manager of oil and gas accounting; two supervisors, two associates and an assistant or two.[243] Each of the managers had extensive experience in oil and gas accounting and maintained WRT's financial records in accordance with their training and SEC standards.

Further, WRT books and records were independently audited by KPMG.[244] KPMG's audit team handling the WRT engagement was highly qualified and included several specialists in oil and gas accounting. The team was headed by Mr. Transier, a nationally recognized expert in his field. Mr. Transier was KPMG's senior partner in the oil and gas area, and also served as the firm's representative to the working group of national accounting firms on oil and gas accounting. Mr. Transier went on to become the number two man and CFO of Ocean Energy, the seventh largest independent oil and gas company in the world.[245] Randy Hill, the senior manager in charge, became a partner at KPMG.[246] Chet Williams, the staff accountant handling the WRT engagement is now a manager at KPMG.[247] Each of these qualified and experienced accountants were involved in examining the accuracy of WRT's records.

Second, the comparable sales mentioned above more than support these values.

Third, the extensive and exhaustive reports of Dr. Holditch and Mr. Huddleston support these values. Dr. Holditch conducted his own reserve analysis of the LLOG properties and concluded that those properties were worth in excess of $62 million. Dr. Holditch also undertook an audit of the reserve work that had been done by Scotia, Veazey and Huddleston and concluded that the non-LLOG properties were worth in excess of $70 million. Mr. Huddleston reviewed numerous sales of interests in West Cote Blanche Bay and concluded that the 32.95221% working interest acquired by WRT from Benton had an estimated fair market value of between $14.06 million to $17.8 million.

Finally, Mr. Legier performed a "ceiling test" to determine what values to use in his solvency analysis. Mr. Legier looked for indicia of value that was contemporaneous and available in KPMG's work papers and in WRT's records. He then compared those to the amount that the properties were recorded on the books, net of depreciation and amortization. If the value was in excess of the book value, he used the book value. If the evidence demonstrated that the value was less than book value, book value was written down. In doing his analysis, Mr. Legier reviewed not only historical reserve engineer reports, but also the current information provided by Dr. Holditch.

As to South Hackberry, the court finds that the record is devoid of any credible evidence regarding the value of WRT's interest in South Hackberry as of the date of that transfer. Accordingly, the court fixes the value of South Hackberry as of June 1995 at $1,170,000, the consideration paid by WRT.

## 2. Notes and accounts receivable.

(a) *The Arnoult Notes.* WRT arranged to sell certain rigs and its marine based

**243.** Deposition Excerpt, Cathy Stubbs, 2/24/99, Vol. 1, p. 28, ln. 3 to p. 30, ln. 1.

**244.** Tr. 6/26/00, p. 172, ln. 3–16.

**245.** Tr. 6/26/00, p. 162, ln. 4–15; Tr. 6/26/00, p. 162, ln. 22.

**246.** Tr. 6/26/00, p. 189, ln. 2–15.

**247.** Tr. 6/26/00, p. 325, ln. 16 to p. 326, ln. 5.

assets to the Arnoult Entities.[248] In 1994, WRT sold the lift boat, the Energy VII, to AEC, and four rigs to E.C. Energy, AEC's wholly owned subsidiary.[249] This sale was completed in two separate transactions as discussed above wherein WRT received the two Arnoult Notes.[250]

WRT's book value for the four rigs and the Energy VII was $2,765,000[251] and $1,173,000,[252] respectively. Accordingly, prior to these transactions, WRT's property account reflected a combined value of $3,938,000 for these marine assets—approximately $1.8 million *less* than the face amount of the Arnoult Notes.[253]

WRT did not immediately book the $1.8 million dollar anticipated gain that would be realized over time from the sale of these assets; the gain was *deferred* and therefore recorded as a liability.[254] By recording the $1.8 million deferred gain as a liability (thus offsetting the $5.7 million in notes then carried on WRT's balance sheet), WRT ensured that the gain would be recognized as an asset if, and only to the extent, the Arnoult Notes performed.[255] The transaction had no affect on WRT's balance sheet, or net worth.[256] KPMG specifically reviewed both transactions.[257]

Both Messrs. Legier and Spilker wrote off the two Arnoult Notes at year-end 1994, as well as the corresponding liability for the deferred gain.[258] They disagreed, however, with respect to the accounting treatment for the underlying collateral. Mr. Legier opined that there was no basis to write off *both* the notes *and* the underlying collateral.[259] As a result, he made an adjusting credit to WRT's property account of $1,723,000, representing an estimate of the fair value of the rigs ($550,000) and the Energy VII ($1,173,000).[260]

Mr. Legier testified that his estimate as to the value of this collateral was conservative, as the four rigs alone had a book value of $2,765,000.[261] Mr. Legier in fact testified that he perhaps seriously undervalued this collateral. Mr. Harvey Davis, Great Southern's expert witness, corroborated this point. He testified that three of the rigs (Rig # 2, Rig # 14 and Rig # 55) *alone* had a fair market value of

**248.** Tr. 6/26/00, p. 118, ln. 24 to p. 120, ln. 5; See Exhibit L–289 (Hale Memorandum re: Rig and Equipment); see discussion at pp. 366–67, *supra*.

**249.** Tr. 5/2/00, p. 137, ln. 10 to p. 138, ln. 7.

**250.** See Exhibit L–1 (12/31/94 WRT 10–KSB) at 14.

**251.** See Exhibit L–294 (8/22/95 Hale memo).

**252.** See Exhibit L–294 (8/22/95 Hale memo).

**253.** See Exhibit L–1 (12/31/94 WRT 10–KSB) at 14 and Exhibit L–294 (8/22/95 Hale memo).

**254.** Tr. 6/29/00, p. 318, ln. 3–18.

**255.** Deposition Excerpt, Ronald Hale, 4/22/99, Vol. I, p. 169, ln. 2 to p. 170, ln. 25; Tr. 6/26/00, p. 358, ln. 10 to p. 359, ln. 9.

**256.** Deposition Excerpt, Ronald Hale, 4/22/99, Vol. I, p. 169, ln. 2 to p. 170, ln. 25.

**257.** Deposition Excerpt, Ronald Hale, 4/22/99, Vol. I, p. 169, ln. 2 to p. 170, ln. 25; Tr. 6/26/00, p. 358, ln. 10 to p. 359, ln. 9.

**258.** Tr. 6/29/00, p. 314, ln. 18 to p. 315, ln. 18; Tr. 5/31/00, p. 241, ln. 1–5.

**259.** Tr. 6/30/00, p. 39, ln. 6–17.

**260.** Tr. 6/29/00, p. 314, ln. 1 to p. 317, ln. 5.

**261.** Part of L–2272. Legier Binder, Tab V (KPMG work paper, see WRT Energy Corporation support for sale of rigs and equipment, December 1994).

$1,061,600.[262] This expert analysis is supported by a 1990 appraisal of only three of the rigs which fixed a fair market value of $1,142,200.[263]

Similarly, the Energy VII had a value on WRT's books of $1,173,000 prior to the sale to E.C. Energy.[264] Mr. Legier reviewed all of the available information regarding the vessel and decided that this figure represented a fair value for the asset. His reasons for this are several. First, an appraisal of the Energy VII commissioned by James Arnoult in August of 1994 found that the vessel had "a fair current market value of $1,100,000" and a replacement value of $2,200,000.[265] Second, the survey report notes that the Energy VII had recently undergone extensive refurbishment and detailed the recent efforts of WRT to repair and modify this vessel.[266] Third, WRT's efforts to fully repair and refurbish the vessel did not end in August of 1994.[267] Fourth, in May 1995, AEC reaffirmed its indebtedness to WRT for the Energy VII and executed another mortgage on the vessel; AEC thus confirmed that WRT had advanced significant sums of money for the refurbishment of the vessel and that the vessel had a fair market value of $1.8 million.[268] Fifth, consistent with the foregoing, WRT (through its Trustee, Goldin) has taken the position in litigation before the Eastern District of Louisiana,[269] that WRT had advanced AEC $1,173,393.12 to repair and refurbish the Energy VII,[270] and that the Energy VII's market value, in its restored condition, was approximately $1.8 million.[271] And sixth, an appraisal of the vessel on February 19, 1996, concluded that it had a "forced liquidation value" of $1 million.[272]

Based on these facts, Mr. Legier was of the opinion that WRT's security on the Energy VII was not impaired as of either year-end 1994 or March 31, 1995, and that $1,173,000—as a fair value of the vessel—should be credited to WRT's property account as of those dates.[273] Combined with an estimate for the value of the rigs ($555,-000), Mr. Legier adjusted WRT's balance sheet (property account) to recognize as an

262. See Great Southern Exhibit No. 53.

263. See Exhibit L–916 (Hadco Appraisal for Great Southern Oil & Gas (GSOG) Rig No. 2 valuing the rig at $150,900); Exhibit L–917 (Hadco Appraisal for GSOG Rig No. 14 valuing the rig at $487,000); Exhibit L–918 (Hadco Appraisal for GSOG Rig No. 55 valuing the rig at $503,900).

264. Part of L–2272. Legier Binder, Tab V (KPMG work paper, see WRT Energy Corporation support for sale of rigs and equipment, December 1994).

265. Exhibit T888 (8/16/94 Perry H. Burke & Associates, Marine Surveyors and Consultants, appraisal of the M/V Energy VII). Legier Binder No.1, V. 43.

266. Exhibit T888 (8/16/94 Perry H. Burke & Associates, Marine Surveyors and Consultants, appraisal of the M/V Energy VII). Legier Binder No.1, V. 43.

267. See, Tr. 6/26/00, p. 216, ln. 9–22; Tr. 5/25/00, p. 176, ln. 18 to p. 178, ln. 6.

268. See Mayfield Pre–Trial Order, June 21, 1994, L–1782 at p. 5. Legier Binder No.1, v. 42.

269. *Claude Mayfield v. Energy VII, et al.,* Civil Action No. 96–1954.

270. See Mayfield Pre–Trial Order, June 21, 1994, L–1782 at p. 5. Legier Binder No.1, v. 42.

271. See Mayfield Pre–Trial Order, June 21, 1994, L–1782 at p. 5. Legier Binder No. 1, v. 42.

272. See Exhibit L–1784 (2/16/96 Bachrach, Wood, Peters & Associates, Inc., Survey Report re: M/V Energy VII). Introduced as part of Legier Binder No. 1, v. 5.44.

273. Tr. 6/29/00, p. 315, ln. 19 to p. 320, ln. 12.

asset the collateral underlying the Arnoult Notes at a fair value of $1,723,000.[274]

In stark contrast, despite the fact that he admitted on cross-examination that an impaired loan should be measured at the fair value of its collateral,[275] Mr. Spilker gives WRT no credit for the value of the collateral underlying the Arnoult Notes, contending that WRT's collateral was "impaired."[276] He was of the opinion that WRT should not be given credit for any value of the collateral because there was a "high probability that the collateral would be lost,"[277] as WRT had agreed that its security interest might be subordinated. WRT's SEC filings do note that subordination was a possibility. According to Mr. Spilker, however, the mere possibility of subordination wholly eliminates the value of collateral regardless of whether subordination ever in fact occurs. He then asserted that the entire value of the rigs—which had a book value to WRT of over $2.5 million at November 30, 1994—was lost one week later merely by the sale to E.C. Energy.[278]

This position is simply not supported by the evidence. On cross-examination, Mr. Spilker admitted that he has never seen a subordination agreement.[279] He has not checked any public records or even inquired as to whether there was subordination.[280] He was unable to cite any accounting standard supporting his theory that the mere possibility of subordination

means collateral has no value for financial statement purposes.[281]

The public filings which Mr. Spilker cites as confirmation for such an agreement's existence evidence no such thing. For example, WRT's 10-KSB for year-end 1994, filed April 13, 1995, speaks only to the possibility of subordination, which according to the legally operative documents, WRT controlled by virtue of its unfettered discretion to grant or withhold its consent to any encumbrance of these secured assets.[282] For example, the preferred ship mortgage securing the $1.8 million AEC note clearly states:

10. Owner *shall not, without the prior written consent of Mortgagee [WRT], sell, mortgage, or charter the vessel or any interest therein,* and then only to persons and for uses lawful for American vessels and provided said insurance be unaffected thereby or adequately replaced; nor, if a corporation, merge or consolidate with any other person, firm or corporation or dissolve.[283] [Emphasis added.]

More to the point, no fact witness, including Mr. Arnoult, testified that a subordination agreement was ever entered into between the parties.[284]

Mr. Spilker's theory as to the Energy VII's subordination is particularly weak given that his client, the Trust, litigated and prevailed as to the priority of the WRT mortgage on the grounds that WRT

274. Tr. 6/29/00, p. 317, ln. 6 to p. 318, ln. 3.

275. Tr. 6/1/00, p. 110, ln. 6–21.

276. See Expert Report, Spilker, 5/10/00, pp. 51, 71, and 79.

277. 6/2/00, p. 86, ln. 12–22.

278. Tr. 5/31/00, p. 238, ln. 18 to p. 239, ln. 9.

279. Tr. 6/1/00, p. 110, ln. 25 to p. 111, ln. 20.

280. Tr. 6/1/00, p. 120, ln. 14 to p. 121, ln. 1.

281. Tr. 6/1/00, p. 110, ln. 22 to p. 111, ln. 20.

282. See Exhibit L–297 (Preferred Mortgage on M/V Energy VII); Exhibit L–1 (12/31/94 WRT 10–KSB) at 14.

283. See Exhibit L–297 (Preferred Mortgage on M/V Energy VII).

284. Tr. 5/2/00, p. 234, ln. 5–19.

had not consented to a subsequently recorded mortgage. In *Mayfield, supra,* the District Court was required to rank two mortgages—that of WRT and a subsequently recorded mortgage of GECC. The Trust argued that WRT's mortgage had been recorded first and that WRT had never provided the necessary written consent to subordination. The Trust prevailed.[285]

As testified to by Mr. Legier at trial, the mere possibility of impairment is not a sufficient basis to write these assets off.[286] Mr. Transier confirmed Mr. Legier's conclusion, and testified that KPMG considered the value of the collateral when accounting for these promissory notes and that a potential subordination did not affect that judgment.[287]

In sum, both experts agree that when considering an impaired loan, one looks to the fair value of the underlying collateral. While Mr. Spilker valued that collateral at zero, his "subordination" theory is not supported by the evidence. Mr. Legier's fair valuation of the rigs and vessel at $1,723,000 is conservative. The court concludes that his credit adjustment to WRT's property account for this amount (in conjunction with the write off of the Arnoult Notes) is proper.

■ (b) *Continental Guaranty Notes.* As discussed earlier herein, WRT, Tricore, and Stag entered into the GCJV in 1991. WRT was to contribute oil and gas property to the GCJV and Stag would raise the necessary capital to develop the properties.[288] Tricore's obligation under the GCJV was the contribution of capital, while Stag was to receive a five (5%) percent share of the production revenue from the various wells contributed to the GCJV by WRT.[289]

In 1992 and 1993, WRT agreed to loan Stag $540,000 representing an advance, or prepayment, of Stag's estimated share of the production revenue to be realized by the GCJV.[290] Continental Guaranty Corporation ("CGC"), though its president, Mr. Sterling,[291] acknowledged this debt and executed two promissory notes in favor of WRT—one dated April 15, 1992, in the amount of $200,000, and the other dated April 1, 1993, in the amount of $340,000 (collectively, the "CGC Notes").[292] All parties contemplated that the CGC Notes were to be satisfied from Stag's pro-rata

**285.** Tr. 6/1/00, p. 116, ln. 4 to p. 118, ln. 14 (Summary of Material Facts claimed by Trust); Exhibit L–1781 (Ruling granting WRT's Motion for Summary Judgment in *Mayfield v. The Energy VII, et al.,* No. 96–1954, Section "J" (3), U.S.D.C., Eastern District of Louisiana) at p. 8–9.

**286.** Tr. 6/29/00, p. 312, ln. 13 to p. 313, ln. 11.

**287.** Tr. 6/26/00, p. 364 ln. 21 to p. 365, ln. 15.

**288.** See KPMG Workpaper re: CGC Notes Receivable Collectability at 8/31/94, Legier Binder, (Tab D) at p. 1.

**289.** See Exhibit L–2295 (10/18/91 Joint Venture Agreement) at ¶ 1.02.

**290.** See KPMG Workpaper re: CGC Notes Receivable Collectability at 8/31/94. Legier Binder, (Tab D); Letter of Ernie Begnaud (WRT Manager of Corporate Accounting) to Continental Guaranty Corporation 10/6/93, Legier Binder, (Tab C). Mr. Sterling, President of Stag and CGC, returns this letter confirming the obligation and corrects notation that interest is paid on the note through 10/12/94.

**291.** Mr. Sterling was also the owner of Stag.

**292.** See Exhibit T–4178 (4/15/92 Promissory Note), Legier Binder (Tab A); Exhibit T–4197 (4/1/93 Promissory Note), Legier Binder, (Tab B).

share of the production revenue generated by the GCJV.[293]

Review of the CGC Notes was one of KPMG's primary audit objectives for the 1994 audit.[294] KPMG carefully reviewed the history of the CGC Notes and determined that payments were in fact made in 1994 and applied to both interest and principal; in excess of $40,000 was applied against the principal balance in the last quarter of 1994 alone.[295] Subsequent KPMG work and WRT's records confirm that the CGC Notes continued to perform as of June 30, 1995.[296]

KPMG also performed a thorough review of the anticipated future net cash flows attributable to Stag's interest in the oil and gas properties underlying the CGC Notes.[297] KPMG's year-end 1994 calculations of Stag's interest in the undiscounted cash flows from the GCJV supported a finding that projected future net revenue was sufficient to satisfy the outstanding balance of the CGC Notes.[298] Specifically, KPMG determined that the projected net revenue attributable to Stag's interest in the joint venture, $556,889, was more than sufficient to cover the entire outstanding balance of the CGC Notes as of December 31, 1994, namely, $494,538.04.[299] Accordingly, KPMG determined that the CGC "Note Receivable" balance appeared proper and collectible at December 31, 1994.[300]

At trial, Mr. Legier testified that he had reviewed all of the data available as of year-end 1994 (including KPMG's study of the issue), considered the testimony of all fact witnesses with regard to the anticipated production from the Lac Blanc Field and determined that there was no reason to impair this note either as of year-end 1994 or as of March 31, 1995.[301] Mr. Legier testified that he agreed with KPMG that the CGC Notes were properly carried as an asset on WRT's balance sheet as of December 31, 1994, and March 31, 1995.[302]

**293.** Tr. 6/1/00, p. 313, ln. 6–15. Spilker admits that the CGC notes are payable from the Joint Venture distributions.

**294.** Tr. 5/30/00, p. 127, ln. 1–5, Tr. 5/30/00; p. 314, ln. 7 to p. 316, ln. 15; Tr. 6/29/00, p. 323, ln. 3–22; Exhibit T–4252 (12/31/94 KPMG Audit Strategy Documents and Planning Memorandum) at 3; KPMG 12/31/94 Completion Memo, dated 3/30/95, Legier Binder, (Tab G).

**295.** KPMG Workpaper re: CGC Note Receivable 12/31/94, Exhibit T–4287, prepared 2/95, Legier Binder, (Tab E).

**296.** See Exhibit L–292 (WRT Energy Notes Receivable roll forward).

**297.** See Exhibit T–4252 (12/31/94 KPMG Audit Strategy Memo) at 3; KPMG Memo to Audit Workpapers re: CGC Notes Receivable Collectability at 8/31/94, dated 11/4/94, Legier Binder (Tab D) at 2; KPMG Workpaper re: collactability of Stag Energy Note under Future Cash Flows 12/31/94, Legier Binder, (Tab F).

**298.** See KPMG Memo to Audit Workpapers re: CGC Note Receivable Collectability at 8/31/94, Legier Binder, (Tab D) at 2; KPMG Workpaper re: Collectability of Stag Energy Note Under Future Cash Flows 12/31/94, Legier Binder, (Tab F); and KPMG 12/31/94 Completion Memo, dated March 30, 1995, Legier Binder, (Tab G).

**299.** KPMG Workpaper re: Collectability of Stag Energy Note Under Future Cash Flows 12/31/94, Legier Binder, (Tab F).

**300.** KPMG 12/31/94 Completion Memo, "Conclusions on Critical Audit Objectives," Legier Binder, (Tab G).

**301.** Tr. 6/29/00, p. 322, ln. 24 to p. 327, ln. 10. As an aside, Mr. Legier determined that the CGC promissory notes are in fact with recourse. Accordingly, while not the principal point in dispute, Mr. Legier testified that WRT could, in fact later call upon CGC for any shortcoming in cash flow from the joint venture.

**302.** Tr. 6/29/00, p. 327, ln. 6–10.

Mr. Spilker admitted that the CGC Notes are worth what one could reasonably expect from Stag's five (5%) percent interest in the GCJV.[303] He further acknowledged that KPMG had reviewed both the CGC Notes and CGC's ability to pay based upon the projected net revenues.[304] Mr. Spilker, however, decided to write the CGC Notes off completely as of November 30, 1994.[305] One of the reasons he concluded that this was appropriate was because neither Mr. Sterling nor CGC had any assets from which to pay the note independent of the receipt by Stag of proceeds from the GCJV. Mr. Spilker also considered that numerous joint venture owners had accused Mr. Sterling of fraud and failure to pay royalties, and were threatening to sue him at the time. Finally, Mr. Spilker asserted that certain of the loans were either not disclosed by WRT and/or fraudulently booked as equipment purchases, which made it unlikely that the loans were going to be paid back. Given this, Mr. Spilker determined that the CGC Notes were totally uncollectible.[306]

The court finds that the Trust has not satisfied its burden of establishing that the CGC Notes should be entirely written off. First, as evidenced by the decreasing adjustments Mr. Spilker makes to WRT's balance sheet 11/30/94 ($386,000), 1/31/95 ($373,000) and 3/31/95 ($365,000), the CGC

Notes were actually performing during the relevant time periods.[307] The evidence at trial also established that, as of year-end 1994, all available resources bearing on likely revenue (reserve reports, reserve engineers, accountants and joint venture participants) demonstrated that Stag's interest in the GCJV was sufficient to service this obligation in full.[308] Messrs. Beninger, Sterling, and McGuire all testified that the Lac Blanc wells were prolific performers in the fourth quarter of 1994 and that the decline of those fields in the fall of 1995 was neither anticipated nor foreseeable as of year-end 1994.[309] No fact witness testified otherwise. With the benefit of perfect hindsight, however, Mr. Spilker uses the unexpected failure of the Lac Blanc well in the fall of 1995 to write the CGC Notes off months earlier.[310] Such use of hindsight is inappropriate in determining value of assets at a particular point in time.

(c) *Accounts Receivable.* Both solvency experts made certain adjustments to the accounts receivable recorded in WRT's books.

*1–Employee receivables.* Included in WRT's books under accounts receivable were certain notes representing loans to employees.

---

**303.** Tr. 6/01/00, p. 314, ln. 10–18.

**304.** Tr. 6/01/00, p. 314, ln. 10–25.

**305.** See, Tr. 5/31/00, p. 231, ln. 8–21.

**306.** Tr. 5/30/00, p. 125 ln. 21.—p. 131, ln. 3. (discussing Trust Ex. 4851—Spilker Analysis of Tricore Joint Venture Turnkey Drilling Fees; Trust Ex. 4342—CGC Note; and Trust Ex. 4266—KPMG Workpaper on CGC Note Collectability); p. 230, ln. 22—p. 232, ln. 14.

**307.** Spilker Expert Report, dated May 10, 2000 pp. 50, 71, 79, and 80.

**308.** See, KPMG Workpaper re: calculation of Stag Energy's Undiscounted Future Cash

Flows 12/31/94, Legier Binder, (Tab F); KPMG Audit Workpaper re: CGC Notes Receivable Collectability at 8/31/94, Legier Binder, (Tab D).

**309.** Tr. 5/4/00, p. 207, ln. 16 to p. 208, ln. 8; Tr. 5/26/00, p. 110, ln. 12 to p. 111, ln. 15; Tr. 5/25/00, p. 92, ln. 20 to p. 93, ln. 15.

**310.** Tr. 6/01/00, p. 315, ln. 11. Spilker's reserve analysis is based on the year-end 1995. Reserve Report prepared by NSA. See Section VI(B)(3) of Brief re: Tricore Production Guarantee.

Mr. Spilker deducted $474,000 on December 16, 1994, and January 31, 1995, and $399,000 on March 31, 1995, on account of employee loans for which he believed collection was doubtful. He indicated that collection was doubtful because the loans were made for the purpose of purchasing WRT stock and as such, collection was dependent upon the price of WRT stock.

The loans to these employees, however, did not actually contain such a limitation. In fact, as to the $300,000 loan to Mr. Petersen, the largest of the employee loans, Mr. Petersen responded to inquiries following the audit of December 31, 1994. His letter of March 23, 1995, set forth a summary of his assets to illustrate his ability to repay the loan according to its terms.[311] The court concludes that the mere fact that the purpose of the loan was to purchase WRT stock does not make the repayment of the loan dependent upon the ultimate price of that stock.

The court further concludes that the Trust has failed to meet its burden of proving that the employee loans should be removed as an asset of WRT on the relevant dates. The proper test would be a determination of the ability of the account debtor to pay the obligation, not an inquiry into the use of the funds borrowed.

*2—Bear Stearns litigation.* Also included in WRT's books under accounts receivable were accrued legal fees which were booked in anticipation of a potentially favorable ruling in the Bear Stearns litigation. WRT had paid the legal fees of certain employees which would be repaid if the employees were successful in the litigation.

Both financial experts agreed that this receivable should be removed from WRT's books. The amount to be written off was $450,000 on December 16, 1994, January 30, 1995, and March 8, 1995, and $950,000 on March 31, 1995.

*3—Milam receivable.* Mr. Spilker deducted the amount of operating costs in East Hackberry that WRT had recorded as receivable working interest expenses from Milam. Mr. Spilker took the position that WRT's entitlement to recover 50% of the operating costs from Milam was contingent on generation of profits from the East Hackberry Field because operating costs could only be collected from Milam's share of the net revenue. Thus, if WRT had current losses from its operations, it could only recoup operating costs from Milam's share of future net revenue. Mr. Spilker therefore deducted this receivable from each adjusted balance sheet because it was a "gain contingency", and in his view, it should have been anticipated that East Hackberry would not generate revenues sufficient to pay the receivables.[312]

The arrangement between Milam and WRT contemplated that Milam's share of expenses would be paid from production revenues and, employing the Trust's expert report, Mr. Spilker concluded that revenues would not support expenses. This conclusion, however, directly contradicts the contemporaneous view of both WRT and Milam. Projections prepared in March 1995 anticipated more than adequate revenues.[313] Milam certainly anticipated substantial revenues. Indeed, in the last quarter of 1994 and continuing through 1996, Milam spent more than $8.7 million in this field in addition to the $11.3 million paid as part of the original and

---

311. LLOG Exhibit 4045, Tab IV, D.

312. Tr. 6/1/00, p. 130, ln. 15 to p. 132, ln. 10.

313. Tr. 6/1/00, p. 133, ln. 18 to p. 136, ln. 11; See also Exhibit L–785 (WRT May—December 1995 Budget).

deferred purchase price through September 2, 1994.[314] Based on what was known at year-end 1994, the Milam receivable was valid and should properly have been included as an asset on WRT's books.

*4–GCJV receivable adjustments.* Mr. Spilker deducted costs WRT accrued as receivables due from its GCJV partners. He felt this deduction was proper because the drilling arrangement under the GCJV was "turnkey", meaning that WRT bore all responsibility for the drilling costs. Therefore, WRT had improperly allocated a portion of these costs to the GCJV.[315]

Mr. Spilker added a portion of the operating costs attributable to wells for which its partners in the GCJV did bear some responsibility—the wells not subject to the turnkey drilling arrangement. This adjustment was required because WRT was entitled to bill its joint venture partners for certain receivables, stemming from expenses which WRT had incurred, but not yet recorded on its books.

The court believes that these adjustments are appropriate. The amounts of these adjustments on the relevant dates are set forth below.

| Adjustment | 12/16/94 | 1/30/95 | 3/8/95 | 3/31/95 |
|---|---|---|---|---|
| Deduction for accrued costs | ( 594,000) | (21,000) | (21,000) | (22,000) |
| Joint venture share of operating costs | 21,000 | 38,000 | 24,000 | 32,000 |
| Total adjustment | ($573,000) | $ 17,000 | $ 3,000 | $ 10,000 |

### 3. The value of equipment.

In December 1994, WRT began its sale of marine equipment when four workover and drilling rigs and the Energy VII were sold to E.C. Energy and AEC, respectively. At that time, WRT continued to negotiate with AEC regarding the sale of WRT's remaining marine equipment, although WRT did not anticipate that this sale would close until April 1995.[316] As a result, WRT continued to carry the cost-basis of the marine equipment on its books and records.[317]

During the course of those negotiations to sell the remaining marine equipment, the Arnoult Entities continued to refurbish and operate WRT's marine assets.[318] In addition, the company continued to acquire marine equipment apparently for use on WRT's properties.[319] In May 1995, WRT and AEC came to an agreement with respect to the marine equipment and closed this final transaction.[320] AEC agreed to purchase the marine equipment for $3.4 million.[321] AEC executed a promissory

**314.** Deposition Excerpt, William Hurt, 4/5/99, p. 69, ln. 25 to p. 74, ln. 8; p. 82, ln. 21 to p. 87, ln. 17; p. 100, ln. 25 to p. 102, ln. 24; p. 219, ln. 8 to p. 220, ln. 9.

**315.** Tr. 5/31/00, p. 220, ln. 7—p. 221, ln. 3.

**316.** See Exhibit L–1 (12/31/94 WRT 10–KSB) at 14; Exhibit L–289 (12/22/94 Hale Memorandum re: Rig and Marine Equipment) at 2.

**317.** See Exhibit L–289 (12/22/94 Ronald Hale memorandum) at 2.

**318.** See Exhibit L–294 (8/22/95 Ronald Hale memo) at 1 "During 1994, additional equipment consisting of barges, crew boats, barge mounted cranes, etc. was purchased and sent to AEC's yard for refurbishment and repairs."

**319.** Tr. 6/30/00, p. 69, ln. 1–9 and p. 137, ln. 19 to p. 158, ln. 13.

**320.** See Deposition Excerpt, Ronald Hale, 4/22/99, Vol. I, p. 225, ln. 13 to p. 227, ln. 16. See also Exhibit L–295 (12/31/95 KPMG Rig and Equipment Memo) (dated 4/96).

**321.** See Exhibit L–295 (12/31/95 KPMG Rig and Equipment Memo) (dated 4/96); Deposition Excerpt, Ronald Hale, 4/22/99, Vol. I, p. 227, ln. 9–16.

note for the purchase price and granted WRT a mortgage in the amount of $3.4 million on five marine vessels.[322] As part of this arrangement, WRT entered into a Master Service Contract and Bareboat Charter Agreement whereby WRT would pay AEC a flat $250,000 per month for its operation of the WRT properties.[323]

Mr. Legier determined that WRT appropriately booked the marine equipment as a $3.4 million dollar asset as of year-end 1994 and March 31, 1995. His determination was based upon a review of WRT's books and records, WRT's relationship with the Arnoult Entities, the KPMG work papers and the testimony of fact witnesses with respect to the marine equipment issue.[324] Accordingly, Mr. Legier made no adjustment to WRT's PP & E account for the marine equipment. Mr. Legier opined that whether WRT was the owner or beneficial owner of substantial marine assets utilized to operate WRT's water based oil and gas fields,[325] it was proper for WRT to book these marine assets as equipment.[326]

Mr. Spilker disagreed and observed that although WRT had recorded $3.4 million dollars in its balance sheet equipment account to reflect marine equipment it purportedly purchased, he believed that WRT never purchased that quantity of equipment. Mr. Spilker found $3.2 million—not $3.4 million—in 1994 journal entries for wire transfers to AEC that were classified by WRT as purchases of marine equipment. He also found a lack of journal entries reflecting payment for AEC's ongoing work on WRT's fields. Mr. Spilker testified that he found that there was documentation evidencing that equipment was actually being purchased or refurbished, but it only was for a few hundred thousand dollars worth of the payments. The remaining wire transfer documents bore no indication that the payments were for equipment. Mr. Spilker also testified that he did not find title documents, bills of sale, or other proof an accountant would expect to find to back up $3.4 million in marine equipment purchases. In fact, because AEC was doing substantial work for WRT in the fields, Mr. Spilker believed that the bulk of these payments were actually for that work, not equipment.[327]

Mr. Spilker determined that journal entries alone were insufficient proof that WRT actually purchased $3.4 million worth of marine equipment. However, giving the benefit of the doubt to the existence of at least some marine equipment, Mr. Spilker relied on an AEC appraisal of equipment to assign a $900,000 fair value to the equipment which WRT purported to own. This resulted in a write-off of $2.5 million of WRT's $3.4 million listed basis in the equipment.[328]

The court does not believe that Mr. Spilker's adjustments are appropriate. He attempted to review the equipment issue in a vacuum, rather than looking to fact witnesses and contemporaneous documents evidencing the relationship between AEC and WRT. WRT did not advance millions of dollars to AEC for charitable

322. See Exhibit L–300 (5/18/95 $3.4 million Promissory Note); Exhibit L–302 (5/18/95 Preferred Mortgage filed with the U.S. Coast Guard).

323. See Exhibit L–913, (Master Service Contract); Exhibit L–914 (AEC/Energy Marine, Inc. Bareboat Charter Party).

324. Tr. 6/29/00, p. 329, ln. 11 to p. 331, ln. 4.

325. Deposition Excerpt, Ronald Hale, Vol. I, 4/22/99, p. 230, ln. 12 to p. 231, ln. 7.

326. Tr. 7/7/00, p. 100, ln. 12 to p. 101, ln. 5.

327. Tr. 5/30/00, p. 131, ln. 4—p. 132, ln. 11; 5/31/00, p. 242, ln. 2, p. 250, ln. 21.

328. Id.

purposes. WRT did so for legitimate purposes, namely the accumulation, refurbishment and operation of marine assets in order to conduct workovers and exploit WRT's oil and gas properties.

The evidence presented at trial confirms that WRT advanced significant funds to AEC by wire transfer.[329] The intended purpose of these transfers was for AEC to purchase marine equipment or make improvements to the existing equipment or vessels.[330] AEC's own corporate promotional literature confirms this fact: "The large producing fields that WRT owns have the need for extensive land and marine operations. AEC and WRT have *together* assembled over $10 million worth of rigs, marine vessels and wireline equipment and AEC operated the majority of this equipment on WRT properties."[331] Given the fact that the Arnoult Entities had virtually no financial support other than from WRT, it is clear that these assets were in fact paid for and refurbished with WRT's money.[332] Mr. Hale, WRT's chief financial officer, testified that he believed that there was an understanding between the two companies that WRT would finance the acquisition of the equipment. He testified that AEC had refur-

bished WRT's equipment and accumulated additional equipment with WRT's funds for the purpose of using it in WRT's fields. As WRT had funded the equipment, he believed it to be WRT's equipment.[333]

The trial testimony of Messrs. Petersen and McGuire is entirely consistent with that of Mr. Hale regarding the nature of WRT's arrangement with AEC. While WRT desired to exit the business of operating marine equipment, AEC wanted to expand its holdings in this area.[334] However, as Mr. Petersen testified, AEC did not have the financial resources to acquire and refurbish the amount of marine equipment necessary to operate certain of WRT's properties.[335] Hence, WRT agreed to purchase or finance the equipment, pay for its refurbishment and ultimately sell the completed assets to AEC.[336] In turn, WRT contracted with AEC to conduct its water-based operations by utilizing these same assets.[337] This effectively resulted in what Messrs. Petersen, Hale and McGuire all described as a sale and leaseback arrangement whereby WRT was able to reduce its Jones Act liability but still secure the availability of marine equipment at a reasonable rate.[338] In addition, the

---

329. Tr. 5/31/00, p. 191, ln. 10–14.

330. See Deposition Excerpt, Ronald Hale, Vol. III, p. 102, ln. 4 to p. 103, ln. 15; Deposition Excerpt, Ronald Hale, Vol. III, p. 110, ln. 12 to p. 112, ln. 17; Tr. 5/25/00, p. 176, ln. 18 to p. 177, ln. 8.

331. Exhibit L–1892 (AEC, Inc. and Energy Companies Promotional Packet) (Emphasis added).

332. Exhibit L–1892 (AEC, Inc. and Energy Companies Promotional Packet). AEC lists its primary sources of repayment as WRT.

333. Deposition Excerpt, Ronald Hale, 4/22/99, Vol. I, p. 229, ln. 4 to p. 231, ln. 7.

334. Tr. 6/26/00, p. 118, ln. 21 to p. 120, ln. 17.

335. Tr. 6/26/00, p. 118, ln. 21 to p. 120, ln. 17.

336. Deposition Excerpt, Ronald Hale, Vol. I, p. 225, ln. 13 to p. 228, ln. 2 and p. 229, ln. 4 to p. 231, ln. 7; Tr. 6/26/00, p. 118, ln. 21 to p. 120, ln. 5; 5/25/00, p. 57, ln. 25 to p. 58, ln. 13.

337. See Exhibit L–913 (Master Service Contract) and Exhibit L–914 (Bareboat Charter Party); Tr. 5/25/00, p. 51, ln. 14–23.

338. Deposition Excerpt, Ronald Hale, Vol. I, p. 225, ln. 13 to p. 228, ln. 2 and p. 229, ln. 4 to p. 231, ln. 7; Tr. 6/26/00, p. 118, ln. 21 to p. 120, ln. 5; Tr. 5/25/00, p. 57, ln. 25 to p. 58, ln. 13.

form of the transaction allowed WRT to avoid the direct cost of maintaining a fleet of marine assets during inactive periods.[339]

Although occurring after the relevant dates, perhaps the greatest factor confirming the $3.4 million value assigned to WRT's remaining marine equipment are the events of May 1995. Between February 1994 and May 1995, a significant dispute arose as to the amount of money WRT owed AEC and its related companies for goods and services provided.[340] WRT and AEC jointly selected an auditor to review all work performed and all invoices alleged due to AEC.[341] The purpose of this reconciliation, according to both Messrs. McGuire and Hale, was to wipe the slate clean with respect to the amount of money owed AEC[342] and more importantly, clarify WRT's actual ownership of the marine equipment gathered and refurbished by AEC at WRT's expense.[343] As Mr. McGuire testified at trial, WRT did not believe that it actually owed AEC that amount of money, but agreed to pay it in order to settle the dispute over ownership of the equipment.[344] With that settled, the parties then arranged to formally execute the sale and lease-back arrangement.[345]

On May 18, 1995, WRT completed the sale of the remaining marine equipment to AEC as part of the resolution of all issues between WRT and the Arnoult Entities.[346] WRT sold the equipment at its carrying cost of $3.4 million and recorded no gain from the sale.[347] AEC executed a promissory note in the amount of $3.4 million, payable in monthly installments over nine (9) years.[348] In addition, AEC granted WRT a preferred mortgage in the amount of $3.4 million on six (6) vessels that comprised part of the sale.[349]

KPMG reviewed this transaction, deemed the $3.4 million promissory note collectible, and recorded the note receivable at full value as of June 30, 1995.[350] The auditor's comments further provided that the marine equipment sold was comprised of five vessels and that "two payments of $35,250 had become due and were paid [by AEC]."[351] Accordingly, the $3.4 million note was performing as of July,

339. See Exhibit L–289 (12/22/94 Ronald Hale memo).

340. See Tr. 5/25/00, p. 51, ln. 16 to p. 52, ln. 24.

341. See Exhibit L–308 (5/18/95 Memorandum of Understanding).

342. Tr. 5/25/00, p. 60, ln. 5 to p. 61, ln. 6; Deposition Excerpt, Ronald Hale, 4/22/99, Vol. I, p. 240, ln. 21 to p. 241, ln. 18.

343. Tr. 5/25/00, p. 63, ln. 2 to p. 64, ln. 15; Deposition Excerpt, Ronald Hale, 4/22/99, Vol. I, p. 229, ln. 4 to p. 231, ln. 7.

344. Tr. 5/25/00, p. 63, ln. 8–19.

345. Tr. 5/25/00, p. 58, ln. 3–13.

346. Tr. 5/2/00, p. 173, ln. 24 to p. 174, ln. 2.

347. See Exhibit L–340 (Promissory Note); Exhibit L–302 (Preferred Mortgage on M/V Energy VII); Exhibit L–1940 (KPMG workpaper re: WRT Balance Sheet Analytical 6/30/95), ("The amount of the note receivable is $3.4 million, the book value of the equipment at the date of sale.")

348. See Exhibit L–300 (5/18/95 Promissory Note).

349. See Exhibit L–302 (5/18/95 Preferred Mortgage).

350. Exhibit L–1940 (KPMG workpaper, WRT Balance Sheet Analytical—T/M Explanations, June 30, 1995, prepared 7/95) and included in Legier Binder, L–4046, (Tab C).

351. Exhibit L–1940 (KPMG workpaper, WRT Balance Sheet Analytical—T/M Explanations, June 30, 1995, prepared 7/95) and included in Legier Binder, L–4046, (Tab C).

1995.[352] In addition, correspondence from AEC's own auditors, Charlet & Simon, CPAs, confirms AEC's receipt of the funds for the purchase and refurbishment of marine equipment and its debt to WRT in the amount of $3.4 million.[353]

Based upon this information, Mr. Legier determined that WRT appropriately booked its marine equipment at $3.4 million as of December 31, 1994, through March 31, 1995.[354] The court believes the evidence supports Mr. Legier's conclusion and concludes that the deductions made by Mr. Spilker are improper.

### 4. Other assets.

Mr. Spilker makes certain adjustments to WRT's balance sheets on the transaction dates to reduce the assets to account for the cost of the property purchased while at the same time adding the value of that property. The court finds that this type of adjustment is appropriate.

Mr. Spilker deducted $7.0 million from WRT's cash account and increased WRT's notes payable account by $8 million for WRT's adjusted February 1, 1995, balance sheet. This was because WRT used the $7 million cash, along with a draw down of $8 million on its credit facility with INCC, to purchase the Bayou Penchant Field from LLOG. The value of the Bayou Penchant property was added to the balance sheet, necessitating the removal of the funds used by WRT to pay for that property.[355] This adjustment is appropriate.

Mr. Spilker added $34,814,000 to WRT's cash account and $78,900,000 to WRT's notes payable account for WRT's adjusted

March 8, 1995, balance sheet. This was to account for WRT's receipt of funds from the $100 million notes offering, and use of the proceeds to pay back its credit lines, to purchase the LLOG Phase II properties, and for miscellaneous acquisition costs.[356] This adjustment is appropriate.

Mr. Spilker reduced WRT's cash account by $5,140,000 for WRT's adjusted March 31, 1995, balance sheet to account for cash used to purchase a working interest in the West Cote Blanche Bay Field from Tenneco. The Tenneco purchase, however, did not close until after the March 31, 1995, financial statement. The court does not believe that this adjustment is appropriate as the Tenneco purchase was not completed as of March 31, 1995.

### D. The fair value of WRT's liabilities as of the dates of the transactions at issue.

### 1. Accounts payable including the AEC payables.

With respect to WRT's accounts payable, Mr. Spilker makes an $8,890,000 adjustment as of January 30, 1995, a $9,322,000 adjustment as of March 8, 1995, and a $7,272,000 adjustment as of March 31, 1995, to increase accounts payable for alleged unrecorded liabilities. Mr. Spilker's accounts payable adjustment is broken into three categories: (a) "unrecorded" invoices from Scotia; (b) "unrecorded" invoices from AEC, and (c) invoices that were not recorded in the same month the invoice was issued because of either dis-

---

352. See Deposition Excerpt, Ronald Hale, 4/22/99, Vol. I, p. 231, ln. 8 to p. 232, ln. 16.

353. See Exhibit L–607 (6/30/95 Letter from Gil Acosta, C.A.O of AEC).

354. Tr. 6/29/00, p. 329, ln. 11 to p. 330, ln. 15.

355. Tr. 5/31/00, p. 311, ln. 17—p. 312, ln. 3 (discussing Trust Exs. 4857 and 4858).

356. Tr. 5/31/00, p. 319, ln. 6—p. 320, ln. 2 (discussing Trust Exs. 4859 and 4860).

putes or delay in receiving the invoice from the field.

(a) *Scotia Invoices.* Both Mr. Legier and Mr. Spilker agree that the accounts payable should be increased to include Scotia invoices which were not recorded on WRT's books. The experts differ, however, as to the amount which should be included. The difference between the two numbers arrived at by the experts is $318,000. At trial, Mr. David Heather, president of Scotia,[357] identified a May 3, 1995, fax he sent to Mr. McGuire and confirmed that attached to the fax was an account summary generated by Scotia.[358] The two center columns of the account summary reflect either the amount of the invoice to WRT or WRT's payment; the last column is the outstanding account balance on the various dates.[359] Reflected in the account summary are three payments totaling $318,000 which Mr. Spilker argues should not be included in his analysis. He acknowledges these three payments were made, but does not give WRT credit for them because they were not recorded on WRT's books.[360]

The court does not agree with Mr. Spilker's analysis. The question in this Insolvency Trial is not whether a journal entry should have been made, but whether a true liability existed. The court concludes that the actual liability owed to Scotia on the relevant dates and the amounts which should be added to the account payables on WRT's books are $384,703.86 as of December 16, 1994, $384,426.26 as of January 30, 1995, $345,209.97 as of March 8, 1995, and $1,692.66 as of March 31, 1995.

(b) *AEC Invoices.* As part of his accounts payable adjustment, Mr. Spilker adds $3,413,000 in liabilities as of December 16, 1994, $3,274,000 in liabilities as of January 30, 1995, $2,828,000 in liabilities as of March 8, 1995, and $1,665,000 in liabilities as of March 31, 1995, for alleged AEC invoices that were not recorded on WRT's books and records.[361] As Mr. Spilker testified, to get to these numbers, he tallied up twelve boxes of invoices produced in this litigation by the AEC entities.[362] To get his final adjustment for "alleged unrecorded AEC invoices," he deducted from the total (i) payments WRT made to AEC and (ii) invoices WRT received from AEC to the extent reflected on WRT's Petro-Comp system.[363]

The Defendants contend that the evidence contradicts the assumption that the entirety of the twelve boxes of invoices produced by AEC were valid obligations owed by WRT. The Defendants argue that WRT had properly recorded the liabilities owed to AEC on the relevant dates based upon the following: (1) beginning in early 1994, AEC and WRT entered into an operating contract which the parties treated as a turnkey agreement under which AEC performed services for WRT for an agreed fee;[364] (2) under WRT's agreement with AEC, WRT would be invoiced and would pay for work AEC performed above and

---

357. Tr. 5/2/00, pg. 266, ln. 18–20.

358. Tr. 5/3/00, p. 26, ln. 20 to p. 27, ln. 1; See also Exhibit T–2631 (May 3, 1995 fax from David Heather to Steve McGuire).

359. Tr. 5/3/00, p. 27, ln. 2–13.

360. Tr. 6/1/00, p. 207, ln. 19 to p. 209, ln. 9.

361. Exhibit T–4880 (Spilker Report) at pp. 74 and 82.

362. Tr. 5/31/00, p. 255, ln. 21 to p. 256, ln. 13.

363. Tr. 5/31/00, p. 262, ln. 21 to p. 263, ln. 13.

364. Tr. 5/25/00, p. 52, ln. 13 to p. 54 and p. 288, ln. 13 to p. 289, ln. 11.

beyond the turnkey and for work outside vendors performed that fell outside the turnkey agreement; [365] (3) WRT was having problems with AEC double-billing and sending duplicate invoices; [366] (4) in early 1995, WRT and AEC were in a dispute over invoices that WRT believed should have been covered by the turnkey agreement and not considered work above and beyond the turnkey agreement; [367] (5) WRT and AEC entered into negotiations to resolve the dispute over what was owed; [368] (6) in April 1995, AEC generated and sent WRT a box of invoices to demonstrate what would have been owed by WRT if they were not operating under a turnkey agreement; [369] (7) the mass of invoices delivered by AEC were not to have been paid by WRT, but were simply intended to contrast what WRT was getting under the turnkey agreement with what they would be paying otherwise; [370] (8) these invoices should never have been recorded on WRT's books and records; [371] and (9) after substantial negotiations—and an audit performed by an independent au-

ditor jointly selected by WRT and AEC—WRT and the AEC entities [372] entered into a Memorandum of Understanding on May 18, 1995, under which the parties agreed that:

a) the audit showed that WRT owed AEC only $1,017,000.00 as of May 18, 1995; and

b) the payment of this amount was not a compromise or settlement, but payment in full for all goods and services rendered by AEC through that date.[373]

The Defendants argue that there is no support for Mr. Spilker's conclusion that the unrecorded AEC invoices were actual liabilities of WRT.

Mr. Spilker admitted that he did not determine whether these invoices were accepted as valid by WRT.[374] He admitted that "not every invoice was signed-off" by WRT.[375] And, he admitted that he "didn't go back through the 12 boxes to specifically say there is support for the individual invoices." [376] Accordingly, the Defendants

365. Tr. 5/25/00, p. 289, ln. 13–23.

366. Tr. 6/26/00, p. 117, ln. 7–14; Tr. 6/26/00, p. 120, ln. 18 to p. 121, ln. 7; Deposition Excerpt, Ronald Hale, 4/22/99, Vol. I, p. 239, ln. 10–22.

367. Tr. 5/25/00, p. 51, ln. 24 to p. 52, ln. 24 Tr. 5/25/00, p. 289, ln. 21–23; Deposition Excerpt, Ronald Hale, 4/22/99, Vol. I, p. 240, ln. 21 to p. 241, ln. 4 See also Exhibit L–1911 (January 6, 1995 memorandum from Don Muller, AEC, Inc., to Steve McGuire, Ronnie Hale, and Danny LeJeune).

368. Tr. 5/25/00, p. 53, ln. 23 to p. 55, ln. 11; Tr. 5/25/00, p. 286, ln 20 to pg. 287, ln. 15; See also Exhibit L–1911 (January 6, 1995 memorandum from Don Muller, AEC, Inc., to Steve McGuire, Ronnie Hale, and Danny LeJeune).

369. Tr. 5/25/00, p. 52, ln. 5–13; Tr. 5/25/00, p. 54, ln. 3 to p. 55, ln. 11; Tr. 5/25/00, p. 286, ln. 20 to p. 287, ln. 16; Tr. 5/19/00, p. 344, ln. 23 to p. 345, ln. 14.

370. Tr. 5/25/00, p. 55, ln. 5–11; Tr. 5/19/00, p. 346, ln. 17 to p. 347, ln. 11.

371. Tr. 5/25/00, p. 55, ln. 1–11.

372. The AEC entities who were signatories to the agreement were: Arnoult Equipment and Construction Company, Inc., AEC Energy Marine, Inc., D.H. Valve, Inc., L.V. Wireline, Inc., Energy Workover and Drilling Services, Inc., Energy Labor Services, Inc., Energy Production Services, Inc. and Energy VII, Inc. See Exhibit L–308 (May 18, 1995 Memorandum of Understanding).

373. See Exhibit L–308 (May 18, 1995 Memorandum of Understanding).

374. Tr. 5/31/00, p. 268, ln. 12–17.

375. Tr. 5/31/00, p. 256, ln. 8–13.

376. Tr. 5/31/00, p. 267, ln. 6–8.

assert that no adjustment should be made to WRT's books based upon the unrecorded AEC invoices.

The court agrees with the Defendants. The Trust failed to meet its burden of proving that the unrecorded AEC invoices were actual liabilities of WRT. In fact, the preponderance of the evidence establishes that WRT had properly included the amount owed to AEC in its books. As such, no adjustment should be made to WRT's accounts payable for the so-called unrecorded AEC invoices.

(c) *Untimely and Unrecorded Invoices.* Mr. Spilker also increases WRT's accounts payable by recording liabilities of $4,303,000 as of December 16, 1994, $5,537,000 as of January 30, 1995, $6,440,000 as of March 8, 1995 and $6,028,000 for what he alleges are "unrecorded accounts payable—vendors." The Trust contends that WRT improperly recorded invoices into its oil and gas accounting computer system, the PetroComp system.

Mr. Spilker testified that, with regard to certain invoices, the expense date recorded in the system was the proper cate of entry rather than the earlier invoice date. Therefore, Mr. Spilker took the position that, according to PetroComp, invoices dated in one month, but later received by WRT and entered into the system were not timely captured for reporting purposes.

Initially, the Defendants dispute the trustworthiness of Mr. Spilker's particular copy of the PetroComp accounting system, which he obtained from the Trust's paid consultant, Ms. Suzanne Ambrose.[377] Indeed, Mr. Spilker's copy is actually a copy of a copy. Ms. Ambrose is a former contract employee who was first employed in the fall of 1996—after the company filed bankruptcy.[378] She claims to have downloaded a copy of WRT's PetroComp system onto her personal laptop where it has been for over two years.[379]

The Defendants express four concerns with respect to the integrity of this copy of the PetroComp system. First, the copy on its face is not a contemporaneous reflection of WRT's books and records as of the year-end 1994 and the first-quarter 1995. It appears that certain adjustments to WRT's financial records as of year-end 1994 and first-quarter 1995 were likely made after the bankruptcy filing. For example, Ms. Ambrose testified that invoices for amounts asserted in proofs of claim were entered into the accounting system.[380] It is this modified copy—which includes pre-petition invoices entered into the system after the bankruptcy filing—that Mr. Spilker used to perform his analysis.

Second, the Defendants' express concerns about the lack of control regarding access to the system. In fact, when Ms. Ambrose's logged onto the computer database on her laptop during the trial, she did not even have her own personal identification number; instead, she used a personal code for Ms. Stubbs.[381] When questioned, Ms. Ambrose confirmed that she does not know who was using whose identification code while she was a contract employee for

---

**377.** Tr. 5/30/00, p. 52, ln. 6–20. Ms. Ambrose has worked for the Trust since October of 1997 and has been paid to "[a]ssist them answering their questions, locating documents, information." Tr. 5/2/00, p. 10, ln. 22 to p. 11, ln. 10.

**378.** Tr. 5/2/00, p. 9, ln. 5–7.

**379.** Tr. 5/2/00, p. 27, ln. 7 to p. 28, ln. 2.

**380.** Tr. 5/2/00, p. 20, ln. 14–20.

**381.** Tr. 5/2/00, p. 62, ln. 8–22.

WRT.[382]

Third, because Ms. Ambrose's copy of the system was "copied over" from WRT's records, the access log was purged. As a result, she could not even determine who was accessing the database in 1994 or 1995.[383]

Finally, the subledgers that Mr. Spilker uses to generate invoice date runs cannot be tied in any way to public filings so the accuracy of the numbers can be confirmed.

Beyond the concerns regarding the integrity of the underlying data, the Defendants also argue that Mr. Spilker's analysis is flawed. Mr. Legier testified, while Mr. Spilker created a larger accounts payable, "[h]e didn't take into consideration all of the other side of the ledger, because for every debit, there must be a credit. So if you look at those transactions that made up the accounts payable, the[re] were assets that were acquired." [384]

Accordingly, the Defendants argue that even if one adopts Mr. Spilker's analysis, adjustments to reflect the corresponding credits must be made increasing WRT's receivables and property accounts.[385] In other words, because the invoices that Mr. Spilker contends should be added as liabilities to the balance sheet are for work in the field, recordation of the invoices, as Mr. Legier testified, also results in (i) an increase in receivables from joint interest partners, or (ii) an increase in the property account due to the company's capitalization of these expenses.[386]

The court agrees with Mr. Spilker's analysis that adjustments must be made to reflect the correct expense dates for the invoices. The court also agrees with Mr. Legier's analysis that if those adjustments are made, corresponding adjustments must be made to the asset side of the ledger to reflect either an increase in receivables from joint interest partners and/or capitalization of the expenses. However, the court believes that Mr. Spilker had taken into account adjustments on both sides of the ledger and had increased joint interest billings on the accounts receivable side of the ledger to account for the unrecorded liabilities.

Accordingly, the court finds that the adjustments made by Mr. Spilker were appropriate.

### 2. Liabilities relating to the Napoleonville transactions.

Mr. Spilker increases WRT's obligations on account of a purported liability arising from the Napoleonville transaction. The Defendants of course dispute this adjustment.

On December 16, 1994, WRT and BSFI executed a Purchase and Sale Agreement regarding Napoleonville.[387] Paragraph 2 of the Purchase and Sale Agreement provides that the consideration shall be 1.25 million shares of WRT common stock.[388] WRT committed to issue and BSFI agreed to take 1.25 million shares of WRT common stock as consideration for the Napoleonville Field.[389] WRT actually issued 1.3

---

382. Tr. 5/2/00, p. 63, ln. 2–10.

383. Tr. 5/2/00, p. 65, ln. 15–23.

384. Tr. 6/29/00, p. 347, ln. 13–19.

385. See Exhibit L–3074 (March 15, 2000 expert report of William R. Legier) at 3.

386. Tr. 6/29/00, p. 306, ln. 24 to p. 309, ln. 10; Tr. 6/29/00, p. 368, ln. 5 to p. 369, ln. 21.

387. Trust Ex. 1185.

388. Tr. 5/22/00 p. 227, ln. 7–20; Trust Ex. 1185.

389. Tr. 5/22/00 p. 228, ln. 5–16; Tr. 5/24/00 p. 151, ln. 23–25; Trust Ex. 1185.

million shares of its common stock to BSFI as consideration for the purchase of the Napoleonville Field.[390] The certificates were given to Mr. Edwards to hold as the escrow agent.[391]

The Trust argues that the economic substance of the Napoloenville transaction was that WRT promised or guaranteed to pay BSFI $10 million in cash for the property. Mr. Spilker believes that the following actions of the parties demonstrated that WRT had a "responsibility to pay cash." First, WRT recorded the Napoleonville purchase price in its financials at the $9.75 million, the then market value of the common stock supposedly exchanged, even though the stock was restricted and was subject to a steep discount.[392] Second, WRT always remained in control of the stock supposedly exchanged, and WRT itself arranged for the sales of the stock to deliver funds to BSFI to satisfy the $10 million obligation.[393] Third, multiple letters sent to and from Mr. Brantley and Mr. Edwards at and after the time of the transaction continually refer to cash payments to be made to BSFI.[394] Fourth, when WRT was unable to deliver enough cash to BSFI, Mr. Brantley held back turning over control of operations of the property, until funds were transferred.[395]

The Defendants argue that the documents speak for themselves, that is, the consideration for the sale was stock. The

court agrees. The Purchase and Sale Agreement entered into between BSFI and WRT provided that the consideration for WRT's acquisition of the Napoleonville Field was 1.25 million shares of WRT's common stock.[396] The Purchase and Sale Agreement contains an integration clause that requires any amendment to the agreement be made in writing.[397] The Purchase and Sale Agreement was not amended and is the document that controls the rights and obligations between the parties pertaining to the purchase of the Napoleonville Field.[398]

Under Louisiana law, antecedent or contemporaneous oral agreements or understandings which are not made part of a written contract may not be admitted to vary the contents of an authentic act. La. C.C. art. 1848; *Perfection Metal & Supply Co. v. Independent Supply of N.O., Inc.*, 707 So.2d 86, 90 (La.App. 5th Cir.1998) (parol evidence is inadmissible to alter the terms of a written contract where the defendant failed to plead mistake or fraud.); *Pelican Homestead & Savings Assoc. v. Airport Mini-Warehouses, Inc.*, 531 So.2d 524, 527 (La.App. 5th Cir.1988) (antecedent verbal agreements which are in conflict with a written agreement cannot be proved by parol evidence.); and *Crochet v. Pierre*, 646 So.2d 1222, 1225 (La.App. 5th Cir. 1994), *writ denied*, 649 So.2d 429 (La.1995) ("contemporaneous oral agreements or understandings between the parties which

---

**390.** Tr. 5/22/00 p. 241, ln. 12 through p. 242, ln. 12; Tr. 5/24/00 p. 154, ln. 11–19; Tr. 6/1/00 p. 418, ln. 11–21; Edwards Exs. 301 and 302.

**391.** Tr. 5/22/00 p. 228, ln. 5–16.

**392.** Tr. 5/31/00, p. 4, ln 16—p. 5, ln. 10; See also Trust Ex. 4867 (Recorded Transaction tab).

**393.** Tr. 5/31/00, p. 9, ln. 7–23; 20, ln. 12—p. 21, ln. 22.

**394.** Tr. 5/31/00, p. 14, ln. 22—p. 20, ln. 11 (referring to letters at Trust Ex. 4867, Guarantee tab).

**395.** Tr. 5/22/00, p. 276, ln. 21—p. 277, ln. 8; Tr. 5/31/00, p. 56, ln. 18—p. 61, ln. 17.

**396.** Plaintiff Ex. 1185 at ¶ 2.

**397.** Plaintiff Ex. 1185 at ¶ 18.

**398.** Tr. 5/22/00 p. 228, ln. 17—p. 230, ln. 20; Tr. 5/24/00 p. 143, ln. 14—p. 144, ln. 4.

are not made part of the written contract do not qualify as an exception of the parol evidence rule."). The Trust is precluded as a matter of law from using parol evidence to argue that the agreement was something other than what was stated in the Purchase and Sale Agreement.

Even if parol evidence may be considered, however, the adjustment proposed by Mr. Spilker is not proper, as there is no evidence from the fact witnesses involved in the transaction that WRT itself guaranteed anything to BSFI. All parties to the negotiations, namely, Messrs. Brantley, McGuire, Petersen, and Hale, denied that WRT agreed to provide any guarantee to BSFI.[399]

What the evidence does show is that BSFI and WRT discussed the possibility of WRT arranging for a third party to guarantee the value of the WRT shares being issued to BSFI through what is known as a "cap and collar" agreement.[400] The third party guarantor would guarantee that BSFI would receive a set amount for the stock. In exchange, the third party guarantor would receive the benefit of any increase in the value of the stock above a set amount. Mr. Petersen made inquiries and learned that such a guarantee would require BSFI to relinquish the upside potential should the value of the WRT stock increase as expected.[401] Mr. Brantley rejected the offer of a third party guarantor upon learning that he would be required to relinquish the upside potential if the price of the stock increased.[402] WRT never obtained a third party guarantor.[403]

Mr. Brantley testified that he expected to receive at least $10 million from sale of the WRT stock; however, he was clear that the money was to come from sale of the stock, and not from WRT.[404] Moreover, both Mr. Brantley and Mr. John Cutrer, the largest investor in BSFI, believed that the value of the WRT stock would increase because WRT purchased the Napoleonville Field with equity.[405] Mr. Brantley's dissatisfaction began when the price of the WRT stock began decreasing instead of increasing after the transaction.[406]

The Trust argues that a January 25, 1995, letter from Mr. Edwards to Mr. Brantley demonstrates WRT's guarantee to BSFI. The terms of that letter provide that WRT will redeem the stock issued to BSFI (a non-binding obligation as matter of law to the extent that WRT was insolvent as alleged by the Trust). First, the court has already held that any agreement by WRT to redeem the WRT stock issued to BSFI "cannot be considered a binding obligation under basic corporate law and thus cannot be considered in determining the solvency or insolvency of WRT."[407]

Moreover, the totality of the testimony and circumstances do not support the Trust's position that WRT agreed to redeem the stock issued to BSFI. The evidence suggests that not only did WRT not agree to the terms set forth in the letter,

399. Tr. 5/22/00 p. 236, ln. 2–19; Tr. 5/24/00 p. 142, ln. 4—p. 143, ln. 6; Tr. 6/26/00 p. 92, ln. 3–10; Hale Dep. 6/16/99 p. 176, ln. 2—p. 177, ln. 7.

400. Tr. 5/22/00 p. 235, ln. 20—p. 236, ln. 1; Tr. 6/25/00 p. 83, ln. 20—p. 84, ln. 17.

401. Tr. 6/26/00 p. 84, ln. 18—p. 85, ln. 14.

402. Tr. 6/26/00 p. 85, ln. 15—p. 86, ln. 1.

403. Tr. 5/22/00 p. 57, ln. 15–17.

404. Tr. 5/22/00 p. 74, ln. 2–4.

405. Tr. 5/22/00 p. 233, ln. 14—p. 234, ln. 16.

406. Tr. 5/24/00 p. 145, ln. 16—p. 147, ln. 10.

407. Memorandum Ruling dated March 9, 2000.

but that Mr. Edwards was not authorized to write the letter on behalf of WRT.[408] And WRT did not adhere to the terms of Mr. Edwards' letter.[409] Further, Mr. Brantley, a practicing attorney, did not seek enforcement when WRT did not comply with the terms of the letter.[410] And finally, no mention is made of Mr. Edwards' letter in subsequent dealings between BSFI and WRT.

Mr. Brantley executed a Memorandum of Understanding on March 20, 1995, which confirmed that the total consideration paid by WRT to BSFI for the Napoleonville Field was 1.3 million shares of WRT common stock.[411] Brantley provided the Memorandum of Understanding to WRT.[412] The lack of any reference to a guarantee or additional obligations in the Memorandum of Understanding is further support for the conclusion that WRT incurred no additional obligations in favor of BSFI.

There is no evidence that WRT agreed to pay $10 million cash to BSFI either before or after execution of the Purchase and Sale Agreement with BSFI. Mr. Legier concluded after studying all of the information, documents, and testimony that no liability should be booked for the Napoleonville transaction because there was no evidence that the transaction was anything other than a stock transaction for 1,300,000 shares of stock.[413]

The Trust argues that WRT's assistance to BSFI in liquidating the stock supports Mr. Spilker's assertion that WRT's financial statements should be adjusted to reflect an obligation owed by WRT to BSFI. Again, the facts do not support this conclusion.

Mr. Edwards was the escrow agent appointed to hold the WRT stock issued to BSFI.[414] Mr. Brantley signed a power of attorney on behalf of BSFI authorizing Mr. Edwards to sell the WRT stock on behalf of BSFI.[415] Mr. Brantley understood that WRT would assist BSFI in liquidating the stock by contacting individuals within the investment community that had a relationship with WRT that may be interested in purchasing the stock.[416]

The stock was in fact liquidated over the next several months. WRT placed Mr. Edwards in contact with GFL Ultra Fund, Ltd., in December 1994. GFL was to purchase a portion of the shares issued to BSFI, but that sale fell through when GFL withdrew.[417] Thereafter, Mr. Edwards arranged for sale of 500,000 shares of BSFI's WRT stock to Banque Franck.[418]

**408.** Tr. 5/22/00 p. 237, ln. 3—p. 240, ln. 6; Tr. 5/24/00 p. 144, ln. 15—p. 145, ln. 15; p. 148, ln. 6—p. 151, ln. 6; p. 162, ln. 13—p. 163, ln. 8; Tr. 6/26/00 p. 102, ln. 1–23; p. 105, ln. 1—p. 107, ln. 4; Hale Dep. 6/16/99 p. 185, ln. 21—p. 189, ln. 4; Plaintiff Ex. 1323.

**409.** Tr. 5/22/00 p. 237, ln. 3—p. 239, ln. 9; Tr. 5/24/00 p. 148, ln. 6—p. 149, ln. 21; Tr. 6/26/00 p. 102, ln. 1—p. 105, ln. 7; Tr. 6/1/00 p. 430, ln. 6–19.

**410.** Tr. 5/22/00 p. 239, ln. 10—p. 240, ln. 12.

**411.** Tr. 5/22/00 p. 240, ln. 13—p. 242, ln. 12; Tr. 5/24/00 p. 153, ln. 25—p. 154, ln. 19; Edwards Ex. 54.

**412.** Tr. 5/24/00 p. 154, ln. 20–22.

**413.** Tr. 6/30/00 p. 29, ln. 1–17.

**414.** Tr. 5/22/00 p. 228, ln. 5–16; p. 232, ln. 8—p 233, ln. 3; McGuire Tr. 5/25/00 p. 175, ln. 7–25; 6/26/00 p. 151, ln. 5–22; Edwards Ex. 41.

**415.** Tr. 5/22/00 p. 232, ln. 8—p. 233, ln. 3; p. 247, ln. 3–5; Edwards Ex. 41.

**416.** Tr. 5/22/00 p. 33, ln. 22—p. 34, ln. 10; p. 73, ln. 22–24.

**417.** Tr. 6/26/00 p. 87, ln. 23—p. 89, ln. 1.

**418.** Tr. 5/22/00 p. 243, ln. 6—p. 244, ln. 12; Tr. 6/26/00 p. 101, ln. 2–6; p. 101, ln. 22–25; p. 108, ln. 23—p. 109, ln. 12; Plaintiff Ex. 1307.

Mr. Brantley himself directed the transfer of 300,000 shares to Mr. Boelte.[419] An additional 300,000 shares were sold to Tico.[420] The final 200,000 shares were sent to Oppenheimer by Mr. Edwards and by Banque Franck (Edwards had sent a 600,-000 share certificate to Banque Franck for purchase of 500,000 shares).[421] BSFI, not WRT, received the proceeds from the stock sales.

In conclusion, the court finds that the evidence does not support the Trust's contention that WRT was obligated to pay BSFI $10 million in cash for the Napoleonville property. The transaction was completed once the stock was transferred to Mr. Edwards on BSFI's behalf. Accordingly, the adjustment suggested by Mr. Spilker is unwarranted.

### 3. Liabilities with respect to the Tricore production guaranty.

■ Mr. Spilker deducted $9,165,000 as of December 16, 1994, $9,000,000 as of January 30 and March 8, 1995, and $8,968,000 as of March 31, 1995, from WRT's balance sheet for an alleged liability under a minimum production guaranty found in the GCJV.

The Defendants argue that this adjustment is improper for several reasons, namely: (1) the GCJV expressly contemplated that any obligations owed by WRT under the minimum production guarantee may be paid in stock;[422] (2) every fact witness which addressed the issue agreed that the guarantee would, if ever called, be paid in stock [423]—an action that would not have created a liability;[424] (3) as of December 31, 1994, no one involved (Tricore, Stag, or WRT) anticipated that the minimum production guarantee would ever be called upon;[425] and, (4) Mr. Spilker's calculation of the alleged amounts owed directly contradict not only the testimony of the witnesses involved, but the express terms of the agreement.

Effective June 30, 1994, WRT, Stag, and Tricore entered into the Amended and Restated JVA.[426] Article Seven thereof sets forth the "Production Guarantee" under which WRT guaranteed that Tricore's "interest in this Joint Venture will produce the minimum quantities of natural gas set forth in Exhibit B ... during the forty eight month period commencing October 1, 1992." [427] The agreement also explicitly provides under ¶ 7.11 that "[a]ny payment required by this Article Seven may be satisfied by the issuance to [Tricore] of registered debt or equity securities of WRT or Stag which have a full market

419. Plaintiff Ex. 2045 at BB 0426.

420. Tr. 5/22/00 p. 245, ln. 25—p. 247, ln. 9; Plaintiff Ex. 1440.

421. Tr. 5/22/00 p. 257, ln. 25—p. 260, ln. 5; Edwards Exs. 121 and 161; Plaintiff Ex. 2045 at BB 0423.

422. See Exhibit L–2301 (Amended and Restated Joint Venture Agreement WRT–Gulf Coast JV Effective June 30, 1994) at 7, ¶ 7.11

423. Tr. 5/25/00, p. 84, ln. 6–14; Tr. 5/26/00, p. 100, ln. 7 to p. 101, ln. 18; Tr. 6/26/00, p. 126, ln. 3 to p. 127, ln. 23.

424. Tr. 6/30/00, p. 11, ln. 18 to p. 12, ln. 12.

425. Tr. 6/26/00, p. 130, ln. 23 to p. 131, ln. 1; Tr. 5/26/00, p. 109, ln. 22 to p. 110, ln. 2 and p. 110, ln. 19 to p. 111, ln. 1; Deposition Excerpt, Roberts, 1/11/00, Vol. 1, p. 182, ln. 9–16; Tr. 5/4/00, p. 207, ln. 6 to p. 208, ln. 8; Tr. 5/25/00, p. 93, ln. 5–15.

426. Exhibit L–2301 (Amended and Restated Joint Venture Agreement WRT—Gulf Coast JV Effective June 30, 1994).

427. Exhibit L–2301 (Amended and Restated Joint Venture Agreement WRT—Gulf Coast JV Effective June 30, 1994) at ¶ 7.01, page 5.

value equal to the required payment."[428]

Mr. Spilker acknowledged that the Amended and Restated JVA permitted WRT to fulfill any obligation it may owe by issuing stock.[429] In fact, as Mr. McGuire testified, WRT specifically negotiated for the option to use stock to satisfy any obligation that may arise under the production guarantee.[430] He further testified that it was a deal breaking point, and that WRT would not have entered into the guarantee without the option.[431] Finally, Mr. McGuire testified that WRT would never have paid with anything other than the stock had there ever been a call on the guarantee.[432]

Mr. McGuire's testimony was corroborated by that of Mr. Petersen, who was also involved in the negotiations, and who confirmed that WRT would have elected to issue stock had the guaranty ever been called.[433] Indeed, in communications addressing generally WRT's SEC filings, Mr. Jeffrey P. Riedler, Branch Chief of the SEC, notes: "The [SEC] staff notes that approximately 330,000 shares of the Company's common stock (as valued at December 31, 1993) would be required to discharge fully the Company's obligations to Tricore."[434] In its response to the SEC, WRT confirmed that—in the unlikely event there was a call on the guarantee— payment would, in fact, be made in stock.[435]

Because WRT could have satisfied the guarantee by issuing stock, Mr. Legier did not record any liability for the minimum production guarantee. He testified that the 1994 10–KSB WRT filed for the year ending December 31, 1994, confirmed that WRT had sufficient authorized stock in order to satisfy the production guarantee. As detailed at page 25 of the 1994 10–KSB, WRT had 50 million authorized shares, and only 8,981,000 issued shares, leaving over 40 million shares to satisfy the minimum production guarantee.[436] WRT's stock at that time was trading for about $8 per share.[437]

■ Further, both experts agree that the issuance of registered stock by WRT would not affect WRT's liabilities.[438] Mr. Spilker acknowledged that the minimum production guarantee was a contingent lia-

---

**428.** Exhibit L–2301 (Amended and Restated Joint Venture Agreement WRT—Gulf Coast Effective June 30, 1994) at ¶ 7.11, page 7. Although the parties entered into an addendum to the Amended and Restated JV Agreement, ¶ 7.11 was neither altered nor modified. See Exhibit L–2300 (1994 Addendum to the Amended and Restated Joint Venture Agreement WRT–Gulf Coast JV (the "Addendum")). See also Tr. 5/25/00 p. 86, ln. 8–18.

**429.** Tr. 6/1/00, p. 253, ln. 13–23.

**430.** Tr. 5/25/00, p. 83, ln. 22 to p. 84, ln. 2.

**431.** Tr. 5/25/00, p. 84, ln. 6–14. See also Tr. 5/25/00, p. 86, ln. 8–18.

**432.** Tr. 5/25/00, p. 87, ln. 14–25.

**433.** Tr. 6/26/00, p 125, ln. 11 to p. 127, ln. 23.

**434.** Exhibit L–4046, Tab XIII (J) (Legier trial binder including October 14, 1994 letter from SEC to WRT) at 5.

**435.** Exhibit L–3067 (November 1, 1994 letter from John Petersen, WRT Energy Corporation, to Jeffrey P. Reidler, Securities and Exchange Commission) at 7.

**436.** Exhibit L–1 (1994 10–KSB of WRT Energy Corporation) at 25. See also Tr. 6/30/00, p. 10, ln. 25 to p. 11, ln. 17.

**437.** Exhibit L–401 (Legier Demonstrative re: WRT Energy Corporation Stock Values by Quarter); Exhibit L–4046, Tab XIV (H) (Legier trial binder including WRT produced document showing WRT stock prices from 1/4/95 to 12/16/94).

**438.** Tr. 6/1/00, p. 257, ln. 10–16; Tr. 6/30/00, p. 11, ln. 18 to p. 12, ln. 12.

bility.[439] Under the Bankruptcy Code, for purposes of determining solvency, contingent liabilities should not be considered at face value, but rather should be discounted by the probability that the contingency will materialize. *See Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.)*, 904 F.2d 588, 594 (11th Cir.1990); *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir.1988); *Covey v. Commercial Nat'l Bank of Peoria*, 960 F.2d 657, 659–60 (7th Cir.1992). Indeed, as one court has noted, "[t]o correctly 'value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability become real.'" *Federal Deposit Ins. Corp. v. Bell*, 106 F.3d 258, 264 (8th Cir.1997).

The evidence confirms that, at the end of 1994, and well into the first quarter of 1995, everyone associated with the transaction—Tricore, Stag, and WRT—anticipated that the minimum production guarantee would never be called upon. Every fact witness involved in either the GCJV or in operations on the key well subject to the minimum production guarantee (Lac Blanc 23) believed not only that the minimum production schedule would be fully satisfied from future production, but that the entire project would succeed.

When Mr. Sterling was asked during his video deposition, what was his view as to whether there would ever be a call under the minimum production, he responded:

Oh, I didn't think so. We were blowing and going at the end of '94 ... every-thing was, you know, looked like sunshine. I was getting ready to retire on my little 5 percent interest in this back end when the thing kicked in. There was never a doubt in my mind these investors are going to get every cent of their money back and we were going to go on and raise money in '95 and on into the future.[440]

Similarly, Earl Roberts, president of Tricore, testified at his deposition that not only did he not expect the dramatic decline in production of the Lac Blanc 23 well in the August 1995 time frame, but that even with the benefit of hindsight, he still does not believe that it was foreseeable that there would be a serious decline in production from the well.[441]

Mr. Beninger testified that as of the end of 1994, Lac Blanc was the most prolific gas well at WRT.[442] He further testified that WRT "had a 90 percent confidence that at least that level of reserves projected would be produced ...."[443] Instead, the Lac Blanc 23 well "watered out unexpectedly" some eight months later in August 1995.[444] When asked whether he was shocked when the Lac Blanc well watered up as it did in August of 1995, Mr. Beringer responded: "Yeah, I would say that I was north of surprised."[445]

And, as Mr. McGuire testified, the engineering evaluations, including the reserve report on Lac Blanc 23, all indicated that the guarantee would be fully satisfied.[446] Lac Blanc continued to produce until the third quarter of 1995, and as Mr. McGuire

---

439. Tr. 5/31/00, p. 202, ln. 22 to p. 203, ln 7.

440. Tr. 5/26/00, p. 109, ln. 22 to p. 110, ln. 2; p. 110, ln. 19 to p. 111, ln. 1.

441. Deposition Excerpt, Earl Roberts, 1/11/00, Vol. 1, p. 182, ln. 9–16.

442. Tr. 5/4/00, p. 207, ln. 16–19.

443. Tr. 5/4/00, p. 207, ln. 16 to p. 208, ln 1.

444. Tr. 5/4/00, p. 207, ln. 5.

445. Tr. 5/4/00, p. 207, ln. 6 to p. 208, ln. 8.

446. Tr. 5/25/00, p. 92, ln. 25 to p. 93, ln. 8; See also Exhibit L–2315 (September 6, 1995 letter from Earl Roberts to Steve McGuire attaching draft reserve reports).

testified, no one had a hint that production would cease until that time.[447]

Mr. Spilker relies on the 1999 reserve evaluation prepared by Michael Heinz. Mr. Spilker's use of hindsight gives a false picture of the company in 1994 and early 1995 and is inappropriate.

 The court concludes that the fair value of a contingent liability is properly determined by multiplying total debt guaranteed by the probability that the debtor would be required to make good on the guarantee. *Covey,* 960 F.2d at 659–60. The court further concludes that this evaluation must be made as of the date of the valuation and without the benefit of hindsight. Based upon the evidence adduced, the probability that WRT would be called under the Tricore guaranty was *de minimus.*

Even if the court were to determine that some liability should be assessed based upon the minimum production guarantee, the court does not believe that Mr. Spilker's analysis is correct. His calculation of the minimum production guarantee liability ignored the terms of the contract which control. First, his calculation begins with the faulty assumption that the minimum production guarantee amount is calculated by taking 150% of the amount contributed by Tricore to the GCJV. Mr. Spilker admitted that this method is nowhere to be found in either the Amended and Restated JVA or the Addendum.[448] Mr. Spilker tes-

tified that the 150% formula could only be found in earlier agreements.[449]

Additionally, under the Amended and Restated JVA and the Addendum, the minimum production guarantee is subject to both a time limitation and a monetary cap. Under ¶ 7.01, the minimum production guarantee is limited to a 48 month period that ends by September 30, 1996.[450] Mr. McGuire confirmed that the guarantee would expire by its terms September 30, 1996, and also confirmed that the expiration was a point of negotiation with Tricore.[451] As both Messrs. Petersen and McGuire testified, if there was no call on the guarantee by September 30, 1996, it was gone.[452] Mr. Roberts also testified that it was his understanding that the minimum production guarantee would terminate in 48 months——effective September 30, 1996.[453] Despite all of this evidence, Mr. Spilker did not place any such limit on the production schedule when calculating the alleged liability.[454]

In addition, the minimum production guarantee was subject to a monetary cap. Paragraph 7.12 of the Amended and Restated JVA provides:

> After TEV, L.P. has received aggregate distributions equal to 100% of TEV, L.P.'s total capitalization of $7,052,500 all liability of WRT and Stag under the terms of this Article Seven shall immedi-

---

447. Tr. 5/25/00, p. 93, ln 9–15.

448. Tr. 6/1/00, p. 240, ln. 15 to p. 242, ln. 18.

449. Tr. 6/1/00, p. 242, ln. 8–18.

450. Under Paragraph 7.01, WRT and Stag guaranteed only that Tricore's "interest in this Joint Venture will produce the minimum quantities of natural gas set forth in Exhibit B ... *during the forty eight month period commencing October 1, 1992."* See Exhibit L–2301 (Amended and Restated Joint Venture Agreement WRT–Gulf Coast JV Effective June 30, 1994) at 5, ¶ 7.01.

451. Tr. 5/25/00, p. 83, ln 5–21.

452. Tr. 5/25/00, p. 85, ln. 24 to p. 86, ln. 7; Tr. 6/26/00, p. 132, ln. 3–16.

453. Deposition Excerpt, Roberts, 1/11/00, Vol. I, p. 154, ln. 25 to p. 155, ln. 5.

454. Tr. 6/1/00, p. 246, ln. 8–13.

ately terminate.[455]

Mr. McGuire confirmed that $7,052,500, which could include tax credits, was a monetary cap.[456] Once $7,052,000 was distributed, the guarantee was over.[457] Messrs. Sterling[458], Roberts[459], and Petersen[460] each testified that to determine WRT's maximum exposure as of December 31, 1994, one should deduct the cumulative actual revenue on that date from the cap amount of $7,052,500. According to the matrix prepared by WRT and accepted by Tricore, as of December 31, 1994, the cumulative actual revenue for December 31, 1994, was $3,865,674.[461] As Mr. Petersen testified, the amount of liability therefore would be approximately only "$3.2, with a good deal of cushion built in." [462]

The reality is that, as of December 31, 1994, the GCJV wells had provided a cushion over the minimum production guarantee of $767,005.[463] Mr. Legier analyzed this cushion and presented a demonstrative line graph showing how the cushion grew over time until March 1995.[464]

Mr. Spilker, however, deducted the tax credits Tricore received under Section 29 of the Internal Revenue Code from his calculation of Tricore's gross revenues. In support of this deduction, Mr. Spilker points to a preliminary finding by the Federal Energy Regulatory Commission ("FERC") that Section 29 credits were not available. Notably, FERC's final order was not issued until April 1995[465]—well after the period for which Mr. Spilker makes his adjustment. But what Mr. Spilker ignored is the fact that the Fifth Circuit Court of Appeal, upon hearing the issue, explicitly stated that the FERC ruling "is not dispositive" and that the IRS is "not bound to follow the FERC's ruling." [466] Further, Mr. Spilker ignored the testimony of Messrs. Sterling and Petersen that confirmed that the Section 29 tax credits taken by the joint venture partners were never challenged or disallowed by the IRS.[467] Since the tax credits were never disallowed, it was simply improper to disregard them and act as if they never happened. To do so, as Mr. Legier testified, would "be tantamount to having the company pay something that they would not otherwise have to pay that was already granted to the recipients." [468]

In sum, WRT negotiated for, and obtained, the right to satisfy its guarantee obligation to Tricore through the issuance

---

**455.** Exhibit L–2301 (Amended and Restated Joint Venture Agreement WRT–Gulf Coast JV Effective June 30, 1994) at 7, ¶ 7.

**456.** Tr. 5/25/00, p. 85, ln. 3–18.

**457.** Tr. 5/25/00, p. 85, ln. 19–23.

**458.** Tr. 5/26/00, p. 106, ln. 2 to p. 109, ln. 21.

**459.** Deposition Excerpt, Earl Roberts, 1/11/00, Vol. 1, p. 175, ln. 20 to 177, ln. 7.

**460.** Tr. 6/26/00, p. 133, ln. 8 to p. 134, ln. 24.

**461.** Exhibit L–2317 (Document produced by Tricore titled WRT/Gulf Coast Joint Venture Production) at 3.

**462.** Tr. 6/26/00, p. 134, ln 20–24.

**463.** L–2317 (document produced by Tricore titled WRT/Gulf Coast Joint Venture Production and showing cushion) at p. 3.

**464.** L–4041 (Legier demonstrative titled "WRT Cumulative Actual Revenue and Minimum Revenue in $'s 3/95").

**465.** *WRT Energy Corporation v. Federal Energy Regulatory Commission,* 107 F.3d 314, 317 (5th Cir.1997).

**466.** *WRT Energy Corporation v. Federal Energy Regulatory Commission,* 107 F.3d 314, 318 (5th Cir.1997).

**467.** Tr. 5/26/00, p. 121, ln. 21 to p. 122, ln. 8; Tr. 6/27/00, p. 74, ln. 18 to p. 75, ln. 2.

**468.** Tr. 6/30/00, p. 15, ln. 23 to p. 16, ln. 23.

of WRT stock. Every witness confirmed that if the guarantee was ever called, WRT would have paid in stock. Further, both experts agree that WRT's payment of an obligation with stock would have no effect on its solvency. Based upon this fact alone, no liability should be attributed to the Tricore minium production guarantee.

### 4. Liabilities with respect to plugging and abandonment obligations for the Lac Blanc property.

Mr. Spilker maintained that WRT's balance sheets on each of the relevant dates should reflect an actual liability in the amount of $1,700,000 for the future plugging and abandonment ("P & A") costs for the Lac Blanc Field. This adjustment is a line item entry on the balance sheet-to reflect WRT's contractual commitment to the State of Louisiana to deposit $20,000 per month into an escrow account in order to properly fund WRT's P & A liability for the Lac Blanc Field. WRT was obligated to deposit these funds until the balance in the escrow reached $1,700,000.

Each witness to address this issue, including the Trust's own experts, Mr. Heinz[469] and Ms. Macdonald,[470] testified that a P & A contingency for onshore domestic properties is a "wash," *i.e.,* that the P & A liability is roughly equal to the salvage value of the equipment on site once the property is fully depleted. Simply stated, WRT's ultimate exposure, if and when the Lac Blanc wells ceased to produce hydrocarbons, was fully covered by the salvage value of the equipment.[471]

Petroleum Engineers, Inc., an independent engineering firm retained by the Louisiana State Office of Conservation, evaluated the salvage value of the equipment at Lac Blanc and the P & A cost associated with those wells.[472] Their estimate of the P & A cost for this field was fixed at $1,708,394. Petroleum Engineers also determined, however, that the P & A cost would be offset by the salvage/recovery values of the tubulars and equipment associated with this property, estimated at $1,438,000, thus leaving a net liability of $270,394 at the end of the life of this field.[473] The Office of Conservation specifically accepted this finding and incorporated it in its agreement with WRT.[474]

Mr. Legier testified that WRT properly accounted for this matter:

[I]n the old days in some of the basic accounting textbooks where you dealt with straight line depreciation, you would take into consideration the salvage value and depreciate down to salvage value, so that at the end, if you sold it, you would have an amount that you would offset against that.

However, in this case, and in oil and gas accounting you write the property down throughout its life to zero, thereby leaving no basis on the books, and any gain that you realize, any proceeds you realize would then create a gain. That gain would be offset against the cost of the

---

469. Tr. 5/16/00 p. 3, ln. 22 to p. 94, ln. 11.

470. Tr. 5/18/00 p. 306, ln. 7 to p. 307, ln. 6.

471. Tr. 6/26/00 p. 397, ln. 14–25.

472. See Exhibit L–1012 (June 11, 1993 letter from Petroleum Engineers, Inc. to WRT Energy Corporation estimating net cost of P & A for LacBlanc was $270,000).

473. See Exhibit L–1012 (June 11, 1993 letter from Petroleum Engineers, Inc. to WRT Energy Corporation estimating net cost of P & A for LacBlanc was $270,000).

474. Exhibit L–1012 (June 11, 1993 letter from Petroleum Engineers, Inc. to WRT and attached Office of Conservation Escrow Agreement) at 4.

property. So to offset on the company's books would be zero.[475]

Importantly, Mr. Transier, the chief financial officer of Ocean Energy, Inc., and formerly KPMG's leading oil and gas accounting partner, agreed that this was the proper accounting for this issue. As Mr. Transier explained:

> Salvage value is the leftover value of oil and gas properties that are there today. I mean it assumes that at the time when the property is fully depleted, there is some value that you can salvage out of the remaining assets that are there. What we in the oil and gas business have generally assumed for onshore domestic properties is, is that the P & A liability is roughly equal to the salvage value of the equipment that would be left behind.[476]

Mr. Transier further testified that WRT properly accounted for the P & A obligation in that the company accounted for the net P & A liability in the depletion rate.[477] This testimony is directly consistent with WRT's statement to the SEC on November 1, 1994, that "[t]he estimated future dismantlement and abandonment costs, net of estimated salvage values have been included in the Company's amortization rate for the Lac Blanc Field." [478] Mr. Legier agreed, stating that the $270,000 "P & A liability is estimated in the depletion rate over the life of the assets under the

accounting rule. [ (FASB 19) ]." [479] Finally, when Mr. Transier was asked whether it was appropriate to record the P & A obligation as a $1,700,000 liability, he responded "Absolutely not." [480]

Mr. Spilker admitted that P & A is, by definition, a contingent liability.[481] He admitted that an owner is not obliged to P & A a well until that well ceases production.[482] He further admitted that the date upon which a well will terminate is unknown,[483] and that WRT may not be the owner and, if not, would no longer be the party ultimately responsible when it comes time to P & A the well.[484] Finally, Mr. Spilker acknowledged that although the estimated future P & A cost at the end of the life of the field was $1,700,000, the difference between the estimated salvage value and the estimated future P & A cost was only $270,000.[485]

Mr. Spilker contended that WRT should record a $1,700,000 P & A liability as of December 31, 1994, because of its contractual obligation with the State of Louisiana. The contract with the State, however, simply requires that WRT establish and contribute $20,000 per month to a site specific escrow fund.[486] WRT complied with this obligation and had deposited into a trust account $490,000 as of year end 1994, $550,000 as of March 31, 1995, and $710,000 as of year end 1995. Finally, the contract clearly provides that funds con-

---

475. Tr. 6/30/00, p. 26, ln. 5–21; See also Tr. 6/30/00, p. 25, l. 8–23.

476. Tr. 6/26/00, p. 397, ln. 14–25.

477. Tr. 6/26/00, p. 398, ln. 1–8.

478. Exhibit L–3067 (November 1, 1994 letter from WRT to the SEC) at 5.

479. Tr. 6/26/00, p. 398, ln. 1–8.

480. Tr. 6/26/00, p. 400, ln. 1–5.

481. Tr. 6/1/00, p. 292, ln. 18 to p. 293, ln. 24.

482. Tr. 6/1/00, p. 289 ln. 15–24.

483. Tr. 6/1/00 p. 289, ln. 15, p. 290, ln. 1.

484. Tr. 6/1/00, p. 291, ln. 5 to p. 292, ln. 17.

485. Tr. 6/1/00, p. 295, ln. 23 to p. 296, ln. 21.

486. See L–1012 (June 11, 1993 letter from Petroleum Engineers Inc. to WRT and attached Escrow Agreement).

**404**

tributed to the escrow account remain the property of WRT.[487]

The court finds that the evidence supports the Defendants' contention that WRT properly recorded its P & A obligations regarding the Lac Blanc field. As such, Mr. Spilker's adjustment is inappropriate.

## VI. REASONABLY EQUIVALENT VALUE

### A. *The Law.*

Section 548 provides in relevant part that—

> any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, [may be avoided] if the debtor voluntarily or involuntarily ... (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation ...

11 U.S.C. § 548.

The statute thus presents a two-step inquiry:

> [T]he issue of reasonably equivalent value presents two questions. First, did the transferee give value? Second, if the transferee did give value was the value given reasonably equivalent to the value of the transferred property?

*In re Universal Clearing House,* 60 B.R. 985, 998 (D.Utah 1986).

The term "value" is specifically defined in the statute:

> In this section—
>
> (A) "value" means property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed

promise to furnish support to the debtor or to a relative of the debtor.

11 U.S.C. § 548(d)(2)(A).

Under section 548, therefore, "property" such as those oil and gas properties conveyed to WRT in this case certainly constitute "value" to a debtor. On the other hand, the phrase "reasonably equivalent value" is not defined in the Bankruptcy Code. *See Besing v. Hawthorne,* 981 F.2d 1488, 1494–95 (5th Cir.1993)("The task of determining the scope of the term has been left to the courts."), *cert. denied,* 510 U.S. 821, 114 S.Ct. 79, 126 L.Ed.2d 47 (1993). The legislative history of section 548 equates "reasonably equivalent value" with the debtor's receipt of consideration of reasonably equivalent *value* in exchange for the transfer. H.R. No. 95–595, 95th Cong., 1st Sess. 375 (1977), U.S.Code Cong. & Admin.News 1978, 5963, 6331; S.R. No. 95–989, 95th Cong., 2d Sess. 89–90 (1978), U.S.Code Cong. & Admin.News 1978, 5787, 5875–76. The Supreme Court has stated that reasonably equivalent value means the debtor received a "fair and proper price" for its transfer. *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 545 & 547, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994).

■ Whether a debtor received "reasonably equivalent value" must be measured at the time the debtor made the challenged transfer. *Fairchild Aircraft Corp.,* 6 F.3d 1119, 1126 n. 8 (5th Cir.1993)(citing *In re Morris Communications NC, Inc.,* 914 F.2d 458, 466 (4th Cir.1990)); *In re Viscount Air Servs., Inc.,* 232 B.R. 416 (Bankr.D.Ariz.1998)(observing that the assets involved in the contested transfer must be measured by their fair market value at the time of the transfer).

---

**487.** See L–1012 (June 11, 1993 letter from Petroleum Engineers, Inc. to WRT and attached Escrow Agreement) at ¶ 8,GPT0249 00597.

■ The Fifth Circuit follows the "totality of the circumstances" approach to determining reasonably equivalent value and has rejected the use of a mechanical mathematical formula. *See Fairchild,* 6 F.3d at 1125–26 & n. 7 ("Although the minimum quantum necessary to constitute reasonably equivalent value is undecided, it is clear that the debtor need not collect a dollar-for-dollar equivalent to receive reasonably equivalent value."). Although the Fifth Circuit and other courts have held that a bright-line mathematical test for reasonably equivalent value is inappropriate (*see, e.g., In re DeVito,* 111 B.R. 529, 532 (Bankr.W.D.Pa.1990)), it remains true that when the value received by the debtor is out-of-line with the amount transferred by the debtor, constructive fraud exists under section 548(a)(1)(B). "[A] court must base its [reasonably equivalent value] determination upon subsidiary fact findings regarding the value of the property transferred and the 'value' received in exchange." *Besing,* 981 F.2d at 1494–95. The detailed fact-finding and valuation entailed in the reasonably equivalent value analysis often "requires the fact finder to assess the contrary opinions of the competing experts." *See, e.g., Weaver v. Kellogg,* 216 B.R. 563, 574 n. 13 (S.D.Tex.1997).

■ The test for "reasonably equivalent value" is whether the net economic effect of the transfer was a dissipation of the debtor's estate. *E.g., In re Sullivan,* 161 B.R. 776, 781–82 (Bankr.N.D.Tex. 1993)("The Court must focus on the net effect of the transfer on ... the amount of funds available to unsecured creditors."); *See also In re Suburban Motor Freight, Inc.,* 124 B.R. 984, 997 (Bankr.S.D.Ohio 1990)(focus is placed on adequacy of consideration received by debtor under measurement test in which all aspects of transaction are examined to calculate the economic value of all the benefits and bur-dens to debtor, direct or indirect; collapsing transactions in question to look at net effect of overall transfer).

■ In evaluating the "net effect" of the transaction, the property exchanged by the debtor and the transferee generally must be valued at its fair market value. *See, e.g., BFP,* 511 U.S. at 545, 114 S.Ct. 1757 (stating that outside the foreclosure context, reasonably equivalent value ordinarily means "similar to fair market value"); *Taylor,* 228 B.R. at 501. "Fair market value" in the context of reasonably equivalent value generally means what the property would bring if actually sold on the market at the time of the transfer, assuming a hypothetical willing seller and a hypothetical willing buyer with a reasonable time frame to sell the property. *See, e.g., In re Ozark,* 850 F.2d 342, 344–45 (8th Cir.1988)(finding that the bankruptcy court clearly erred in basing its reasonably equivalent value analysis on testimony that debtor needed 30% markup to survive, where only 20% markup was objectively warranted); *American Nat'l Bank and Trust Co. of Chicago v. Bone,* 333 F.2d 984, 987 (8th Cir.1964)(" '[F]air market value' implies a willing seller and a willing buyer.' ") (citation omitted); *In re Pioneer Home Builders, Inc.,* 147 B.R. 889, 891–92 (Bankr.W.D.Tex.1992)(stating that fair market value is that value that a prudent business person can obtain from the sale of an asset when there is a willing buyer and a willing seller).

This is basically the same test as used for the "fair valuation" of assets under the balance sheet insolvency test. *See WCC Holding Corp. v. Texas Commerce Bank–Houston,* 171 B.R. 972, 985 (Bankr. N.D.Tex.1994)(UFTA case calculating and comparing, for reasonably equivalent value determination, total considerations exchanged in sale transaction based on fair valuation of assets of debtor, which was

going concern). Courts often use the same valuation figures for the insolvency test and the reasonably equivalent value calculations.

■■■ The willing seller and willing buyer contemplated for fair valuation purposes are hypothetical figures—not the buyer and seller in the transaction at issue. *See, e.g., Trans World Airlines,* 134 F.3d at 194–95 (stating that fair valuation of a going concern is what a "hypothetical sale of assets" would yield for creditors); *see also In re Wabash Valley Power Ass'n, Inc.,* 111 B.R. 752 (S.D.Ind.1990)(reviewing bankruptcy court's evaluation of going concern value of chapter 11 debtor for purposes of reorganization plan and holding that bankruptcy court erred in its fair market valuation by focusing only on how willing buyer might evaluate transaction while failing to consider strengths that willing seller would bring to bargaining table). The court in *Wabash* stated as follows:

> A central focus of this going concern value is the willing buyer-willing seller standard. The goal is to determine, on a case-by-case basis, the approximate price at which the property of the debtor would change hands between an informed seller and buyer. Such an analysis presumes that neither . . . is under compulsion . . . and that both are reasonably informed as to all relevant facts . . . The price the willing buyer would pay, and the willing seller would accept, is that which would result from an informed bargaining process . . . . To determine going-concern value, the bankruptcy court had to take into account all considerations that the parties might fairly bring forward and give substantial weight in their bargaining . . . . Such a valuation can presume neither incorrigible optimism nor confirmed pessimism on the part of the partici-

pants . . . . As one federal court has explained in discussing the willing buyer-willing seller standard, the " 'willing buyer' and 'willing seller' whose judgment the court is charged to simulate are hypothetical persons-constructs of the law."

*Wabash,* 111 B.R. at 768–69.

■■■ In determining fair market value for a going concern, "the reasonable time [for measuring the hypothetical sale] should be an estimate of the time that a typical creditor would find optimal: not so short a period that the value of the goods is substantially impaired via a forced sale, but not so long that a typical creditor would receive less satisfaction of its claim, as a result of the time value of money and typical business needs, by waiting for the possibility of a higher price." *In re Trans World Airlines, Inc.,* 134 F.3d 188, 195 (3d Cir.1998)(affirming bankruptcy court's determination that 12 to 18 months was reasonable time to value assets based on the size and nature of TWA).

■■■ Industry standards in place at the time of the transaction should be used to determine the fair market value of the property at issue because these industry standards determine what a hypothetical sale of such property would yield for creditors. "Some speculation is inherent in the ascertainment of value of all resource property, be it mineral, oil, gas, or otherwise, and if the quality of proof follows the custom of the industry, is the best available, and is sufficient to allow the jury or the court to make an informed estimate as to the fact of value, such proof is sufficient to meet the burden [of proof as to fair market valuation]." *See, e.g., United States v. Silver Queen Mining Co.,* 285 F.2d 506, 507–10 (10th Cir.1960)(eminent domain case evaluating fair market value of the property at the time of the taking "measured by what a willing buyer would

pay to a willing seller when neither is acting under compulsion"); *Amstar Corp. v. M/V Alexandros T.*, 472 F.Supp. 1289, 1296 (D.Md.1979)(fair market value of raw sugar for damages calculation should be determined using commercially accepted practice in sugar industry), *aff'd*, 664 F.2d 904 (4th Cir.1981); *See also United States v. Kail*, 804 F.2d 441, 446–47 (8th Cir.1986)(implying that, when possible, expert testimony should be based on industry-wide standards; but even where industry-wide standard did not exist for grading and valuation of rare coins, expert appraisal would not be excluded where based on same standard methodology used by defendant); *Scott Paper Co. v. Taslog, Inc.*, 638 F.2d 790, 799 (5th Cir.1981)(affirming district court's adoption of valuation method agreed to by the parties and consistent with both applicable legal and principles and industry practice).

■ Solvency valuations, including those undertaken by experts, generally must be based on conditions and standards as they existed at the time of the transaction at issue, not on hindsight. *See generally Harman v. Defatta*, 182 La. 463, 162 So. 44, 48 (1935)(valuations for insolvency purposes must be measured based on circumstances as they existed at the time because then-present market value governs; noting that "the value of property shifts from year to year, and even from day to day"); *Union Bank of Switzerland v. Deutsche Fin. Servs. Corp.*, 2000 WL 178278, *10 (S.D.N.Y. Feb.16, 2000)(as long as valuations are based in reality, a "debtor's assets must be valued at the time of the relevant valuation ... and not what the assets turn out to be worth at some later time after the intervening bankruptcy").

■ Moreover, the fair market value of what the debtor gave and received must be valued objectively and from the perspective of the debtor's creditors, without regard to the subjective needs or perspectives of the debtor or transferee. " 'Value' must be determined by an objective standard." *See, e.g., In re Independent Clearing House*, 77 B.R. 843, 859 (D.Utah 1987); *In re Maddalena*, 176 B.R. 551 (Bankr.C.D.Cal.1995)(rejecting transferee-defendant's subjective argument that it had given the debtor reasonably equivalent value because it could not pay more); *Ozark*, 850 F.2d at 344–45 (finding that debtor's subjective needs or perspective were not determinative for purposes of the reasonably equivalent value analysis).

■ Reasonably equivalent value is determined in property cases, including oil and gas cases, by comparing the fair market value of the items of "value" exchanged by the debtor and the transferee, *i.e.*, property and money. "[I]n the real estate context there is no doubt that the debtor is receiving something of 'value' *i.e.*, cash in exchange for real property, which also has a measurable value." *In re R.M.L., Inc.*, 92 F.3d 139, 150 (3d Cir.1996) (discussing *BFP*, 511 U.S. 531, 114 S.Ct. 1757, and noting that the issue in the real estate context is not "whether any value was exchanged, but rather whether the value obtained [by the debtor] was 'reasonably equivalent' to what was given up").

■ Under the case law, "reasonably equivalent value" is absent from a property transaction, making it avoidable, if the debtor, while insolvent, (a) materially overpaid for property or (b) conveyed property and in exchange received materially less than its fair market value. *See, e.g., In re Emerald Oil Co.*, 807 F.2d 1234, 1239 (5th Cir.1987); *In re McConnell*, 934 F.2d 662, 665 (5th Cir.1991). Thus, the analysis of reasonably equivalent value in such property cases is straightforward (though fact-intensive) —— the court need only compare

the money transferred versus the value of the property transferred.

### B. Did WRT receive reasonably equivalent value in connection with the acquisition of the Napoleonville property?

In exchange for the acquisition of the Napoleonville property, WRT gave BSFI 1,300,000 shares of common stock valued at $9,750,000. The court has found that the value of the Napoleonville property as of December 16, 1994, the date of the acquisition, was $9,750,000. Accordingly, the court finds that WRT received reasonably equivalent value in connection with the acquisition of the Napoleonville property.

### C. Did WRT receive reasonably equivalent value in connection with the acquisition of the LLOG Properties?

Based upon the values ascribed by the court to the LLOG properties on the transaction dates, the court finds that WRT received a reasonably equivalent value in connection with the acquisition of the LLOG properties. The evidence supports the conclusion that the value paid by WRT was equivalent to the value of the property received.

### D. Did WRT receive reasonably equivalent value in connection with the West Cote Blanche Bay (WCBB) property?

Based upon the value ascribed by the court to the interest in West Cote Blanche Bay acquired from Benton, the court finds that WRT received a reasonably equivalent value in connection with the acquisition of West Cote Blanche Bay. The evidence supports the conclusion that the value paid by WRT was equivalent to the value of the property received.

### E. Did WRT receive reasonably equivalent value in connection with the South Hackberry property?

As the court has previously indicated, the record is devoid of any credible evidence regarding the value of WRT's interest in South Hackberry as of the date of that transfer. Accordingly, the court fixed the value of South Hackberry as of June 1995 at $1,170,000, the consideration paid by WRT. The court finds that the Trust has failed to meet its burden of proving that WRT did not receive reasonably equivalent value in connection with the South Hackberry property.

## VII. WAS WRT INSOLVENT AS OF THE DATES OF THE TRANSACTIONS AT ISSUE, OR WAS IT RENDERED INSOLVENT AS A RESULT OF ANY OF THE TRANSACTIONS AT ISSUE?

Based upon the court's earlier analysis of the fair value of WRT's assets and liabilities on the relevant transaction dates, the court concludes that WRT was neither insolvent on the dates of the transactions at issue nor was rendered insolvent as a result of any of those transactions. The following chart followed by explanatory remarks summarizes those assets and liabilities.

Assets

| ASSETS | 12/16/94 [1] | 1/30/95 [2] | 3/8/95 [3] | 3/31/95 [4] |
|---|---|---|---|---|
| Cash | ($ 689,000) | $ 668,000 [5] | $ 35,888,000 [6] | $ 15,349,000 |

| | | | | |
|---|---|---|---|---|
| Accounts Receivable | $ 5,501,000 [7] | $ 7,165,000 [8] | $ 6,585,000 [9] | $ 7,500,000 [10] |
| Current Notes Receivable | $ 60,000 | $ 88,000 [11] | $ 88,000 [12] | $ 93,000 [13] |
| Prepaid expenses & others | $ 2,054,000 | $ 454,000 | $ 631,000 | $ 513,000 |
| Cash held in escrow | $ 430,000 | $ 490,000 | $ 490,000 | $ 550,000 |
| Notes and other receivables | $ 326,000 | $ 285,000 [14] | $ 285,000 [15] | $ 276,000 [16] |
| Other assets | $ 524,000 | $ 602,000 | $ 1,496,000 | $ 4,954,000 |
| Equipment | $ 11,017,000 | $ 9,122,000 [17] | $ 9,420,000 [18] | $ 9,693,000 [19] |
| Oil & gas properties | $ 46,931,000 | $ 65,063,000 | $106,947,000 | $130,000,000 |
| Total Assets | $ 66,154,000 | $ 83,937,000 | $161,830,000 | $168,928,000 |

## Liabilities

| | 12/16/94 | 1/30/95 | 3/8/95 | 3/31/95 |
|---|---|---|---|---|
| Accounts payable | $ 10,445,000 [20] | $ 16,431,000 [21] | $ 16,251,000 [22] | $ 13,555,000 [23] |
| Current portion of notes payable | $ 105,000 | ($ 1,148,000) | ($ 1,002,000) | ($ 705,000) |
| Notes payable | $ 123,000 | $ 16,378,000 [24] | $102,622,000 [25] | $102,323,000 |
| Deferred gain | $ 0 | $ 0 [26] | $ 0 [27] | $ 0 [28] |
| Total Liabilities | $ 10,673,000 | $ 31,661,000 | $117,871,000 | $115,173,000 |

## Fair Value of Assets Minus Liabilities

| | 12/16/94 | 1/30/95 | 3/8/95 | 3/31/95 |
|---|---|---|---|---|
| Fair Value of Assets Minus Liabilities | $ 55,481,000 | $ 52,276,000 | $ 43,959,000 | $ 53,755,000 |

1. Unless otherwise noted, the amounts come from the 11/30/94 financial statements of WRT without adjustment.

2. Unless otherwise noted, the amounts come from the 1/31/95 financial statements of WRT without adjustment.

3. Unless otherwise noted, the amounts come from the 2/28/95 financial statements of WRT without adjustment.

4. Unless otherwise noted, the amounts come from the 3/31/95 financial statements of WRT without adjustment.

5. $7,668,000 noted in WRT financial statements less $7 million used in purchase of Bayou Penchant on that date.

6. $1,074,000 noted in WRT financial statements plus $34,814,000 to account for WRT's receipt of funds from the $100 million notes offering, and use of the proceeds to payback its credit lines, to purchase the LLOG Phase II properties, and for miscellaneous acquisition costs.

7. $6,524,000 noted in WRT financial statements less $450,000 for Bear Stearns fees and $573,000 for Gulf Coast Joint Venture adjustments.

8. $7,598,000 noted in WRT financial statements less $450,000 for Bear Stearns fees and addition of $17,000 for Gulf Coast Joint Venture adjustments.

9. $7,032,000 noted in WRT financial statements less $450,000 for Bear Stearns fees and addition of $3,000 for Gulf Coast Joint Venture adjustments.

10. $8,440,000 noted in WRT financial statements less $950,000 for Bear Stearns fees and addition of $10,000 for Gulf Coast Joint Venture adjustments.

11. $488,000 noted in WRT financial statements less $400,000 for uncollectable AEC notes.

12. $488,000 noted in WRT financial statements less $400,000 for uncollectable AEC notes.

13. $493,000 noted in WRT financial statements less $400,000 for uncollectable AEC notes.

14. $5,585,000 noted in WRT financial statement less $5,300,000 for AEC notes.

15. $5,585,000 noted in WRT financial statement less $5,300,000 for AEC notes.

16. $5,576,000 noted in WRT financial statement less $5,300,000 for AEC notes.

17. $7,399,000 noted in WRT financial statement plus $1,723,000 addition as value of collateral in AEC notes.

18. $7,697,000 noted in WRT financial statement plus $1,723,000 addition as value of collateral in AEC notes.

19. $7,970,000 noted in WRT financial statement plus $1,723,000 addition as value of collateral in AEC notes.

20. $5,757,000 noted in WRT financial statement plus $385,000 for unrecorded Scotia invoices and $4,303,000 to account for untimely recorded invoices.

21. $10,509,000 noted in WRT financial statement plus $385,000 for unrecorded Scotia invoices and $5,537,000 to account for untimely recorded invoices.

22. $9,466,000 noted in WRT financial statement plus $345,000 for unrecorded Scotia invoices and $6,440,000 to account for untimely recorded invoices.

23. $7,525,000 noted in WRT financial statement plus $2,000 for unrecorded Scotia invoices and $6,208,000 to account for untimely recorded invoices.

24. $8,378,000 noted in WRT financial statement plus $8 million from ING credit facility used for purchase of Bayou Penchant.

25. $23,722,000 noted in WRT financial statement plus $78,900,000 to account for WRT's receipt of funds from the $100 million notes offering, and use of the proceeds to payback its credit lines, to purchase the LLOG Phase II properties, and for miscellaneous acquisition costs.

26. $1,766,000 included in WRT financial statement deleted as a result of elimination of AEC notes.

27. $1,766,000 included in WRT financial statement deleted as a result of elimination of AEC notes.

28. $1,766,000 included in WRT financial statement deleted as a result of elimination of AEC notes.

## VIII. DID ANY OF THE TRANSACTIONS AT ISSUE CAUSE OR INCREASE WRT'S INSOLVENCY WITHIN THE MEANING OF LOUISIANA CIVIL CODE ARTICLE 2036 ET SEQ.?

The definition of insolvency under the Louisiana revocatory action is worded similarly to that of the Bankruptcy Code: "An obligor is insolvent when the total of his liabilities exceeds the total of his fairly appraised assets." La. Civil Code art. 2037.

In *Harman v. Defatta*, 182 La. 463, 162 So. 44 (1935), the Louisiana Supreme Court considered how insolvency was to be determined in a revocatory action analysis. Similar to today's version, the then-applicable code article stated:

By being in insolvent circumstances is meant, that the whole property and credits are not equal in amount, at a fair appraisement, to the debts due by the party.

*Harman*, 162 So. at 46 (quoting La. Civil Code art.1985 (1870)). The Court specifically compared the meaning of "insolvency" under the Louisiana revocatory action to its meaning under the Bankruptcy Code:

The [Civil] Code, in speaking of what "insolvency" means, does not mention "market value," but says that if the whole property and credits "at a fair appraisement" are not equal in amount to the debts, the debtor is insolvent. The only way to make a fair appraise-

ment of property is to find its "fair value." The federal statutes relating to bankruptcy and the method of determining solvency use practically the same terms as those used in our Code.

162 So. at 47.

In more modern times, the balance sheet test of insolvency continues to be used. *Central Bank v. Simmons,* 595 So.2d 363 (La.App. 2d Cir.1992); *Reading & Bates Construction Co. v. Baker Energy Resources Corp.,* 698 So.2d 413, 423 (La. App. 3rd Cir.1997), *writ denied,* 706 So.2d 976 (La.1998).

Based upon the court's analysis regarding the fair value of the assets and liabilities of WRT on the relevant transaction dates, the court finds that none of the contested transactions herein either caused or increased WRT's insolvency within the meaning of Louisiana Civil Code Article 2036.

## IX. AS OF THE DATES OF THE TRANSACTIONS AT ISSUE, WAS WRT ENGAGED, OR ABOUT TO BE ENGAGED IN BUSINESS FOR WHICH IT HAD AN UNREASONABLY SMALL CAPITAL?

Under the Bankruptcy Code, a transfer or obligation for less than a reasonably equivalent value is constructively fraudulent if the debtor, *inter alia,* "was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital." Section 548(a)(1)(B)(ii)(II). Whether the amount of capital remaining in the hands of the debtor is unreasonably small for running the business is a factual question to be determined on a case-by-case basis. *See, e.g., In re Suburban Motor Freight, Inc.,* 124 B.R. 984, 994 (Bankr.S.D.Ohio 1990).

In determining unreasonably small capital, courts generally examine cash flow, focusing on whether the debtor was left in a position in which it was unable after the transfer to generate sufficient profits to sustain operations. *See, e.g., Moody v. Security Pac. Business Credit, Inc.,* 971 F.2d 1056 (3d Cir.1992). The test is whether the unreasonably small capital condition and consequent cash flow problems were reasonably foreseeable when viewed objectively at the time of the transaction at issue. As stated by the Third Circuit in *Moody:*

> Because [a debtor's cash flow] projections tend to be optimistic, their reasonableness must be tested by an objective standard anchored in the company's actual performance. Among the relevant data are cash flow, net sales, gross profit margins, and net profits and losses.... However, reliance on historical data alone is not enough. To a degree, parties must also account for difficulties that are likely to arise, including interest rate fluctuations and general economic downturns, and otherwise incorporate some margin for error.

*Moody,* 971 F.2d at 1073 (citations omitted); *See also Crowthers McCall Pattern, Inc. v. Lewis,* 129 B.R. 992, 998 (S.D.N.Y. 1991).

The question in not whether cash flow projections were correct in hindsight but rather whether they were reasonable and prudent when made. *See Moody,* 971 F.2d at 1073; *In re O'Day Corp.,* 126 B.R. 370, 404–07 (Bankr.D.Mass.1991) (unreasonably small capital found where the management's financial projections were both unreasonable and imprudent and where the inevitable actual financial result of the transaction was manifest and readily apparent). Other courts have examined the relationship between the debtor and its lenders and trade creditors before and af-

ter the transfer when considering the sufficiency of capitalization, focusing on whether the debtor was able to deal on normal credit terms with suppliers, and obtain credit from its lenders. *Wells Fargo Bank v. Desert View Bldg. Supplies, Inc.*, 475 F.Supp. 693, 697 (D.Nev.1978), *aff'd*, 633 F.2d 225 (9th Cir.1980), *aff'd*, 633 F.2d 225 (9th Cir.1980).

 In the case at bar, the court is faced with two separate types of projections. On the one hand, the court has projections as to WRT's anticipated performance and capital needs prepared by WRT itself, its secured lenders and underwriters, which projections were the basis for decision-making on the most important transactions in the company's history. On the other hand, the court has the calculations of Mr. Spilker, performed in anticipation of trial.

The court initially notes that Mr. Spilker's analysis was based in large part on his conclusions that WRT had far more liabilities than shown on its books. The court has already addressed these issues in determining the fair value of WRT's liabilities and has rejected the vast majority of the adjustments made by Mr. Spilker. This will, of course, have a negative impact on Mr. Spilker's analysis.

The evidence before the court suggests that the projections performed by the numerous professionals involved with WRT accurately reflected that WRT had sufficient capital to continue in business at the time of the transactions at issue herein.

Before making the WRT debt offering, Wertheim generated more than 20 cash flow projections.[488] These contained varied assumptions as to pricing and production.[489] Moody's and Standard and Poor's, who rated WRT's debt independently, prepared their own projections.[490] All of these projections, including even the disaster and pessimistic cases, indicated that WRT would be able to pay its debts, develop its properties and sustain its operations.[491] Wertheim "concluded they could service the debt and meet their obligations,"[492] and thus proceeded with the bond offering.[493]

WRT analyzed Wertheim's projections and created its own. All projections demonstrated WRT would sustain its operations and pay its debts timely.[494] According to Mr. McGuire, the cash flow projections showed that WRT could survive even the disaster scenario.[495]

INCC extended a substantial loan to WRT in December of 1994. As part of its due diligence, INCC also concluded that WRT could sustain its operations and be profitable.[496]

In sum, all of the professionals whose investment decisions were tied to a realistic view of the company prepared projections of its performance, evaluated the company's resources and endorsed WRT's ability to sustain its operations and become

---

**488.** Tr. 5/25/00, p. 31, ln. 18 to p. 33, ln. 19; Exhibit L–944 (Wertheim Projections).

**489.** Tr. 5/25/00, p. 22, ln. 8–11.

**490.** Tr. 5/23/00, p. 76, ln. 8–25; Tr. 5/23/00, p. 104, ln. 4–12.

**491.** Tr. 5/25/00, p. 33, ln. 12–16.

**492.** Tr. 5/23/00, p. 119, ln. 6–14.

**493.** Tr. 5/23/00, p. 119, ln. 2–5.

**494.** Tr. 5/23/00, p. 289, ln. 22–24; Tr. 5/25/00, p. 43, ln. 1 to p. 44, ln. 11; Deposition Excerpt, James Rash, 3/26/99, Vol. 3, p. 39, ln. 4–8; Deposition Excerpt, Ronnie Hale, 4/22/99, Vol. 1, at p. 262, ln. 25 to p. 263, ln. 4.

**495.** Tr. 5/25/00, p. 41, ln. 14–21.

**496.** Tr. 5/23/00, p. 292, ln. 9–19.

profitable. That endorsement was in the form of loans to and investment in WRT totaling over $130 million.

The testimony of Mr. Legier also supports the conclusion that WRT had sufficient capital. Mr. Legier evaluated both WRT's total capital and the company's working capital during the applicable periods.[497] "Total capital" is defined as total assets minus total liabilities.[498] WRT's total capital grew substantially from the beginning of 1993 to the end of the first quarter of 1995.[499] Mr. Legier next evaluated WRT's debt-to-equity ratio during this same time period.[500] He testified that a debt-to-equity ratio of 2 to 1 was not a dangerous level,[501] that a ratio of 4 to 1 was considered "high leverage", but that it was not uncommon to see a debt-to-equity ratio at that level in connection with a high yield bond offering.[502] Throughout 1993 through the first quarter of 1995, WRT was substantially below the industry average debt-to-equity ratio of between 0.9 to 1 and 1 to 1 even on an adjusted basis, until the March 1995 bond offering.[503] Even at the time of the $100,000,000 bond offering,

WRT's adjusted debt-to-equity ratio was not 4 to 1, but remained less than 2 to 1.[504]

Mr. Legier analyzed not only WRT's total capital but also whether WRT's working capital was adequate to sustain its operations during the period December 31, 1994, to March 31, 1995.[505] "Working capital" is defined as current assets minus liabilities.[506] The ratio of current assets over current liabilities is called the "current ratio."[507] Even with Mr. Legier's adjustments to WRT's financial statements, WRT's current ratio for December 31, 1994, was 1.14 and for March 31, 1995, was 2.0—still well within the industry average.[508]

The Trust argues that the ultimate demise of WRT in the latter part of 1995 supports Mr. Spilker's analysis that WRT was operating with an unreasonably small amount of capital. However, there was evidence suggesting that numerous other events caused or at least contributed to the losses of WRT rather than the transactions at issue in this proceeding. Mr. Beninger testified to a series of unanticipated

497. Tr. 6/30/00, p. 86, ln. 12–20.

498. Tr. 6/29/00, p. 276, ln. 16–22.

499. Tr. 6/30/00, p. 89, ln. 15 to p. 90, ln. 3; Exhibits L–3095 (Legier Demonstrative re: Evidence of Adequacy of WRT's Total Capital During Applicable Period); Exhibit L–3096 (Legier Demonstrative re: WRT Total Shareholder Equity).

500. Tr. 6/30/00, p. 92, ln. 1 to p. 96, ln. 26. See Exhibit L–3097 (Legier Demonstrative re: Evidence of Adequacy of WRT's Total Capital During Applicable Period), Exhibits L–3098 and L–3099 (Legier Demonstratives re: WRT Debt to Equity Ratio–Actual and Adjusted).

501. Tr. 6/30/00, p. 94, ln. 12–21.

502. Tr. 6/30/00, p. 94, ln. 22–25.

503. Tr. 6/30/00, p. 92, ln. 1 to p. 94, ln. 1. See Exhibits L–3098 and L–3099 (Legier Demons-

tratives re: WRT Debt to Equity Ratio—Actual and Adjusted).

504. Tr. 6/30/00, p. 94, ln. 24 to p. 95, ln. 5. See Exhibits L–3098 and L–3099 (Legier Demonstratives re: WRT Debt to Equity Ratio—Actual and Adjusted).

505. Tr. 6/30/00, p. 112, ln. 9 to p. 128, ln. 9. See Exhibits L–4012—L–4022 (Legier Demonstratives re: Working Capital and of Liquidity).

506. Tr. 6/29/00, p. 277, ln. 1–13.

507. Tr. 6/29/00, p. 277, ln. 13–17.

508. See Exhibit 3093 (12/31/94 WRT Financial Statements); Exhibit L–3094 (3/31/95 WRT Financial Statements); Exhibit L–4021 (Legier Demonstrative re: WRT Current Ratio). Tr. 6/30/00, p. 124, ln. 20 to p. 126, ln. 19.

events resulting in total unanticipated financial losses exceeding $28,000,000, including unanticipated expenses ($11,500,000), low oil and gas prices ($2,100,000), loss of money in matters involving Trideck Oil and Gas Company (losses on gas liquids sales, gas sales and oil sales, of $350,000, $471,000 and $209,000, respectively), loss of oil ($7,520,000) and gas production ($3,500,000), losses on AEC contracts ($500,000), loss of money through R & D expenses ($1,200,000), and a loss on funds to be spent on the South Hackberry transaction ($1,000,000).[509] Furthermore, Mr. Beninger testified that these losses did not include the unanticipated inability of the company to proceed with the equity offering ($50,000,000), for a total financial loss and lost equity to the company as a result of unanticipated events in excess of $78,000,000.[510]

A significant decrease in production was the result of the loss of the Exxon 23 well in the Lac Blanc Field. Mr. Beninger testified that this field had been the most prolific gas well at WRT,[511] and that it "watered out unexpectedly." [512]

 It cannot be disputed that WRT spent nearly $30 million on capital development in 1995 alone,[513] nor that the company failed to realize nearly $80 million in the third and fourth quarter which it reasonably expected.[514] Adequacy of capital and belief as to ability to pay debts must be judged by what was reasonably believed at the time of the transactions and not on the basis of hindsight informed by the unforeseeable losses of the third and

fourth quarter. *See Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d at 1070; *Credit Managers Association of Southern California v. Federal Co.*, 629 F.Supp. at 186–87.

Based upon the foregoing, the court concludes that the Trust has failed to meet its burden of proving that WRT was engaged in a business or a transaction, or was about to engage in business or a transaction, for which any property remaining was an unreasonably small capital.

## X. ON THE DATES OF THE TRANSACTIONS AT ISSUE, DID WRT INTEND TO INCUR OR BELIEVE THAT IT WOULD INCUR DEBTS WHICH WERE BEYOND ITS ABILITY TO PAY AS SUCH DEBTS MATURED?

 Section 548(a)(1)(B)(ii)(III) provides that a transfer for inadequate consideration may be avoided as fraudulent if the debtor "intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured." This provision is satisfied where "the debtor [in] making a transfer . . . knows that he will be unable to pay future debts as they mature." *In re Hall,* 131 B.R. 213, 217 (Bankr.N.D.Fla.1991). This part of the statute protects future creditors from a debtor who transfers assets with the intent to hide them or impair the debtor's ability to pay debts as they arise or with the

---

509. Tr. 5/4/00, pp. 258–334 and 5/15/00, p. 106–110; Exhibit L–3041 (WRT Financial Losses—1995).

510. Tr. 5/4/00, pp. 334–34; Tr. 5/15/00, pp. 106–110; Exhibit L–3041 (WRT Financial Losses—1995).

511. Tr. 5/4/00, p. 207, ln. 16–19.

512. Tr. 5/4/00, p. 207, ln. 6–15.

513. Tr., 5/14/00, p. 281; See also Exhibit L–10 (WRT 1995 10–K) at 25.

514. Tr. 5/4/00, pp. 284–338; See also Exhibit L–3041 (Chart of WRT Financial Losses—1995).

belief that inability to pay debts would likely result. *Hall,* 131 B.R. at 218.

 The "inability to pay debts" prong of section 548 is met if it can be shown that the debtor made the transfer or incurred an obligation contemporaneous with an intent or belief that subsequent creditors likely would not be paid as their claims matured. 2 *Collier on Bankruptcy* ¶ 548.05[4] (3d ed. rev.2000). While the statute suggests a standard based on subjective intent, the courts have held that the intent requirement can be inferred where the facts and circumstances surrounding the transaction show that the debtor could not have reasonably believed that it would be able to pay its debts as they matured. *See In re Suburban Motor Freight, Inc.,* 124 B.R. 984, 1001 (Bankr.S.D.Ohio 1990), and *In re Taubman,* 160 B.R. 964, 986–87 (Bankr.S.D.Ohio 1993).

 The court finds that the facts deduced at trial establish that WRT and its consultants honestly believed at the time of each of the transactions involved herein, and particularly after the bond offering, that WRT could pay its debts and that the company would succeed as a business venture. The testimony of Messrs. McGuire,[515] Beninger,[516] Heather,[517] Landry,[518] and Israel[519] on this point was not controverted. While WRT may have been ultimately wrong in this belief, it did believe at the time that it would succeed.

While this belief was eventually demolished in the third and fourth quarters of 1995, the Trust has failed in its burden of proving a subjective intent on the part of WRT as of the dates at issue herein, to incur debts beyond its ability to repay as required under section 548(a)(1)(B)(ii)(III). Nor did the Trust produce sufficient facts and circumstances surrounding the transactions to enable the court to infer that the debtor's belief it would be able to pay its debts as they matured was unreasonable. Accordingly, the Trust has failed to carry the requisite burden of proof to succeed under section 548(a)(1)(B)(ii)(III).

## XI. WERE THE CHALLENGED TRANSACTIONS IN THE ORDINARY COURSE OF WRT'S BUSINESS?

As authorized by section 544(b), the Trust seeks to utilize non-bankruptcy law, the Louisiana revocatory action,[520] to avoid the disputed transactions. Under this statute, creditors of a transferor may avoid the transfer if, as a result thereof, the transferor became insolvent or his insolvency was thereby increased. La. Civ. Code art.2036. A safe harbor exists to some extent in article 2040, which provides a defense to the revocatory action: "[a]n obligee may not annul a contract made by the obligor in the regular course of his business." La. Civ.Code art. 2040.

The court previously granted the Defendants' motion for summary judgment on this issue, finding that the acquisitions were part of the Debtor's "regular course of business." In reversing[521] this decision, however, the District Court observed that, based upon the jurisprudence surrounding article 2040, analysis of WRT's regular course of business requires a "determina-

**515.** Tr. 5/25/00, p. 41, ln. 10 to p. 43, ln. 25; Tr. 5/25/00, p. 46, ln. 12–16.

**516.** Tr. 5/4/00, p. 189, ln. 19 to p. 193, ln. 13.

**517.** Tr. 5/3/00, p. 20, ln. 23 to p. 21, ln. 10.

**518.** Tr. 6/2/00, p. 175, ln. 7 to p. 159, ln. 18.

**519.** Tr. 5/23/00, p. 81, ln. 12 to p. 82, ln. 3.

**520.** Louisiana Civil Code Article 2036, et seq.

**521.** Memorandum Ruling dated February 25, 2000.

tion of WRT's prior business dealings with regard to the acquisition of operating working interests, amounts previously paid by WRT, and the impact of such transactions on WRT's bottom line." This list does not purport to be exhaustive.

The court has ruled that the Trust failed to establish that the transactions at issue herein caused or increased WRT's insolvency. This finding by itself will defeat the Trust's claims under the revocatory action. The court will, however, address the "regular course of business" defense in order to provide a complete ruling of all issues presented.

Article 2040 does not define "regular" or "regular course of business," and the legislative history provides no guidance. The words of a law, however, must be given their generally prevailing meaning. La. Civ.Code art. 11.

This court previously determined that WRT's business did comprise the acquisition and development of oil and gas properties. Further, the court has now determined that the transactions at issue did not have a negative impact on WRT's bottom line. The District Court determined that this court erred in not considering the size of the transaction and the prior dealings of the parties. While the LLOG and Benton transactions were significantly larger than any of WRT's prior transactions, WRT was clearly seeking to expand its presence in the market, as clearly evidenced by the $100,000,000 bond offering and the proposed $50,000,000 equity offering. This activity, while broader in scope that WRT's prior acquisitions, was identical to prior acquisitions—only larger in amount.

■ The District Court also suggested that prior dealings between the parties might be an indicia of ordinary course of business. While it is true that, WRT had not made any other purchases from either LLOG or Benton prior to these transactions, the nature of the oil & gas acquisition game does not revolve around repeat business. WRT did not have a "regular" supplier of oil & gas properties. Through its extensive data base in South Louisiana properties, WRT was ever vigilant in seeking out good prospects which were available on the market. In this case the owners of the properties were LLOG and Benton. The court concludes that the fact of no prior dealings with these entities was of no moment in determining "ordinary course of business." This conclusion is supported by the following query? If the LLOG and Benton transactions were not "ordinary course of business" because of no prior dealings, would the answer be different if the vendors were Texaco and Tenneco (assuming these were prior vendors)? Under the circumstances of the case, there is no logical basis for saying one is ordinary course of business while the other is not.

■ As article 2040 is an affirmative defense to the revocatory action, the burden of proof as to whether the transactions were in the ordinary course of business rests on the Defendants. The court concludes that the evidence establishes that the contested transactions were in the regular course of WRT's business. Under the peculiar circumstances of this case, to blindly apply the guidelines set forth by the District Court will result in no company in an expansion mode being deemed in the ordinary course of its business. Accordingly, the court finds that the Defendants have met their burden of proof as to this affirmative defense.

## XII. THE DIVIDEND ACTION

The Trust is also seeking to avoid the transfers of preferred stock dividends. This action is one under Texas law. The

only issue regarding these transfers presently before the court is WRT's financial situation at the time of these transfers, namely, from December 1993 to October 1995. Unfortunately, very little testimony was presented with respect to these transfers. In fact, Mr. Spilker's analysis on this issue relied upon his analysis performed with regard to the real property transfers. He concluded that WRT had unreasonably small capital and was unable to pay its debts as they matured from as early as June 1994.

The court has already addressed Mr. Spilker's analysis as of the dates of the real property transfers. As to later dates, the court concludes that insufficient evidence was presented to determine WRT's financial situation at the relevant time and whether the transfers of preferred stock dividends were avoidable under Texas law.

## XIII. CONCLUSION

These reasons for decision were not lightly considered. The 33 actual days of court translates into almost 10,000 pages of transcript, over 4,000 exhibits, some 94 volumes of deposition designations, and almost 800 pages of final briefs. After all was said and done, however, the court's decision came to rest on the requirement of the Trust, as plaintiff, to prove its case by a preponderance of the evidence. This it has failed to do.

The issue of solvency, in its basic form, is a comparison of the values assigned to assets and liabilities. In this instance, the parties sought to present to the court expert testimony from witnesses in the appropriate areas at issue. With respect to the petroleum/reservoir engineers, the court was impressed by all of the experts. They each performed their duties admirably, both in preparation and presentation. In the final analysis, however, all of this testimony results in the conclusion that

this area is one of "art, not science," and, as all of the professionals agreed, there is substantial grounds for a difference of opinion among professionals as to what lies beneath the surface of the earth, oftentimes 2 and 3 miles deep. While Mr. Heinz attempted to punch holes in the testimony of the Defendants' experts, his testimony did not convince the court that the Defendants' estimates of reserves were incorrect.

While the scientific experts agreed with each other on certain matters, the expert accountants, Messrs. Spilker and Legier, seemed to disagree on all. The court was certainly impressed with the knowledge of Mr. Spilker as well as his significant work in investigating facts and preparing for trial. However, the court eventually came to the conclusion that in virtually each and every situation where a question arose as to how a matter would be resolved by Mr. Spilker, he made the call in favor of the Trust and against the Defendants. Granted, as the Trust's expert in forensic accounting, one would expect his testimony to be favorable to the Trust. However, where he consistently ignored or downplayed existing facts to reach a contradictory conclusion, the court was left with the distinct feeling that his testimony was calculated to reach a desired result rather than to present a fair and balanced picture of assets and liabilities at a given point in time.

Lastly, the court has previously mentioned the disaster surrounding the Trust's other expert, Ms. Macdonald. Even though her testimony was disregarded as totally without credibility, the court concluded that the valuation methodology she employed was inappropriate as she ignored basic facts which must be considered under applicable standards of valuation.

Within 20 days of the entry of these reasons, counsel for LLOG shall prepare a

proposed judgment in conformity herewith and shall submit such order to counsel for the Trust for its review and approval as to form. Within 10 days of such submission, counsel for the Trust shall either (a) approve the judgment as to form and transmit the same to the Clerk of the Bankruptcy Court for execution, or (b) submit to the Clerk of the Bankruptcy Court the Defendants' proposed judgment and a letter setting forth the reasons why counsel does not approve the form of the judgment.